11.    Plaintiff the City of New York, is a municipal corporation organized pursuant to the laws of the State of New York. During the relevant time period, New York State's Medicaid plan required that local social services districts, such as the City, pay one half of the costs for drugs covered by Medicaid, after first deducting the federal share. N.Y. Soc. Serv. L. § 368-a. The federal share is generally 50 percent of the cost, leaving the remaining 50 percent to be split equally between the State and the City.

12.    Merck, a New Jersey corporation, is a pharmaceutical manufacturing and sales company with headquarters at 1 Merck Drive, Whitehouse Station, New Jersey. Merck regularly conducts business within the State of New York and derives substantial revenues from goods consumed in New York.

13.    Venue is proper in this court under N.Y. CPLR § 503.

## FACTUAL ALLEGATIONS

**A.    The Medicaid and EPIC Programs**

14.    The Medical Assistance Program in New York State, commonly referred to as Medicaid, is jointly funded by the Federal, State, and local governments, and was created to provide medical assistance and other benefits for low-income individuals and families. Medicaid reimburses medical care, services, and supplies which are medically necessary and appropriate, consistent with quality of care and generally accepted professional standards. Prescription drugs are included among the supplies and services reimbursed by Medicaid. In New York State, the Medicaid Program is administered by the New York State Department of Health.

15.    EPIC is a voluntary New York State-funded and state-administered program that provides prescription drug coverage to lower income consumers who are 65 years of age or older and are not eligible for full Medicaid coverage. Individuals who choose to participate in the

-4-

M00B942838

program must pay a copayment for each drug purchased based on the price charged for the drug, with the remaining costs being reimbursed by the program.

**B.      Merck's Aggressive Promotion of Vioxx Despite Its Cardiovascular Risks**

16.      In May 1996, Merck announced that it was developing a selective COX-2 inhibitor, publicizing it as a miracle drug for arthritis sufferers. At the time, Merck faced patent expirations on three of its ten most successful drugs – Mevacor, Pepcid, and Prilosec – which represented approximately $4 billion a year in U.S. drug sales. At the same time, Merck faced significant competitive threats from pharmaceutical manufacturers Monsanto and Pfizer, which were, in combination, developing a competitive selective COX-2 inhibitor, Celebrex, scheduled to hit the market months ahead of Merck's COX-2 inhibitor, Vioxx.

17.      In 1996, Merck announced the initiation of clinical trials for Vioxx. Ultimately, Merck proposed a large-scale, long-term, double-blind study of gastrointestinal toxicity in patients taking Vioxx. This study, called the Vioxx Gastrointestinal Outcome Research ("VIGOR"), was designed specifically to demonstrate the gastrointestinal superiority of Vioxx as compared to another NSAID, naproxen.

18.      In the planning stages of VIGOR, Merck suspected that Vioxx might cause cardiovascular problems. On November 21, 1996, an internal Merck memorandum suggested that, because participants in trials would not be permitted to use aspirin during the study to moot the cardiovascular risks of Vioxx "there is a substantial chance that significantly higher rates" of cardiovascular problems would be seen in Vioxx patients.

19.      On February 25, 1997, Merck scientist Briggs Morrison sent an internal e-mail about the design of the VIGOR study. In that e-mail, Morrison suggested that trial participants be allowed to take aspirin to avoid flagging the cardiovascular risks of Vioxx. Unless patients in the

M000942839

Vioxx group could take aspirin, he warned, "without COX-1 inhibition [i.e., aspirin] you will get more thrombotic events and kill drug [sic]."

20.   Merck researcher Alise Reicin, now a Merck Vice President for clinical research, responded in an internal Merck e-mail that Merck was in:

> . . . a no win situation!  The relative risk of [adverse GI events with] even low dose aspirin may be high as 2-4 fold.  Yet, the possibility of increased CV events is of great concern (I just can't wait to be the one to present those results to senior management!).  What about the idea of excluding high risk CV patients – i.e. those that have already had an MI, CABG, PTCA?  This may decrease the CV event rate so that a difference between the two groups would not be evident.  The only problem would be – Would we be able to recruit any patients?

21.   Despite the concerns about cardiovascular risks, from 1996 through 1998, Merck issued public statements that touted the efficacy and gastrointestinal safety of Vioxx.  Merck's pre-release marketing campaign conveyed the uniform message that Vioxx provided safe and effective pain relief while omitting any mention of cardiovascular risks.

22.   Merck galvanized its army of sales representatives.  In the Merck's 1998 Annual Report, CEO Raymond Gilmartin wrote that "[i]n 1998, to prepare for the introduction of Vioxx, as well as to meet other marketing challenges, we began adding 700 new and talented professional representatives to our already strong U.S. sales force."  In fact, during the time period at issue in this complaint, Merck assigned over 3,000 sales representatives across the country to engage in face-to-face discussions with physicians about Vioxx.

23.   Merck also had a huge budget for targeting consumers.  In 2000, Merck spent nearly $161 million on direct-to-consumer advertising for Vioxx — more than PepsiCo spent to advertise Pepsi Cola.  Over the next few years, until it withdrew Vioxx from the market, Merck spent an unprecedented $100 million a year to continue to market Vioxx directly to consumers.

M00B942840

24.     Merck marketed the drug by attempting to increase public demand by convincing

consumers and medical professionals of Vioxx's purported superior safety profile – and

effectiveness.  Merck's message was clear:  Vioxx provided gastrointestinal benefits while being

as safe and effective as traditional NSAIDs.

**C.     A Merck Study Shows the Increased Cardiovascular Risk of Vioxx**

25.     In 2000, Merck completed the VIGOR study.  This study had a large scale (over

8,000 patients), and a relatively long duration (median duration nine months).  The focus of the

study was whether patients with rheumatoid arthritis would experience fewer serious

gastrointestinal problems with Vioxx as compared to naproxen, a generic pain reliever included in

the over-the-counter product Aleve.

26.     The final data from VIGOR showed that Vioxx posed a substantial increase in

cardiovascular risk over naproxen.  Although VIGOR excluded patients with a predisposition to

developing serious cardiovascular problems, forty-five patients in the study, after taking Vioxx,

suffered confirmed serious cardiovascular thrombotic adverse events, including cardiac events

(sudden death, heart attack and unstable angina), cerebrovascular events (ischemic stroke and

transient ischemic accident) and peripheral arterial and venous events, as compared to only

nineteen patients in the study who took naproxen.

27.     Neither VIGOR nor earlier studies conducted by Merck (the "osteoarthritis

studies") were designed to assess the cardiovascular effect of Vioxx and other NSAIDs.  Because

VIGOR was a particularly robust study in number of patients and duration, well-grounded

conclusions concerning the cardiovascular effects of Vioxx could be drawn from the study.

VIGOR enrolled more patients than in all of the prior osteoarthritis studies combined.  VIGOR's

median duration (9 months) was considerably longer than the length of the osteoarthritis studies

(more than three-fourths of the patients in these studies were enrolled for either six weeks or six

M00B942841

months). VIGOR also included a blinded, expert adjudication to confirm the nature and

seriousness of all cardiovascular-related adverse events, while the earlier osteoarthritis studies did

not.

28.    The results of the VIGOR study showed that the relative risk of serious

cardiovascular thrombotic events from Vioxx as compared to naproxen was highly statistically

significant at the .002 level. Statistical significance in medical research defines a probability

value of 0.05 or less as significant, that is, the likelihood that the results could have occurred by

chance is 5% or less. The .002 level means that the relative incidence of heart attacks as between

Vioxx and naproxen would only be expected to occur by chance two times in a thousand

instances. When all the heart attacks are compared between the Vioxx and naproxen groups, the

patients taking Vioxx had five times the risk of having a heart attack compared to patients taking

naproxen.

29.    An FDA Medical Review dated February 1, 2001, was presented to an FDA

Advisory Committee which met on February 8, 2001, to consider the benefits and risks of Vioxx

("February 2001 Advisory Committee"). Advisory Committees made up of non-agency experts

review technical materials presented by the FDA, pharmaceutical manufacturers and others

concerning a particular issue in connection with a specific drug or class of drugs and make

recommendations on these issues to the FDA. The Medical Review concluded that Merck's own

analysis of cardiovascular adverse events from VIGOR "could lead one to conclude that

naproxen, with a 51% risk reduction compared to rofecoxib [Vioxx] could be the <u>preferred</u> drug."

(Emphasis in original.)

30.    The February 2001 Advisory Committee found that physicians needed clear

information, including the data from VIGOR, about Vioxx's serious cardiovascular risks in order

to make appropriate treatment judgments for their patients. The FDA concurred in this judgment.

M00B942842

31.    In March 2001, Merck filed a patent application for a combination of Vioxx with a thromboxane synthase inhibitor, which helps protect against cardiovascular problems caused by blood clots.

32.    Had they been provided with an accurate analysis of the level of statistical significance or relative risk associated with Vioxx, physicians would not have prescribed Vioxx to patients with established coronary artery disease.

**D.    Merck Minimized Vioxx's Cardiovascular Risk Through a Campaign of Suppression and Misrepresentation**

33.    Beginning no later than April 2000, and continuing almost until Vioxx was pulled from the market in 2004, Merck engaged in a campaign to suppress, misrepresent, and conceal adverse cardiovascular data concerning Vioxx, including adverse data from VIGOR, in its communications to doctors and consumers, including New York doctors and consumers. Merck maintained this consistent pattern of fraudulent and deceptive conduct, which minimized the cardiovascular risk posed by Vioxx, in order to keep doctors prescribing this medication and to induce consumers to ask their doctors for it. Described below are examples of Merck's conduct that comprised its on-going pattern of deceptive, fraudulent and illegal conduct.

> Merck Required its Sales Representatives to Misrepresent VIGOR's Negative Cardiovascular Data and Minimize Vioxx's Risk When Responding to Doctors' Questions

34.    Merck undertook a campaign to counter each new revelation or analysis of the VIGOR cardiovascular data by providing doctors with distortions of those data. Until shortly before Vioxx was removed from the market in 2004, Merck directed all of its sales representatives with responsibility for selling Vioxx ("sales reps") to provide misinformation to doctors who asked questions about the negative cardiovascular safety information from VIGOR.

M00B942843

35.    Merck called these directives to its sales reps "Obstacle Responses." These directives included scripts the sales reps were required to follow to overcome the "obstacles" to Vioxx sales created by descriptions of VIGOR's negative cardiovascular findings in medical journals and the press. The Obstacle Responses directed the sales reps not to deviate from Merck's script or to go beyond the limited information set out in the Obstacle Response when responding to doctors' concerns.

36.    Using these Obstacle Responses, Merck successfully barraged doctors with its message that Vioxx was safe for patients without regard to whether they had a history of adverse cardiovascular events, thereby increasing the likelihood that doctors would hear the same misleadingly selective information during multiple sales calls.

37.    Each of Merck's Obstacle Responses and similar communications, which were national in application, were transmitted to Merck's New York sales reps. Merck's New York sales reps, in turn, communicated the information Merck designated, and only that information, to New York doctors who treated New York patients.

38.    In an April 28, 2000 Obstacle Response, Merck directed its sales reps to use a newly developed "Cardiovascular Card" to "respond to questions [from physicians] about the cardiovascular effects of VIOXX." However, this Cardiovascular Card was misleading to physicians because it contained no information from VIGOR. It dealt only with the much smaller scale, shorter duration, less rigorous osteoarthritis studies. The Cardiovascular Card, therefore, was intended to divert doctors' attention, and did divert their attention, from VIGOR's negative results to the less valid, but far more favorable, cardiovascular safety data from the osteoarthritis studies.

39.    Merck also provided its sales reps with a "Roadmap to the CV Card." In the "Roadmap," Merck instructed its sales reps "[t]o ensure that the physician agrees that the

M00B942844

cardiovascular events seen with VIOXX in OA [osteoarthritis] clinical trials were low and similar to diclofenac and nabumetone [two other NSAIDs]." This sales presentation did not use valid comparisons or address VIGOR's finding of Vioxx's increased cardiovascular risks.

40.    In another Obstacle Response dated May 1, 2000, Merck directed sales reps to respond to doctors' questions about Vioxx's cardiovascular risks, by giving only the percentage of patients in the Vioxx and naproxen groups in VIGOR who had had a heart attack (.5 percent and .1 percent, respectively), and omitting material facts: the number of patients enrolled in the study (over 8,000); the number of patients who had had a heart attack; and a measure of either the high statistical significance of these findings or the relative risk (a five-fold increase for Vioxx if all the patients who had a heart attack were counted). The sales reps were also told to guide the doctor through less valid and more favorable data from the osteoarthritis studies described on the Cardiovascular Card.

41.    On May 22, 2001, citing the cardiovascular data from VIGOR, The New York Times published an article that led with the sentence, "Doctors are beginning to worry that Vioxx and Celebrex, two wildly popular arthritis drugs, may not be as safe as they were initially believed to be." On May 24, 2001, Merck sent its sales reps an Obstacle Response addressing this article. Again, Merck directed its sales reps to limit their answers to doctors' questions about VIGOR to the percentage of Vioxx and naproxen patients in VIGOR who had had a heart attack.

42.    The sales reps were instructed to use their Cardiovascular Cards to show the data from the osteoarthritis studies. They were directed to tell doctors that the incidence of heart attack in these smaller, generally shorter studies was less than 0.01 percent with Vioxx and that cardiovascular mortality in 6,000 patients (without identifying the studies, which appear to have been the osteoarthritis trials) was Vioxx 0.1, NSAIDs 0.8 and placebo 0. A doctor hearing this generalized and conclusory information, as opposed to the actual findings of VIGOR, would be

-11-

M00B942845

unable to determine the relative cardiovascular risk posed by Vioxx compared to naproxen. Nor could this minimized extract of VIGOR's cardiovascular outcomes give a doctor sufficient information to evaluate the relative strength of the findings of the VIGOR and osteoarthritis studies based on their size and design.

43.    On August 21, 2001, Merck communicated to all sales reps responsible for selling Vioxx in response to an article in the Journal of the American Medical Association ("JAMA"), a well regarded, widely read, peer-reviewed journal, which analyzed the cardiovascular data from VIGOR. The JAMA article reported that the incidence rate of serious cardiovascular thrombotic events in the Vioxx group, compared to the naproxen group, was highly statistically significant. The article compared the incidence of heart attacks among the VIGOR Vioxx group to the rate of heart attacks suffered by patients receiving a placebo in a very large meta-analysis and found it was statistically significant. The authors urged doctors to exercise caution in prescribing Vioxx for patients at risk of cardiovascular disease.

44.    In its August 21, 2001 communication, Merck directed its sales reps when responding to questions doctors might raise concerning the JAMA article to use the May 1, 2000 Obstacle Response, which limited its information about the VIGOR study to the percent of patients in the Vioxx and naproxen groups who had had a heart attack.

45.    Merck's message to doctors was unequivocal:  Merck had the data it needed to evaluate Vioxx's cardiovascular risk, and its data "suggest[ed] that there is no increase in the risk of cardiovascular events as a result of treatment with Vioxx." This statement was based on data from a purported internal Merck meta-analysis involving 28,000 patients, though the supporting data were not publicly available. The only data from VIGOR included in Merck's response to the JAMA article was the same information previously given concerning the percentage of VIGOR subjects who suffered heart attacks.

-12-

M00B942846

46.     Merck also informed its sales reps, and by extension prescribing doctors, that the difference in the rate of heart attacks between Vioxx and naproxen patients "is consistent with the ability of naproxen to inhibit platelet aggregation," i.e., that naproxen acts in a manner similar to aspirin to prevent the blood from clotting and causing thromboses. There were, however, no adequate studies to support this hypothesis, and the magnitude of the effect Merck claimed for naproxen's supposed anti-platelet properties exceeded that seen in the literature for any other anti-platelet agents.

47.     Merck also issued a "General Bulletin" sometime after September 17, 2001, which instructed its sales reps to respond to doctors' questions concerning the cardiovascular outcomes from VIGOR, and specifically, the higher rate of heart attacks for Vioxx than naproxen, by refusing to discuss VIGOR because it was not reflected on the label. Instead sales reps were to show doctors the results from the osteoarthritis studies, the same studies that were on the Cardiovascular Card.

48.     On September 17, 2003, Merck issued another Obstacle Response directing how its sales reps were to respond to doctors' questions about an abstract presented at the 2003 annual meeting of the American College of Rheumatology. The abstract concerned a study funded jointly by Merck and Harvard University which showed that (a) the use of Vioxx increased the adjusted relative risk of cardiovascular events over the use of Celebrex, a competing NSAID, or no NSAID, (b) the most common dosage of Vioxx was associated with the highest risk, and (c) the risk may be highest in the first ninety days of Vioxx treatment, which could adversely affect new prescriptions and new sales. The Obstacle Response directed the sales reps to respond to questions about the cardiovascular findings in the 2003 abstract by stating: "First, Doctor, let me say that based on all of the data that are available, Merck stands behind the overall efficacy and safety profile of Vioxx." This statement was misleading because it suggested that Merck had a

-13-

M00B942847

valid basis for believing in the cardiovascular safety of Vioxx and that the doctor need not worry about the potential for increased serious cardiovascular thrombotic adverse events in prescribing Vioxx for patients, including patients with established coronary artery disease.

49.    The Obstacle Response warned sales reps not to deviate from Merck's script and directed the sales reps to say, "Doctor, let me review the cardiovascular effects section of the VIOXX label," but omitted material elements of the label. It mentioned the total number of patients in the study (Vioxx and naproxen groups combined, preventing the doctor from making even a gross assessment of relative risk), the median age of the patient population and duration of the study, the raw number of cardiovascular thrombotic events for the two treatment groups, and the number of deaths in each group due to cardiovascular thrombotic events along with the assertion that these mortality data were "similar between the treatment groups." The Obstacle Response omitted material information from the Vioxx label, such as:

- VIGOR excluded patients with a predisposition to developing serious cardiovascular problems;

- VIGOR showed a statistically significant greater incidence of serious cardiovascular events in Vioxx patients as opposed to naproxen patients largely due to a difference in the incidence of heart attacks between the groups; and

- the information about VIGOR, as well as two other studies, "should be taken into consideration and caution should be exercised when VIOXX is used in patients with a medical history of ischemic heart disease."

Moreover, the Obstacle Response pointedly omitted any mention of heart attacks. A physician needed to consider all of these omitted data, as well as the FDA's conclusions and cautions, to exercise sound professional judgment about whether to prescribe Vioxx to a patient with established coronary artery disease.

50.    Barely one month before Merck pulled Vioxx from the market, it issued its final Obstacle Response on August 26, 2004, in response to a presentation of information from a

M00B942848

massive observational study of Vioxx's cardiovascular safety at the August 2004 International

Society for Pharmacoepidemiology Conference. This study estimated that Vioxx had contributed

to 27,785 acute heart attacks and sudden cardiac deaths among Americans who had taken the

drug between 1999 and 2003. The August 26, 2004 Obstacle Response varied little from the one

Merck issued in September 2003, other than the addition of the statement that, "Based on all of

the available data, VIOXX remains an excellent choice for your appropriate patients." But Merck

did not identify which patients were inappropriate for VIOXX or indicate that additional

information was available on which the physician could base that decision.

51.    The 2004 Obstacle Response instructed the sales reps to tell doctors that the Vioxx

label says the number of "cardiovascular thrombotic events" (forty-five for Vioxx and nineteen

for naproxen) was "largely due to <u>nonfatal</u> myocardial infarction (18 vs. 4)." (Emphasis added.)

This statement misrepresents the information contained on the cited Vioxx label in at least two

respects. First, the label states that these patients suffered "<u>serious</u> cardiovascular thrombotic

events" (emphasis added), not just any cardiovascular thrombotic event. Second, the label states

that the rate of serious cardiovascular thrombotic events was largely due to "myocardial

infarction," not "non-fatal myocardial infarction" as the Obstacle Response asserts. Merck's

statement also omits the heart attacks that killed two patients taking Vioxx and falsely implies

that patients in VIGOR experienced only non-fatal heart attacks.

52.    Through its systematic dissemination to doctors of very carefully edited

cardiovascular risk information from the VIGOR study, Merck set out to divert physicians'

attention from source information in the VIGOR study or the label and concealed the impact of

the valid information about Vioxx's real cardiovascular risk, especially the risk to patients with

established coronary artery disease.

M008942849

53.     Merck's New York sales reps received all of the company's Obstacle Responses concerning Vioxx and other communications about how to respond to doctors' questions relating to the cardiovascular safety profile of Vioxx. Merck's New York sales reps communicated the messages contained in those documents to New York doctors in accordance with the company's instructions and directions described above.

Merck's Suppression of VIGOR's Negative Cardiovascular Data in Professional Presentations to Medical Audiences

54.     Merck also misrepresented the incidence of heart attacks suffered by Vioxx patients in the VIGOR study in a November 2000 article that had two Merck employees among its authors and was published in the highly regarded, widely circulated, peer-reviewed, professional journal New England Journal of Medicine ("NEJM").

55.     In March 2000, Merck received data from VIGOR showing that twenty Vioxx patients had suffered heart attacks thus far in the study, while only four naproxen patients had had heart attacks during the same period. Initially, the draft of the article concerning VIGOR contained a table entitled "CV" events showing numbers of heart attacks. However, two days before the article was submitted to the NEJM, the data was deleted, and the draft was submitted with a blank table. Later drafts, and the final article, reported only seventeen of the twenty heart attacks among the Vioxx patients in the VIGOR study.

56.     Thus, though the two Merck employees who were authors of the article were aware of the additional three heart attacks among the Vioxx group no later than July 2000, after five drafts, the final, published version of the article inexplicably failed to include them.

57.     Because three of the heart attacks suffered by Vioxx patients were excluded, the article misrepresented the extent of the relative risk of heart attacks among Vioxx patients as compared to naproxen patients.

M008942850

58.     Due to Merck's omission of the actual number of heart attacks among the Vioxx group, doctors who read and relied on this article were deprived of this material and critically important safety information that would have informed their professional judgment concerning the treatment to prescribe for their patients.

59.     Another example of Merck's effort to suppress true information as to Vioxx's risks is its threats of retaliation against Dr. Gurkirpal Singh when he raised concerns about the cardiovascular safety of Vioxx. Dr. Singh is a highly regarded Stanford University medical researcher experienced in the types of gastrointestinal issues raised by Vioxx and other pain relievers in its class.

60.     In 1999, Merck contracted with Dr. Singh to give lectures and speeches to doctors discussing Vioxx's benefits. After hearing about Vioxx's cardiovascular safety risk as identified in VIGOR, Dr. Singh sought additional data from Merck. Merck did not provide him with such data.

61.     Subsequently, Dr. Singh raised his concerns about the cardiovascular safety of Vioxx during his Merck-sponsored presentations to doctors. Dr. Singh's primary scientific contact at Merck described these presentations as "balanced" and stated that his negative information about Vioxx was "scientifically accurate."

62.     Merck's Senior Vice-President for Medical and Scientific Affairs reacted to Dr. Singh's presentation by telephoning Dr. Singh's supervisor, a medical professor at Stanford, to complain that Dr. Singh was making irresponsible public statements about Vioxx's cardiovascular effects. The Merck Vice President implied there would be repercussions for the professor and the university if Dr. Singh did not stop making these statements.

M00B942651

63.    The Merck Vice President further pressured Stanford, instructing a Merck employee to "[t]ell Singh that we've told his boss about his Merck-bashing" and "should it continue, further actions will be necessary (don't define it)." Following Merck's heavy-handed attempt to suppress a presentation that Merck itself had acknowledged as "balanced" and "scientifically accurate," Dr. Singh terminated his relationship with Merck.

64.    The Merck Vice President made similar calls to officials at other university medical schools with staff who had also publicly raised questions about the cardiovascular safety of Vioxx.

### Merck's Omission of Negative Cardiovascular Data in Direct-to-Consumer Advertising

65.    Merck marketed Vioxx as a safe and effective pain reliever, while diminishing and concealing its increased cardiovascular risk. Using various wording, Merck's press releases issued during 2001 and 2002 consistently told consumers that Merck had -- and therefore they too should have -- confidence in Vioxx's safety profile. In May 2001, despite the results of the VIGOR study, Merck stated that "Merck Confirms Favorable Cardiovascular Safety Profile of Vioxx." In April 2002, Merck also told the public that the significance of VIGOR and two other studies was "unknown," creating the misimpression that the highly statistically significant negative cardiovascular thrombotic outcomes from VIGOR were unimportant and of no consequence to an individual taking Vioxx.

66.    In September 2001, Merck reiterated its assurance of Vioxx's cardiovascular safety in letters it sent to individual doctors and patients, including those who reside in New York, omitting material information about Vioxx's increased risk of serious cardiovascular thrombotic events, including heart attacks.

-18-

M0009942852

67.    Merck's massive direct-to-consumer advertising campaign was aimed at having consumers ask their doctors specifically for Vioxx. These ads, which ran in national magazines, failed to provide consumers with material information about Vioxx's cardiovascular dangers. Merck, therefore, encouraged individuals to take Vioxx, including patients with established coronary artery disease.

68.    Prior to 2002, Merck's advertisements for Vioxx that appeared in popular magazines and in journals directed at physicians contained no reference to the findings from VIGOR that patients taking Vioxx were at a five-fold increased risk of suffering a heart attack as compared to patients on naproxen and that Vioxx patients' increased risk of experiencing a serious cardiovascular thrombotic event was highly statistically significant.

69.    In 2002 and 2003, Merck disseminated advertisements in popular national magazines which, although they referred to VIGOR, failed to allude in any way to the increased risk of serious cardiovascular thrombotic adverse events, and especially to heart attacks, associated with Vioxx. The minimal information about serious cardiovascular thrombotic events they contained was not adequate to put patients with established coronary artery disease on notice that taking Vioxx could be very dangerous for them.

70.    The total extent of information related to cardiovascular thrombotic events in these later advertisements consisted of, on the front of the advertisement, a recommendation that patients tell their doctors if they had a history of angina, heart attack or blood clots (variously described as clots in the heart or clots in the body); and on the back of the advertisement, a reiteration of this recommendation, which sometimes came toward the bottom of a long list of ailments that should be mentioned to a doctor, and a statement that serious but rare side effects included heart attacks and similar serious events. But this latter statement failed to communicate the relative risk of heart attack if the patient took Vioxx instead of another effective, readily

M008942853

available drug. Some New York patients, including those with established coronary artery disease, would not have understood Merck's advertisements as constituting a warning of this specific increased risk of future heart attacks.

E.    **The Effect of Merck's Suppression, Misrepresentation and Concealment of Vioxx's Cardiovascular Risk**

71.    Because Merck knowingly and intentionally suppressed, misrepresented and concealed the true cardiovascular dangers of Vioxx and engaged in a unremitting campaign of misinformation about these risks as they were demonstrated by the VIGOR study, as described above, New York physicians prescribed Vioxx for their patients who had established coronary artery disease.

72.    New York physicians, like other physicians, operate under a professional obligation to recommend and prescribe only those treatments that are appropriate for the individual patient in light of the patient's medical history and current health status. Conversely, patients rely on the professional judgment of their physicians in deciding whether to consent to and purchase a treatment.

73.    Some of the patients who received Vioxx prescriptions that were induced by Merck's suppression, misrepresentation and concealment of material information about Vioxx's cardiovascular risks were New York Medicaid recipients and/or EPIC participants, many of whom had been diagnosed as having coronary artery disease.

74.    New York consumers and, on behalf of consumers enrolled in Medicaid and/or EPIC, the New York Medicaid and/or EPIC programs, paid all or part of the cost of Vioxx prescribed to these patients with established coronary artery disease. In the case of such patients who were Medicaid and/or EPIC participants, the relevant program paid claims submitted by the pharmacies that filled these prescriptions for Vioxx.

-20-

M00B942854

75.    Merck caused New York Medicaid and/or EPIC to reimburse pharmacies from public funds for covered Vioxx prescriptions written for patients with established coronary artery disease. Physicians would not have written these prescriptions if Merck had not suppressed, misrepresented and concealed material information about Vioxx's increased risk of serious cardiovascular thrombotic events.

76.    Merck's repeated and persistent fraud in suppressing, misrepresenting and concealing the material information about Vioxx's increased cardiovascular risk created a dishonest marketplace in which doctors and consumers recommended, prescribed or purchased Vioxx for patients for whom it was not an appropriate medication, which injured those consumers, the New York Medicaid and EPIC programs, the State of New York, and the City of New York.

77.    New York consumers and the New York Medicaid and EPIC programs do not have an adequate remedy at law that would provide complete relief for Merck's actions described above.

## FIRST CAUSE OF ACTION
## OBTAINING PUBLIC FUNDS BY FALSE STATEMENTS
### (N.Y. Social Services Law § 145-b)

78.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 77 of this complaint.

79.    Social Services Law § 145-b provides that "[i]t shall be unlawful for any person, firm or corporation knowingly by means of a false statement or representation, or by deliberate concealment of any material fact, or other fraudulent scheme or device, on behalf of himself or others, to attempt to obtain or to obtain payment from public funds for ... supplies furnished ... pursuant to" the Medicaid Program or EPIC.

-21-

M00B942855

80.    By engaging in the acts and practices described above, Merck, knowingly made false statements or representations, or deliberately concealed material facts, or engaged in a fraudulent scheme on behalf of itself and others, resulting in the payment and/or overpayment of public funds, in an amount yet to be determined, for Merck's prescription drug Vioxx by the New York Medicaid Program or EPIC in violation of Social Services Law § 145-b.

81.    By reason of the foregoing, Merck is liable to the State and the City pursuant to Social Services Law § 145-b for actual damages, as well as for three times the amounts falsely submitted, plus interest at the highest legal rate.

## SECOND CAUSE OF ACTION
## NEW YORK FALSE CLAIMS ACT
## N.Y. Finance Law § 189(1)(a)

82.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 77 of this complaint.

83.    The State of New York and the City of New York seek relief against Merck under section 189(1)(a) of the New York False Claims Act, N.Y. Finance Law § 189(1)(a).

84.    As set forth above, Merck knowing, or acting in deliberate ignorance or in reckless disregard for the truth, caused to be presented to agents of the State of New York false or fraudulent claims for payment or approval of Vioxx prescriptions for patients with pre-existing cardiovascular risk factors.

85.    The New York State Medicaid and EPIC programs paid such false or fraudulent claims because of the acts or conduct of Merck.

86.    By reason of Merck's conduct, the State of New York and the City of New York have been damaged in a substantial amount to be determined at trial.

M00B942856

87.    By reason of the foregoing, Merck is liable, pursuant to N.Y. Finance Law §

189(1), to the State for treble damages, penalties, and costs, and to the City for treble damages

and costs.

**THIRD CAUSE OF ACTION**
**NEW YORK FALSE CLAIMS ACT**
**N.Y. Finance Law § 189(1)(b)**

88.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through

77 of this complaint.

89.    The State of New York and the City of New York seek relief against Merck under

section 189(1)(b) of the New York False Claims Act, N.Y. Finance Law § 189(1)(b).

90.    As set forth above, Merck knowing, or acting in deliberate ignorance or in reckless

disregard for the truth, made, used, or cause to be made or used, false records and/or statements to

get false or fraudulent claims for Vioxx prescriptions for patients with pre-existing cardiovascular

risk factors paid or approved by the New York State Medicaid and EPIC programs.

91.    The New York State Medicaid and EPIC programs paid such false or fraudulent

claims because of the acts or conduct of Merck.

92.    By reason of Merck's false records and/or statements, the State of New York and

the City of New York have been damaged in a substantial amount to be determined at trial.

93.    By reason of the foregoing, Merck is liable, pursuant to N.Y. Finance Law §

189(1), to the State for treble damages, penalties, and costs, and to the City for treble damages

and costs.

**FOURTH CAUSE OF ACTION**
**REPEATED AND PERSISTENT FRAUD**
**N.Y. Executive Law § 63(12)**

94.    Plaintiff New York State incorporates by reference the allegations set forth in

paragraphs 1 through 93 of this complaint.

-23-

M00B94265T

95.    Executive Law § 63(12) makes "repeated fraudulent ... acts or ... persistent fraud ...

in the carrying on, conducting or transaction of business" actionable by the Attorney General.

96.    By engaging in the acts and practices described above, Merck has engaged in

repeated fraudulent acts or persistent fraud in violation of Executive Law § 63(12).

**FIFTH CAUSE OF ACTION**
**REPEATED AND PERSISTENT ILLEGAL CONDUCT:**
**OBTAINING PUBLIC FUNDS BY FALSE STATEMENTS**
**N.Y. Executive Law § 63(12)**

97.    Plaintiff New York State incorporates by reference the allegations set forth in

paragraphs 1 through 93 of this complaint.

98.    Executive Law § 63(12) makes "repeated ... illegal acts or ... persistent ... illegality

in the carrying on, conducting or transaction of business" actionable by the Attorney General.

99.    Merck's violations of N.Y. Social Services Law § 145-b and N.Y. Finance Law

§ 189(1) constitute repeated and persistent illegal conduct in violation of Executive Law § 63(12).

100.    By engaging in the acts and practices described above, Merck has engaged in

repeated illegal acts or persistent illegal conduct in violation of Executive Law § 63(12).

**SIXTH CAUSE OF ACTION**
**NEW YORK CITY FALSE CLAIMS ACT**
**N.Y.C. Admin. Code §§ 7-801 et seq.**

101.    Plaintiff City of New York incorporates by reference the allegations set forth in

paragraphs 1 through 77 of this complaint.

102.    The City of New York seeks relief against Merck under sections 7-801 et seq. of

the New York City Administrative Code.

103.    As set forth above, Merck knowing, or acting in deliberate ignorance or in reckless

disregard for the truth, made, used, or caused to be made or used, false records and/or statements

to get false or fraudulent Medicaid claims for Vioxx prescriptions for patients with pre-existing

M008942858

cardiovascular risk factors paid or approved.

104.    As set forth above, Merck knowing, or acting in deliberate ignorance or in reckless disregard for the truth, caused to be presented to agents of the State of New York and the City of New York, false or fraudulent Medicaid claims for payment or approval of Vioxx prescriptions for patients with pre-existing cardiovascular risk factors.

105.    The City of New York paid such false or fraudulent Medicaid claims because of the acts or conduct of Merck.

106.    By reason of Merck's false or fraudulent claims, records and/or statements, the City of New York has been damaged in a substantial amount to be determined at trial, and seeks treble damages, civil penalties, costs and attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, the People of the State of New York and the City of New York respectfully request that a judgment and order be entered that:

A.    Permanently enjoins Merck from engaging in the type of repeated or persistent fraudulent and unlawful practices alleged herein;

B.    Directs Merck to pay restitution and damages to all aggrieved consumers, including those not known at the time the order is entered;

C.    Directs Merck to pay restitution and damages to the State of New York based on Merck's repeated or persistent fraudulent and illegal practices, for the economic injuries suffered by the New York Medicaid and EPIC programs;

D.    Directs Merck to pay to the State of New York and the City of New York damages equal to three times the amount by which the State or any political subdivision, based on Merck's false statement or representation or other fraudulent scheme, overpaid public funds for Merck's prescription drugs under the New York Medicaid or EPIC program;

-25-

M00B9426S9

E.     Directs Merck to pay to the State of New York and the City of New York three times the amount of damages sustained because of the acts described herein, pursuant to N.Y. Finance Law § 189(1);

F.     Directs Merck to pay to the State of New York civil penalties in the amount of $12,000 for each false or fraudulent claim that Merck caused to be presented to the State of New York in violation of the New York False Claims Act, pursuant to N.Y. Finance Law § 189(1);

G.     Directs Merck to pay to the State of New York civil penalties in the amount of $12,000 for each false or fraudulent record or statement that Merck made, used, or caused to be made or used, in order to get a false or fraudulent claim paid or approved in violation of the New York False Claims Act, pursuant to N.Y. Finance Law § 189(1);

H.     Directs Merck to pay to the City of New York three times the amount of its damages, plus a civil penalty of $15,000 for each violation of the New York City False Claims Act, Title 7, Chapter 8 of the New York City Administrative Code, §§ 7-801 et seq., plus costs, expenses and attorneys' fees and the cost of the City's investigation;

I.     Awards Plaintiffs costs, including additional costs in the amount of $2,000 pursuant to CPLR § 8303(a)(6); and

J.     Grants all other relief that is just and proper.

Dated: New York, New York
       September 17, 2007

ANDREW M. CUOMO
Attorney General of the State of New York
Attorney for the State of New York

By:   *Heidi A. Wendel*

HEIDI A. WENDEL
Special Deputy Attorney General
Medicaid Fraud Control Unit
120 Broadway – 13th Floor
New York, New York 10271-0007
(212) 417-5250

M00B942860

MICHAEL A. CARDOZO
Corporation Counsel of the City of New York
Attorney for the City of New York

By: _____

JOHN R. LOW-BEER
Assistant Corporation Counsel
100 Church Street
New York, New York  10007
(212) 788-1007

M00B942861

# Exhibit H

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUN 1 4 2006

FILED
CLERK'S OFFICE

## DOCKET NO. 1657

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

## IN RE VIOXX MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION

## BEFORE WM. TERRELL HODGES, CHAIRMAN, JOHN F. KEENAN, D. LOWELL JENSEN, J. FREDERICK MOTZ,* ROBERT L. MILLER, JR., KATHRYN H. VRATIL AND DAVID R. HANSEN, JUDGES OF THE PANEL

## TRANSFER ORDER

Presently before the Panel are motions, pursuant to Rule 7.4, R.P.J.P.M.L., 199 F.R.D. 425, 435-36 (2001), by plaintiffs in 25 actions to vacate the Panel's orders conditionally transferring the actions listed on Schedule A to the Eastern District of Louisiana for inclusion in the Section 1407 proceedings occurring there in this docket. Merck & Co., Inc., favors inclusion of these actions in MDL-1657 proceedings.

On the basis of the papers filed and hearing session held, the Panel finds that these actions involve common questions of fact with actions in this litigation previously transferred to the Eastern District of Louisiana. Transfer of the actions to that district for inclusion in the coordinated or consolidated pretrial proceedings occurring there will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation. Motions to remand to state court can be presented to and decided by the transferee judge. *See, e.g., In re Ivy,* 901 F.2d 7 (2d Cir. 1990); *In re Prudential Insurance Company of America Sales Practices Litigation,* 170 F.Supp.2d 1346, 1347-48 (J.P.M.L. 2001). The Panel further finds that transfer of these actions is appropriate for the reasons expressed in the original order directing centralization in this docket. In that order, the Panel held that the Eastern District of Louisiana was a proper Section 1407 forum for actions involving claims relating to Vioxx. *See In re Vioxx Products Liability Litigation,* 360 F.Supp.2d 1352 (J.P.M.L. 2005).

Some opposing plaintiffs argue that the presence of individual and/or local questions of fact as well as differing legal theories should militate against inclusion of these actions in MDL-1657 proceedings. We are unpersuaded by these arguments. Inclusion of these actions in Section 1407 proceedings has the salutary effect of placing all the related actions before a single judge who can formulate a pretrial program that: 1) prevents repetition of previously considered matters; 2) allows pretrial proceedings with respect to any non-common issues to proceed concurrently with pretrial proceedings on common issues, *In re Multi-Piece Rim Products Liability Litigation,* 464 F.Supp. 969,

---

* Judge Motz took no part in the decision of this matter.

M003387655

- 2 -

974 (J.P.M.L. 1979); and 3) ensures that pretrial proceedings will be conducted in a manner leading to the just and expeditious resolution of all actions to the overall benefit of the parties. *See In re StarLink Corn Products Liability Litigation*, 152 F.Supp.2d 1378 (J.P.M.L. 2001).

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 1407, these actions are transferred to the Eastern District of Louisiana and, with the consent of that court, assigned to the Honorable Eldon E. Fallon for inclusion in the coordinated or consolidated pretrial proceedings occurring there in this docket.

FOR THE PANEL:

Wm. Terrell Hodges
Chairman

M003387656

## SCHEDULE A

<u>MDL-1657 -- In re Vioxx Marketing, Sales Practices and Products Liability Litigation</u>

<u>Southern District of Alabama</u>

*Robert Shawn Roach, et al. v. Merck & Co., et al.*, C.A. No. 1:06-44

<u>District of Alaska</u>

*State of Alaska v. Merck & Co., Inc.*, C.A. No. 3:06-18

<u>Eastern District of California</u>

*Boyd Cole, et al. v. Merck & Co., Inc., et al.*, C.A. No. 2:05-2609
*Jill Desart v. Merck & Co., Inc., et al.*, C.A. No. 2:06-62

<u>Northern District of California</u>

*Trey Ditlevsen v. Merck & Co., Inc., et al.*, C.A. No. 3:05-5158

<u>Southern District of Illinois</u>

*Peggie Craig, et al. v. Merck & Co., Inc., et al.*, C.A. No. 3:05-823
*Irene Anzona v. Merck & Co., Inc., et al.*, C.A. No. 3:05-884
*Willis Fuller, et al. v. Merck & Co., Inc.*, C.A. No. 3:06-63
*Robert Paskero v. Merck & Co., Inc., et al.*, C.A. No. 3:06-64
*Eugene Perry, et al. v. Merck & Co., Inc.*, C.A. No. 3:06-65
*Maria Kopes, et al. v. Merck & Co., Inc., et al.*, C.A. No. 3:06-154
*Kevin Keeney, et al. v. Merck & Co., Inc., et al.*, C.A. No. 3:06-158
*Shirley Johnson, et al. v. Merck & Co., Inc., et al.*, C.A. No. 3:06-162

<u>Eastern District of Missouri</u>

*Diana Larrabee v. Merck & Co., Inc., et al.*, C.A. No. 4:05-1740

<u>Western District of Missouri</u>

*Helen G. Sarle, et al. v. Merck & Co., Inc., et al.*, C.A. No. 4:06-40

<u>Western District of New York</u>

*Kathleen Campbell v. Merck & Co., Inc., et al.*, C.A. No. 6:05-6740
*Gergory Paterniti v. Merck & Co., Inc., et al.*, C.A. No. 6:06-6065
*George Adams v. Merck & Co., Inc., et al.*, C.A. No. 6:06-6066
*Deborah Stroka v. Merck & Co., Inc., et al.*, C.A. No. 6:06-6068

- A2 -

*Bruce Stenzel v. Merck & Co., Inc., et al.*, C.A. No. 6:06-6069
*Eugenia B. Lukasik, etc. v. Merck & Co., Inc., et al.*, C.A. No. 6:06-6075

### Eastern District of Pennsylvania

*Robbie Tallas, et al. v. Merck & Co., Inc., et al.*, C.A. No. 2:06-388
*Robbie Tallas, et al. v. Merck & Co., Inc., et al.*, C.A. No. 2:06-389

### Southern District of Texas

*H.G. Pool, et al. v. Merck & Co., Inc., et al.*, C.A. No. 5:06-35
*Robert L. Williams, etc. v. Merck & Co., Inc.*, C.A. No. 4:05-4265

M003387658

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

AUG 1 0 2006

FILED
CLERK'S OFFICE

### DOCKET NO. 1657

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

## IN RE VIOXX MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION

*Amanda Pritchett v. Merck & Co., Inc., et al.*, S.D. Alabama, C.A. No. 2:06-122
*Rebecca Moore, et al. v. Merck & Co., Inc.*, N.D. Illinois, C.A. No. 1:06-1354
*Mary L. Harper, et al. v. Merck & Co., Inc., et al.*, W.D. Kentucky, C.A. No. 3:05-604
*Jacqueline Fuqua v. Merck & Co., Inc., et al.*, N.D. Mississippi, C.A. No. 2:06-63
*Randy Robinson v. Merck & Co., Inc., et al.*, N.D. Mississippi, C.A. No. 2:06-64
*Owen Kittle v. Merck & Co., Inc., et al.*, N.D. Mississippi, C.A. No. 2:06-65
*Ginger Pope v. Merck & Co., Inc., et al.*, N.D. Mississippi, C.A. No. 2:06-66
*State of Montana, et al. v. Merck & Co., Inc.*, D. Montana, C.A. No. 6:06-7

## BEFORE WM. TERRELL HODGES, CHAIRMAN, D. LOWELL JENSEN, J. FREDERICK MOTZ,* ROBERT L. MILLER, JR., KATHRYN H. VRATIL DAVID R. HANSEN AND ANTHONY J. SCIRICA, JUDGES OF THE PANEL

### TRANSFER ORDER

Presently before the Panel are motions, pursuant to Rule 7.4, R.P.J.P.M.L., 199 F.R.D. 425, 435-36 (2001), by plaintiffs in eight actions to vacate the Panel's orders conditionally transferring the actions to the Eastern District of Louisiana for inclusion in the Section 1407 proceedings occurring there in this docket. Defendant Merck & Co., Inc., favors inclusion of these actions in MDL-1657 proceedings.

On the basis of the papers filed and hearing session held (without oral argument), the Panel finds that these actions involve common questions of fact with actions in this litigation previously transferred to the Eastern District of Louisiana. Transfer of the actions to that district for inclusion in the coordinated or consolidated pretrial proceedings occurring there will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation. Motions to remand to state court can be presented to and decided by the transferee judge. *See, e.g., In re Ivy*, 901 F.2d 7 (2d Cir. 1990); *In re Prudential Insurance Company of America Sales Practices Litigation*, 170 F.Supp.2d 1346, 1347-48 (J.P.M.L. 2001). The Panel further finds that transfer of these actions is appropriate for the reasons expressed by the Panel in the original order directing centralization in this docket. In that order, the Panel held that the Eastern District of Louisiana was a proper Section 1407 forum for actions involving claims relating to Vioxx. *See In re Vioxx Products Liability Litigation*, 360 F.Supp.2d 1352 (J.P.M.L. 2005).

---

* Judge Motz took no part in the decision of this matter.

M009200728

- 2 -

Some opposing plaintiffs argue that the presence of individual and/or local questions of fact as well as differing legal theories should militate against inclusion of these actions in MDL-1657 proceedings. We are unpersuaded by these arguments. Inclusion of these actions in Section 1407 proceedings has the salutary effect of placing all the related actions before a single judge who can formulate a pretrial program that: 1) prevents repetition of previously considered matters; 2) allows pretrial proceedings with respect to any non-common issues to proceed concurrently with pretrial proceedings on common issues, *In re Multi-Piece Rim Products Liability Litigation*, 464 F.Supp. 969, 974 (J.P.M.L. 1979); and 3) ensures that pretrial proceedings will be conducted in a manner leading to the just and expeditious resolution of all actions to the overall benefit of the parties. *See In re StarLink Corn Products Liability Litigation*, 152 F.Supp.2d 1378 (J.P.M.L. 2001).

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 1407, these actions are transferred to the Eastern District of Louisiana and, with the consent of that court, assigned to the Honorable Eldon E. Fallon for inclusion in the coordinated or consolidated pretrial proceedings occurring there in this docket.

FOR THE PANEL:

Wm. Terrell Hodges
Chairman

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

OCT 1 8 2006

FILED
CLERK'S OFFICE

## *DOCKET NO. 1657*

## *BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION*

## *IN RE VIOXX MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION*

*Felix Arrington, et al. v. Merck & Co., Inc., et al.*, M.D. Alabama, C.A. No. 2:06-488
*Rosemary Leverett, etc. v. Merck & Co., Inc., et al.*, M.D. Alabama, C.A. No. 3:06-476
*Milton Elliot v. Merck & Co., Inc., et al.*, S.D. Florida, C.A. No. 9:06-80545
*Coy Nunn, et al. v. Merck & Co., Inc., et al.*, S.D. Illinois, C.A. No. 3:06-430
*Ruthie Young, et al. v. Merck & Co., Inc., et al.*, S.D. Illinois, C.A. No. 3:06-462
*Norman Mahan v. Merck & Co., Inc., et al.*, N.D. Mississippi, C.A. No. 2:06-62
*Larry Williams v. Merck & Co., Inc., et al.*, N.D. Mississippi, C.A. No. 4:06-60
*Joyce Calloway, et al. v. Merck & Co., Inc.*, S.D. Texas, C.A. No. 4:06-1772
*State of Utah v. Merck & Co., Inc.*, D. Utah, C.A. No. 2:06-406

## *BEFORE WM. TERRELL HODGES, CHAIRMAN, D. LOWELL JENSEN, J. FREDERICK MOTZ,[*] ROBERT L. MILLER, JR., KATHRYN H. VRATIL DAVID R. HANSEN AND ANTHONY J. SCIRICA, JUDGES OF THE PANEL*

### *TRANSFER ORDER*

Presently before the Panel are motions, pursuant to Rule 7.4, R.P.J.P.M.L., 199 F.R.D. 425, 435-36 (2001), by plaintiffs in these actions to vacate the Panel's orders conditionally transferring the actions to the Eastern District of Louisiana for inclusion in the Section 1407 proceedings occurring there in this docket. Defendant Merck & Co., Inc., favors inclusion of these actions in MDL-1657 proceedings.

On the basis of the papers filed and hearing session held (without oral argument), the Panel finds that these actions involve common questions of fact with actions in this litigation previously transferred to the Eastern District of Louisiana. Transfer of the actions to that district for inclusion in the coordinated or consolidated pretrial proceedings occurring there will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation. Motions to remand to state court can be presented to and decided by the transferee judge. *See, e.g., In re Ivy*, 901 F.2d 7 (2d Cir. 1990); *In re Prudential Insurance Company of America Sales Practices Litigation*, 170 F.Supp.2d 1346, 1347-48 (J.P.M.L. 2001). The Panel further finds that transfer of these actions is appropriate for the reasons expressed by the Panel in the original order directing centralization in this docket. In that order, the Panel held that the Eastern District of Louisiana was a proper Section 1407 forum for actions involving claims relating to Vioxx. *See In re Vioxx Products Liability Litigation*, 360

---

[*] Judge Motz took no part in the decision of this matter.

M00A142130

- 2 -

F.Supp.2d 1352 (J.P.M.L. 2005).

The *Utah* plaintiff argues that the presence of questions of fact relating to Utah's Medicaid program as well as unique causes of action under Utah law counsel against inclusion of this action in MDL-1657 proceedings. We are unpersuaded by this argument. Regardless of any differences in legal theory, *Utah* and the actions in the transferee district arise from representations about the safety of Vioxx. Inclusion of *Utah* in Section 1407 proceedings has the salutary effect of placing all the related actions before a single judge who can formulate a pretrial program that: 1) prevents repetition of previously considered matters; 2) allows pretrial proceedings with respect to any non-common issues to proceed concurrently with pretrial proceedings on common issues, *In re Multi-Piece Rim Products Liability Litigation*, 464 F.Supp. 969, 974 (J.P.M.L. 1979); and 3) ensures that pretrial proceedings will be conducted in a manner leading to the just and expeditious resolution of all actions to the overall benefit of the parties. *See In re StarLink Corn Products Liability Litigation*, 152 F.Supp.2d 1378 (J.P.M.L. 2001).

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 1407, these actions are transferred to the Eastern District of Louisiana and, with the consent of that court, assigned to the Honorable Eldon E. Fallon for inclusion in the coordinated or consolidated pretrial proceedings occurring there in this docket.

FOR THE PANEL:

*Wm. Terrell Hodges*

Wm. Terrell Hodges
Chairman

RECEIVED
OCT 23 7.
SS&D

M00A142131

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

APR 1 8 2007

FILED
CLERK'S OFFICE

*DOCKET NO. 1657*

*BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION*

*IN RE VIOXX MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION*

*BEFORE WM. TERRELL HODGES, CHAIRMAN, D. LOWELL JENSEN, J. FREDERICK MOTZ,* ROBERT L. MILLER, JR., KATHRYN H. VRATIL, DAVID R. HANSEN AND ANTHONY J. SCIRICA,* JUDGES OF THE PANEL*

*TRANSFER ORDER*

Presently before the Panel are motions, pursuant to Rule 7.4, R.P.J.P.M.L., 199 F.R.D. 425, 435-36 (2001), by plaintiffs in 83 actions to vacate the Panel's orders conditionally transferring the actions listed on Schedule A to the Eastern District of Louisiana for inclusion in the Section 1407 proceedings occurring there in this docket.  Merck & Co., Inc., favors inclusion of these actions in MDL-1657 proceedings.

On the basis of the papers filed and hearing session held (without oral argument), the Panel finds that these actions involve common questions of fact with actions in this litigation previously transferred to the Eastern District of Louisiana. Transfer of the actions to that district for inclusion in the coordinated or consolidated pretrial proceedings occurring there will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation.  Any pending motions to remand to state court can be presented to and decided by the transferee judge. *See, e.g., In re Ivy,* 901 F.2d 7 (2d Cir. 1990); *In re Prudential Insurance Company of America Sales Practices Litigation,* 170 F.Supp.2d 1346, 1347-48 (J.P.M.L. 2001).  The Panel further finds that transfer of these actions is appropriate for the reasons expressed by the Panel in the original order directing centralization in this docket.  In that order, the Panel held that the Eastern District of Louisiana was a proper Section 1407 forum for actions involving claims relating to Vioxx. *See In re Vioxx Products Liability Litigation,* 360 F.Supp.2d 1352 (J.P.M.L. 2005).

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 1407, these actions are transferred to the Eastern District of Louisiana and, with the consent of that court, assigned to the Honorable Eldon E. Fallon for inclusion in the coordinated or consolidated pretrial proceedings occurring there in this docket.

FOR THE PANEL:

*Wm. Terrell Hodges*
Wm. Terrell Hodges
Chairman

---

* Judges Motz and Scirica took no part in the decision of this matter.

M00F201604

# SCHEDULE A

MDL-1657 -- In re Vioxx Marketing, Sales Practices and Products Liability Litigation

### Eastern District of California

*Sheryl Churchman v. Merck & Co., Inc., et al.*, C.A. No. 2:06-2479
*Irene Lear v. Merck & Co., Inc., et al.*, C.A. No. 2:06-2830
*Allan J. English v. Merck & Co., Inc., et al.*, C.A. No. 2:06-2833

### Northern District of California

*Dolores Lee Tazmon v. Merck & Co., Inc., et al.*, C.A. No. 3:06-7455

### Southern District of California

*Hermogenes Del Rosario v. Merck & Co., Inc., et al.*, C.A. No. 3:06-2535
*Maria Graham, etc. v. Merck & Co., Inc., et al.*, C.A. No. 3:06-2536
*Sandra Boardman, etc. v. Merck & Co., Inc., et al.*, C.A. No. 3:06-2537
*Lloyd Bell, etc. v. Merck & Co., Inc., et al.*, C.A. No. 3:06-2538
*Joseph Cornwall, etc. v. Merck & Co., Inc., et al.*, C.A. No. 3:06-2539
*Nancy Murphy v. Merck & Co., Inc., et al.*, C.A. No. 3:07-13

### District of Colorado

*James Franklin, etc. v. Merck & Co., Inc.*, C.A. No. 1:06-2164

### Southern District of Florida

*Kenneth Bowe, et al. v. Merck & Co., Inc., et al.*, C.A. No. 2:06-14284
*Jacob Avidon, et al. v. Merck & Co., Inc., et al.*, C.A. No. 2:06-14285
*Veronica Clark-Atchinson v. Merck & Co., Inc., et al.*, C.A. No. 2:06-14287
*Robin A. Curry v. Merck & Co., Inc., et al.*, C.A. No. 2:06-14288
*Lystine Fairweather, et al. v. Merck & Co., Inc., et al.*, C.A. No. 2:06-14289
*Mary Lee Hudson v. Merck & Co., Inc., et al.*, C.A. No. 2:06-14290
*Walter Smith, et al. v. Merck & Co., Inc., et al.*, C.A. No. 2:06-14291
*Warren Young, et al. v. Merck & Co., Inc., et al.*, C.A. No. 2:06-14292
*Andrew Trax, et al. v. Merck & Co., Inc., et al.*, C.A. No. 2:06-14293
*Helen Spano, et al. v. Merck & Co., Inc., et al.*, C.A. No. 2:06-14294
*John Gumas v. Merck & Co., Inc., et al.*, C.A. No. 2:06-14295
*Darrell Duncan v. Merck & Co., Inc., et al.*, C.A. No. 2:06-14296
*James Ferguson v. Merck & Co., Inc., et al.*, C.A. No. 2:06-14297
*Carol Morgan v. Merck & Co., Inc., et al.*, C.A. No. 2:06-14298

- A2 -

**MDL-1657 Schedule A (Continued)**

<u>Southern District of Florida</u> (Continued)

*Patricia C. Putman, et al. v. Merck & Co., Inc., et al.*, C.A. No. 2:06-14299
*Donald L. Simons v. Merck & Co., Inc., et al.*, C.A. No. 2:06-14300
*Donna Robinson v. Merck & Co., Inc., et al.*, C.A. No. 2:06-14301
*Gail Simmons v. Merck & Co., Inc., et al.*, C.A. No. 9:06-80994
*Anita Finnegan v. Merck & Co., Inc., et al.*, C.A. No. 9:06-80996
*Joseph Iuvara, et al. v. Merck & Co., Inc., et al.*, C.A. No. 9:06-80997
*Thomas Erling v. Merck & Co., Inc., et al.*, C.A. No. 9:06-80998

<u>Southern District of Illinois</u>

*Sharon Calaway v. Merck & Co., Inc., et al.*, C.A. No. 3:06-870
*Sandra Kay Lindsey v. Merck & Co., Inc., et al.*, C.A. No. 3:06-883
*Steven Strader v. Merck & Co., Inc., et al.*, C.A. No. 3:06-896
*Patricia A. Taylor v. Merck & Co., Inc., et al.*, C.A. No. 3:06-948

<u>District of Nevada</u>

*Charles Fitzgerald, et al. v. Merck & Co., Inc., et al.*, C.A. No. 2:06-1324
*Calvin Maestro, M.D., et al. v. Merck & Co., Inc., et al.*, C.A. No. 2:06-1325
*George Morris, et al. v. Merck & Co., Inc., et al.*, C.A. No. 2:06-1326
*Estate of Mary Hoffman Williams, et al. v. Merck & Co., Inc., et al.*, C.A. No. 2:06-1327
*George Mayfield, et al. v. Merck & Co., Inc., et al.*, C.A. No. 2:06-1328
*Barbara Wyman, et al. v. Merck & Co., Inc., et al.*, C.A. No. 2:06-1329

<u>Southern District of New York</u>

*Ali Ghanem v. Merck & Co., Inc., et al.*, C.A. No. 1:06-11419

<u>District of South Carolina</u>

*Joyce R. Sanders, etc. v. Merck & Co., Inc., et al.*, C.A. No. 4:06-3225

<u>Southern District of Texas</u>

*Juan Lizardi v. Merck & Co., Inc., et al.*, C.A. No. 1:06-176
*Maria G. Gonzalez v. Merck & Co., Inc., et al.*, C.A. No. 1:06-181
*San Juanita Mares Lejia, et al. v. Merck & Co., Inc., et al.*, C.A. No. 1:06-184
*Rosario Lechuga v. Merck & Co., Inc., et al.*, C.A. No. 2:06-478
*Divine Garcia v. Merck & Co., Inc., et al.*, C.A. No. 2:06-489

- A3 -

**MDL-1657 Schedule A (Continued)**

Southern District of Texas (Continued)

*Hortencia Garza, et al. v. Merck & Co., Inc., et al.*, C.A. No. 2:06-494
*Pedro Hernandez v. Merck & Co., Inc., et al.*, C.A. No. 2:06-499
*John Blazier v. Merck & Co., Inc., et al.*, C.A. No. 3:06-721
*Evert Crump v. Merck & Co., Inc., et al.*, C.A. No. 3:06-723
*Richard Smith v. Merck & Co., Inc., et al.*, C.A. No. 3:06-724
*Vada Tolbert v. Merck & Co., Inc., et al.*, C.A. No. 4:06-3689
*Lynna J. Anderson, et al. v. Merck & Co., Inc., et al.*, C.A. No. 6:06-114
*Lilian Murphree v. Merck & Co., Inc., et al.*, C.A. No. 7:06-303
*Juan R. Gonzalez v. Merck & Co., Inc., et al.*, C.A. No. 7:06-319
*Adolfo De Leon v. Merck & Co., Inc., et al.*, C.A. No. 7:06-320
*Victor Saenz v. Merck & Co., Inc., et al.*, C.A. No. 7:06-321
*Francisca Villarreal, et al. v. Merck & Co., Inc., et al.*, C.A. No. 7:06-322
*Jose Zuniga v. Merck & Co., Inc., et al.*, C.A. No. 7:06-329
*Rodolfo Regalado v. Merck & Co., Inc., et al.*, C.A. No. 7:06-331
*Ludivina Pena v. Merck & Co., Inc., et al.*, C.A. No. 7:06-333
*Anita Salinas v. Merck & Co., Inc., et al.*, C.A. No. 7:06-334
*Alonzo Rivas v. Merck & Co., Inc., et al.*, C.A. No. 7:06-336
*Dora Hernandez v. Merck & Co., Inc., et al.*, C.A. No. 7:06-337
*Julio Sierra v. Merck & Co., Inc., et al.*, C.A. No. 7:06-338
*Javier Trevino v. Merck & Co., Inc., et al.*, C.A. No. 7:06-340
*Marcelina Tijerina v. Merck & Co., Inc., et al.*, C.A. No. 7:06-341
*Maria De Leon v. Merck & Co., Inc., et al.*, C.A. No. 7:06-344
*Abdon Gonzalez v. Merck & Co., Inc., et al.*, C.A. No. 7:06-345
*Maria Quintanilla v. Merck & Co., Inc., et al.*, C.A. No. 7:06-346
*Adriana Negrete v. Merck & Co., Inc., et al.*, C.A. No. 7:06-347
*Nora De Los Rios, et al. v. Merck & Co., Inc., et al.*, C.A. No. 7:06-357

Western District of Texas

*Emil Kenneth Braune v. Merck & Co., Inc., et al.*, C.A. No. 1:06-848
*Marilyn Trent v. Merck & Co., Inc., et al.*, C.A. No. 1:06-858
*Charles Ray Garrett, et al. v. Merck & Co., Inc., et al.*, C.A. No. 1:06-859
*Shirley Ison, et al. v. Merck & Co., Inc., et al.*, C.A. No. 1:06-865
*Esther McConoghy v. Merck & Co., Inc., et al.*, C.A. No. 1:06-870
*Ruby Shaw v. Merck & Co., Inc., et al.*, C.A. No. 1:06-871
*Nathaniel Knight v. Merck & Co., Inc., et al.*, C.A. No. 1:06-901
*Selma Gonzalez, et al. v. Merck & Co., Inc., et al.*, C.A. No. 5:06-985

M00F201607

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

DEC - 6 2005

FILED
CLERK'S OFFICE

*DOCKET NO. 1657*

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

## IN RE VIOXX MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION

## (SEE ATTACHED SCHEDULE)

## CONDITIONAL TRANSFER ORDER (CTO-34)

On February 16, 2005, the Panel transferred 138 civil actions to the United States District Court for the Eastern District of Louisiana for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. Since that time, 2,517 additional actions have been transferred to the Eastern District of Louisiana. With the consent of that court, all such actions have been assigned to the Honorable Eldon E. Fallon.

It appears that the actions on this conditional transfer order involve questions of fact which are common to the actions previously transferred to the Eastern District of Louisiana and assigned to Judge Fallon.

Pursuant to Rule 7.4 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, 199 F.R.D. 425, 435-36 (2001), these actions are transferred under 28 U.S.C. § 1407 to the Eastern District of Louisiana for the reasons stated in the order of February 16, 2005, 360 F.Supp.2d 1352 (J.P.M.L. 2005), and, with the consent of that court, assigned to the Honorable Eldon E. Fallon.

This order does not become effective until it is filed in the Office of the Clerk of the United States District Court for the Eastern District of Louisiana. The transmittal of this order to said Clerk shall be stayed fifteen (15) days from the entry thereof and if any party files a notice of opposition with the Clerk of the Panel within this fifteen (15) day period, the stay will be continued until further order of the Panel.

FOR THE PANEL:

Michael J. Beck
Clerk of the Panel

M00513084+

# SCHEDULE CTO-34 - TAG-ALONG ACTIONS
## DOCKET NO. 1657
## IN RE VIOXX MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION

| DIST. DIV. C.A. # | CASE CAPTION |
|---|---|
| **ALABAMA SOUTHERN** | |
| ALS 1 05-626 | Bettie Cassel v. Merck & Co., Inc. |
| **ARKANSAS WESTERN** | |
| ARW 6 05-6078 | John Gray, etc. v. Merck & Co., Inc. |
| **ARIZONA** | |
| AZ 3 05-3600 | Thomas Bruno v. Merck & Co., Inc. |
| **CALIFORNIA CENTRAL** | |
| CAC 2 05-7910 | Miron A. Costin, et al. v. Merck & Co., Inc. |
| **CALIFORNIA EASTERN** | |
| CAE 2 05-2199 | Bryce Reeve v. Merck & Co., Inc. |
| CAE 2 05-2203 | Clara Puma v. Merck & Co., Inc., et al. |
| CAE 2 05-2218 | Vance Skillsky v. Merck & Co., Inc, et al. |
| CAE 2 05-2267 | Clayton Welch v. Merck & Co., Inc., et al. |
| **CALIFORNIA NORTHERN** | |
| CAN 3 05-4718 | Elvira Casale v. Merck & Co., Inc., et al. |
| **CONNECTICUT** | |
| CT 3 05-1643 | Robert Macher v. Merck & Co., Inc. |
| **FLORIDA MIDDLE** | |
| FLM 3 05-1143 | Dolores Anderson v. Merck & Co., Inc. |
| FLM 3 05-1144 | Truett George, et al. v. Merck & Co., Inc., et al. |
| FLM 3 05-1145 | Laura Dellamonica v. Merck & Co., Inc. |
| FLM 3 05-1147 | Marcia Pitts v. Merck & Co., Inc. |
| FLM 5 05-469 | Edwin Linhart v. Merck & Co., Inc., et al. |
| FLM 8 05-2109 | Warren Monberg v. Merck & Co., Inc., et al. |
| FLM 8 05-2116 | Thomas Cesarski v. Merck & Co. Inc., et al. |
| FLM 8 05-2117 | Albert Hassan v. Merck & Co., Inc., et al. |
| FLM 8 05-2118 | Ronald Timpanaro v. Merck & Co., Inc., et al. |
| **FLORIDA SOUTHERN** | |
| FLS 0 05-61705 | Thomas Schulkind, et al. v. Merck & Co., Inc. |
| FLS 1 05-22878 | Roxanne De Los Reyes, et al. v. Merck & Co., Inc. |
| FLS 1 05-22879 | Maria Roman v. Merck & Co., Inc. |
| FLS 1 05-22891 | Anne Greggains v. Merck & Co., Inc. |
| FLS 4 05-10115 | Ronald Finkelstein v. Merck & Co., Inc. |
| **GEORGIA MIDDLE** | |
| GAM 4 05-123 | Lurlene Perry v. Merck & Co., Inc. |
| **IOWA NORTHERN** | |
| IAN 5 05-4135 | Bradley Rowe, et al. v Merck & Co., Inc. |

M00513084S

SCHEDULE CTO-34 TAG-ALONG ACTIONS (MDL-1657)                    PAGE 2 of 5

| DIST. DIV. C.A. # | CASE CAPTION |
|---|---|

**KENTUCKY WESTERN**

| | |
|---|---|
| KYW 1 05-175 | James L. Bragg, Jr., etc. v. Merck & Co., Inc., et al. |
| KYW 3 05-597 | Ronald Campbell v. Hardin County Kentucky, et al. |
| KYW 3 05-645 | Jeffrey Joyce v. Merck & Co., Inc. |
| KYW 3 05-657 | Isabella B. Cummings, et al. v. Merck & Co., Inc. |
| KYW 3 05-662 | Barbara Keeling v. Merck & Co., Inc. |
| KYW 3 05-679 | Daniel Gill v. Merck & Co., Inc., et al. |
| KYW 3 05-684 | Onna James, et al. v. Merck & Co., Inc., et al. |
| KYW 3 05-686 | Garlin Cupp, et al. v. Merck & Co., Inc., et al. |
| KYW 3 05-692 | Martha Sue Taylor v. Merck & Co., Inc., et al. |
| KYW 3 05-693 | Sarah E. Nichols, etc. v. Merck & Co., Inc., et al. |
| KYW 3 05-694 | William Mohon, et al. v. Merck & Co., Inc., et al. |
| KYW 3 05-695 | Scarlett Macy, etc. v. Merck & Co., Inc., et al. |
| KYW 3 05-696 | Shannon M. Age, et al. v. Merck & Co., Inc., et al. |
| KYW 3 05-711 | Faye Byers, et al. v. Merck & Co., Inc. |
| KYW 3 05-712 | Dora Gorman, et al. v. Merck & Co., Inc., et al. |
| KYW 3 05-713 | Cleo D. Gilbert, et al. v. Merck & Co., Inc. |
| KYW 3 05-714 | Lorenia Henson, etc. v. Merck & Co., Inc. |
| KYW 3 05-715 | Darrell G. Moore, et al. v. Merck & Co., Inc. |
| KYW 3 05-717 | Billy Joe Logsdon, et al. v. Merck & Co., Inc., et al. |
| KYW 3 05-718 | Kathryn O'Neill v. Merck & Co., Inc., et al. |
| KYW 3 05-719 | Paul E. Mangeot, et al. v. Merck & Co., Inc. |
| KYW 3 05-724 | Millard T. Shepherd v. Merck & Co., Inc. |
| KYW 3 05-729 | Luther B. Yount, Jr., et al. v. Merck & Co., Inc., et al. |
| KYW 5 05-211 | Carroll Gene Dorroh v. Merck & Co., Inc. |
| KYW 5 05-212 | Wanda Sue Parker, et al. v. Merck & Co., Inc., et al. |

**LOUISIANA MIDDLE**

| | |
|---|---|
| LAM 3 05-1292 | Crystal Wright, et al. v. Merck & Co., Inc. |

**LOUISIANA WESTERN**

| | |
|---|---|
| LAW 1 05-1669 | L.C. Wiley, et al. v. Merck & Co., Inc., et al. |
| LAW 2 05-1768 | Michael Breaux v. Merck & Co., Inc. |
| LAW 2 05-1771 | Robert Berard v. Merck & Co., Inc. |
| LAW 2 05-1772 | Howard Fontenot v. Merck & Co., Inc. |
| LAW 2 05-1773 | Bryan Harper v. Merck & Co., Inc. |
| LAW 2 05-1774 | James Hooper, Jr. v. Merck & Co., Inc. |
| LAW 2 05-1847 | Donna Seaton v. Merck & Co., Inc. |
| LAW 5 05-1870 | Halvor Peterson v. Merck & Co., Inc., et al. |
| LAW 6 05-1368 | William Lee Melancon, Sr., et al. v. Merck & Co., Inc. |

**MARYLAND**

| | |
|---|---|
| MD 1 05-2625 | Lisa Matthews, et al. v. Merck & Co., Inc. |
| MD 1 05-3027 | Annie M. Sullivan v. Merck & Co., Inc. |

**MINNESOTA**

| | |
|---|---|
| MN 0 05-2377 | Paula Crouch, etc. v. Merck & Co., Inc. |
| MN 0 05-2478 | Rebecca J. Kegler v. Merck & Co., Inc. |
| MN 0 05-2601 | Karen Langness, et al. v. Merck & Co. |
| MN 0 05-2668 | Gary L. Kober v. Merck & Co., Inc. |

**MISSOURI EASTERN**

| | |
|---|---|
| MOE 4 05-1944 | James Coleman v. Merck & Co., Inc. |
| MOE 4 05-1945 | Robert Ruzicka, et al. v. Merck & Co., Inc. |
| MOE 4 05-1977 | Roy Lacey, et al. v. Merck & Co., Inc., et al. |
| MOE 4 05-1978 | Wayne Lyons, et al. v. Merck & Co., Inc., et al. |
| MOE 4 05-1985 | Russel Curtis, et al. v. Merck & Co., Inc. |

M005130846

SCHEDULE CTO-34 TAG-ALONG ACTIONS (MDL-1657)                    PAGE 3 of 5

| DIST. DIV. C.A. # | CASE CAPTION |
|---|---|
| MOE 4 05-1986 | Zelmar Bond v. Merck & Co., Inc. |
| MOE 4 05-2001 | Wanda Patterson v. Merck & Co., Inc. |
| MOE 4 05-2031 | Virginia Whitton, etc. v. Merck & Co., Inc. |
| MOE 4 05-2033 | Linda Sue Lewis, et al. v. Merck & Co., Inc., et al. |
| MOE 4 05-2041 | Gene Warmann v. Merck & Co., Inc., et al. |
| MOE 4 05-2046 | Brian Lawson, et al. v. Merck & Co., Inc., et al. |
| MOE 4 05-2054 | Darrell Hunt v. Merck & Co., Inc., et al. |
| MOE 4 05-2118 | Cheryl Wolff v. Merck & Co., Inc. |
| MOE 4 05-2159 | Joyce Kern v. Merck & Co., Inc. |
| MOE 4 05-2160 | Jack Levitt v. Merck & Co., Inc. |
| MOE 4 05-2166 | Pearlie Lindsey v. Merck & Co., Inc. |

MISSOURI WESTERN

| | |
|---|---|
| MOW 4 05-1090 | Robert Wiese, etc. v. Merck & Co., Inc. |
| MOW 4 05-1116 | Maurice Logan v. Merck & Co., Inc. |
| MOW 4 05-1117 | James M. Howerter, et al. v. Merck & Co., Inc. |
| MOW 6 05-3538 | Lora Ann Creson v. Merck & Co., Inc., et al. |

MISSISSIPPI NORTHERN

| | |
|---|---|
| MSN 2 05-231 | Caroline Paris v. Merck & Co., Inc., et al. |
| MSN 2 05-232 | Lionel James v. Merck & Co., Inc., et al. |
| MSN 2 05-233 | Tekonsa Green v. Merck & Co., Inc., et al. |
| MSN 4 05-253 | Charlene Meeks v. Merck & Co., Inc., et al. |
| MSN 4 05-255 | Willie Bee v. Merck & Co., Inc., et al. |

MISSISSIPPI SOUTHERN

| | |
|---|---|
| MSS 3 05-666 | Jim Hood, ex rel. v. Merck & Co., Inc. |
| MSS 3 05-687 | Charity Kelly v. Merck & Co., Inc., et al. |

NEW MEXICO

| | |
|---|---|
| NM 2 05-1095 | Rex Allen v. Merck & Co., Inc. |

NEW YORK EASTERN

| | |
|---|---|
| NYE 1 05-5113 | Walter Sagel, et al. v. Merck & Co., Inc. |
| NYE 1 05-5151 | Richard Edgar v. Merck & Co., Inc. |
| NYE 1 05-5306 | Lewis Warren, et al. v. Merck & Co., Inc. |

NEW YORK SOUTHERN

| | |
|---|---|
| NYS 1 05-9313 | Mary Bainum, et al. v. Merck & Co., Inc. |
| NYS 1 05-9383 | Jose Rivera, etc. v. Merck & Co., Inc., et al. |
| NYS 1 05-9534 | Amanda Evans, etc. v. Merck & Co., Inc. |

OHIO NORTHERN

| | |
|---|---|
| OHN 1 05-2547 | William Jeffries, et al. v. Merck & Co., Inc., et al. |
| OHN 1 05-2586 | Joane Johnson, etc. v. Merck & Co., Inc. |
| OHN 1 05-2663 | Carrie Moore, etc. v. Merck & Co., Inc. |

OHIO SOUTHERN

| | |
|---|---|
| OHS 1 05-705 | Frederick McNamara, et al. v. Merck & Co., Inc., et al. |

OKLAHOMA EASTERN

| | |
|---|---|
| OKE 6 05-438 | Heather King, etc. v. Merck & Co., Inc. |
| OKE 6 05-439 | Ronna Napier, etc. v. Merck & Co., Inc. |

OKLAHOMA WESTERN

| | |
|---|---|
| OKW 5 05-1265 | Francis Anderson v. Merck & Co., Inc., et al. |
| OKW 5 05-1308 | David M. Jones, et al. v. Merck & Co., Inc., et al. |

SCHEDULE CTO-34 TAG-ALONG ACTIONS (MDL-1657)                    PAGE 4 of 5

| DIST. DIV. C.A. # | CASE CAPTION |
|---|---|
| **OREGON** | |
| OR  3  05-1654 | Marilyn Blatter v. Merck & Co., Inc. |
| OR  3  05-1709 | James A. Boullet v. Merck & Co., Inc. |
| OR  6  05-1701 | Dolores Syverson, et al. v. Merck & Co., Inc. |
| **PENNSYLVANIA EASTERN** | |
| PAE  2  05-5289 | Janice M. Richardson, et al. v. Merck & Co., Inc., et al. |
| PAE  2  05-5679 | William Allen v. Merck & Co., Inc., et al. |
| PAE  2  05-5975 | Greg Rhineer, etc v. Merck & Co., Inc., et al. |
| PAE  2  05-6030 | Russell Beach, et al. v. Merck & Co., Inc. |
| **PENNSYLVANIA MIDDLE** | |
| PAM  1  05-2311 | Stanley Bethea v. Merck & Co., Inc. |
| **TENNESSEE EASTERN** | |
| TNE  1  05-306 | James E. Queen, et al. v. Merck & Co., Inc., et al. |
| TNE  2  05-292 | George Sklenicka v. Merck & Co., Inc. |
| TNE  3  05-520 | Theadore Trohanowski v. Merck & Co., Inc. |
| TNE  3  05-521 | Robert Vineyard v. Merck & Co., Inc. |
| **TENNESSEE MIDDLE** | |
| TNM  2  05-117 | Mildred Clark, etc. v. Merck & Co., Inc. |
| TNM  3  05-884 | Randal C. Childress v. Merck & Co., Inc. |
| TNM  3  05-885 | Pansy M. Nash v. Merck & Co., Inc. |
| TNM  3  05-886 | Charlotte L. Johnson v. Merck & Co., Inc. |
| TNM  3  05-887 | Deborah D. Todd, et al. v. Merck & Co., Inc. |
| TNM  3  05-888 | Vivian Yvonne Jordan v. Merck & Co., Inc. |
| TNM  3  05-889 | Francisco Negron v. Merck & Co., Inc. |
| TNM  3  05-890 | Jeffrey R. Hein v. Merck & Co., Inc. |
| TNM  3  05-891 | Roy L. Miller v. Merck & Co., Inc. |
| TNM  3  05-892 | Geneva B. Bledsoe v. Merck & Co., Inc. |
| TNM  3  05-893 | Connie J. Thedford v. Merck & Co., Inc. |
| TNM  3  05-894 | Joyce A. Odom v. Merck & Co., Inc. |
| TNM  3  05-895 | Terry R. Staggs v. Merck & Co., Inc. |
| TNM  3  05-898 | Carolyn C. Long v. Merck & Co., Inc. |
| TNM  3  05-899 | Eddean Blackwood v. Merck & Co., Inc. |
| TNM  3  05-900 | Patricia R. Ochs v. Merck & Co., Inc. |
| TNM  3  05-901 | William S. Rogers v. Merck & Co., Inc. |
| TNM  3  05-902 | Glenn Galyon v. Merck & Co., Inc. |
| TNM  3  05-903 | Joe D. Wooden v. Merck & Co., Inc. |
| TNM  3  05-905 | Janice K. Nichols v. Merck & Co., Inc. |
| TNM  3  05-906 | Susie R. Mallory, et al. v. Merck & Co., Inc. |
| TNM  3  05-907 | Magaly H. Arcia v. Merck & Co., Inc. |
| TNM  3  05-908 | Thurman Williams v. Merck & Co., Inc. |
| TNM  3  05-909 | Sarah Prince v. Merck & Co., Inc. |
| TNM  3  05-910 | Ralph D. Tropeano v. Merck & Co., Inc. |
| TNM  3  05-911 | Roy F. Cantrell v. Merck & Co., Inc. |
| TNM  3  05-912 | Ruthie M. Hayes v. Merck & Co., Inc. |
| TNM  3  05-914 | Dorothy M. Crum v. Merck & Co., Inc. |
| TNM  3  05-915 | Roxie Lacy v. Merck & Co., Inc. |
| TNM  3  05-916 | Mary L. Hopper v. Merck & Co., Inc. |
| TNM  3  05-917 | Frances C. Hitchcock v. Merck & Co., Inc. |
| TNM  3  05-918 | Evelyln D. Arnold v. Merck & Co., Inc. |
| TNM  3  05-919 | Johnny W. Barrett v. Merck & Co., Inc. |
| TNM  3  05-920 | Virginia Reno v. Merck & Co., Inc. |
| TNM  3  05-921 | Michael B. Cooper v. Merck & Co., Inc. |
| TNM  3  05-922 | Georgia M. Savage v. Merck & Co., Inc. |

M005130848