1

## DEMAND FOR JURY TRIAL

2      Plaintiff demands trial by jury of all issues of fact in this case.

3 Dated this 23d day of December, 2005.

4                     MIKE McGRATH
                    Attorney General

5                     PAMELA D. BUCY
                    Assistant Attorney General

6                     P.O. Box 201401
                    Helena, MT 59620-1401

7                     Tel.: 406-444-2026

8

9         BY:

10                     E. CRAIG DAUE
                    Special Assistant Attorney General

11                     BUXBAUM, DAUE & FITZPATRICK, PLLC
                    P.O. Box 8209

12                     Missoula, MT 59807
                    Tel.: 406-327-8677

13

14

15         BY:

16                     WILLIAM A. ROSSBACH
                    Special Assistant Attorney General

17                     ROSSBACH HART BECHTOLD, PC
                    401 North Washington, Box 8988

18                     Missoula, MT 59807
                    Tel.: 406-543-5156

19

20

21

22

23

24

25

26

27

28

**COMPLAINT** - Page 20

M00427O487

FILED DISTRICT COURT
Third Judicial District

APR 2 8 2006

SALT LAKE COUNTY

By _____
Deputy Clerk

Matthew L. Garretson (Bar No. **)
Joseph W. Steele (Bar No. 9697)
Special Assistant Attorneys General
5664 South Green Street
Murray, Utah 84123
Telephone: (801) 266-0999
Fax: (801) 266-1338

David R. Stallard (Bar No. 7993)
Assistant Attorney General
160 East 300 South, 6th Floor
Salt Lake City, Utah 84114
Telephone: (801) 366-0555
Facsimile: (801) 366-0221

**Attorneys for Plaintiff, State of Utah**

---

**IN THE THIRD JUDICIAL DISTRICT COURT OF SALT LAKE COUNTY**

**STATE OF UTAH**

---

| | |
|---|---|
| THE STATE OF UTAH , | ) **COMPLAINT AND JURY DEMAND** |
| Plaintiffs, | ) |
| vs. | ) Civil No. 060907140 |
| MERCK & CO., INC., | ) Judge KOURIS |
| . Defendant. | ) |

---

Plaintiff, the State of Utah (hereinafter "Plaintiff" or "the State"), by and through its

Attorney General Mark L. Shurtleff, hereby complains of Defendant Merck & Co., Inc.,

(hereinafter "Defendant" or "Merck") and alleges as follows:

**JURISDICTION AND VENUE**

1.    Jurisdiction over the subject matter of this cause of action is based upon the False Claims Act, Title 26, Chapter 20 of the Utah Health Code, which provides remedies to redress Defendant's actions under Utah Code Annotated § 26-20-1 et seq.

2.    Personal jurisdiction over this Defendant is proper under the Utah Long Arm Statute as codified in §§ 78-27-22 and 78-27-24 of the Utah Code Annotated.

3.    Venue is proper in the Third Judicial District and Salt Lake County pursuant to Utah Code Annotated § 78-13-7 in that many of the unlawful acts committed by Defendant were committed in Salt Lake County, including the making of false statements and misrepresentations of material fact to the State of Utah, its departments, agencies, instrumentalities and contractors, including the Utah Medicaid Program.

**PARTIES**

4.    Plaintiff is the State of Utah in its capacity as sovereign and on behalf of the Division of Health Care Financing within the Utah Department of Health, the single state agency administering the Utah Medicaid Program.

5.    Defendant Merck is a corporation organized and existing under the laws of the State of New Jersey with its principal place of business in Whitehouse Station, New Jersey. At all times relevant to this action, Merck was in the business of licensing, manufacturing, distributing, and/or selling, either directly or indirectly, through third parties or related entities, the prescription pharmaceutical Vioxx (hereinafter "the product" or "Vioxx"). At all times relevant to this action, Merck did business within the State of Utah by marketing and selling Vioxx within the State to both the State and its agencies and to the general public.

2

## NATURE OF THE CASE

6.    This is a civil action for damages and civil penalties pursuant to Utah Code

Annotated § 26-20-13.

## ALLEGATIONS OF FACT

7.    The Federal Food and Drug Administration (hereinafter "FDA") approved Vioxx

on May 20, 1999, for the treatment of dysmenorrhea (painful menstrual cramps), management of

acute pain in adults, and for relief of signs and symptoms of osteoarthritis.  Subsequent to FDA

approval, Vioxx was widely advertised and marketed by Merck as a safe and effective pain relief

medication.

8.    From the time Defendant started developing Vioxx, through the date of its

withdrawal from the market on September 30, 2004, the Defendant engaged in knowing

misrepresentations that Vioxx was safe and effective, as well as advertising and promotional

campaigns that falsely represented the safety of Vioxx.

9.    Defendant was aware of the serious and significant health hazards caused by

Vioxx even before the medication was promoted to physicians, the State and the general public.

Specifically, Defendant knew that cerebrovascular and cardiovascular problems occurred more

frequently in patients receiving Vioxx than in patients receiving placebos or other medicines.

Defendant's internal memos and e-mails dating back to at least 1996 show that the Defendant

knew how and why Vioxx caused cardiovascular problems in Vioxx patients, as compared to a

control group.  This information was knowingly withheld or misrepresented to the FDA, the

State and the general public.  This information was material and relevant to Plaintiffs.

3

10.     According to Merck, more than 52 million prescriptions have been written for Vioxx since 1999.  Vioxx generated sales of 2.6 billion dollars in 2001 out of an anti-arthritic market of 5.5 billion dollars.

11.     After Vioxx was approved and made available to the public, Merck sponsored the VIGOR (Vioxx Gastrointestinal Outcomes Research) study to obtain information regarding clinically meaningful gastrointestinal events and to develop a large controlled database for overall safety assessment.  At the conclusion of the VIGOR study, it was reported that serious cardiovascular events occurred in 101 patients who took Vioxx, compared to 46 patients who took an over-the-counter alternative.  Additionally, myocardial infarctions (heart attacks) occurred in 20 patients in the Vioxx treatment group, as opposed to only four in the alternative group.

12.     In addition, Vioxx has been linked to several severe and life-threatening disorders including, but not limited to, edema, unsafe changes in blood pressure, heart attack, stroke, seizures, kidney and liver damage, pregnancy complications, meningitis and death.  These dangers were not shared with physicians, the FDA, the State or the general public.

13.     Beginning in the 1990s, Defendant's strategy was to aggressively market and sell Vioxx by willfully misleading potential users about serious dangers resulting from the use of Vioxx.  Defendant undertook an advertising blitz, extolling the virtues of Vioxx in order to induce widespread use.  This marketing campaign consisted of advertisements, telephone conferences, live conferences, direct promotional literature to doctors and other healthcare providers, and other promotional materials provided directly to Vioxx users.

4

14.     The advertising program sought to create the impression and belief by consumers and physicians that Vioxx was safe for human use, and had fewer side effects and adverse reactions than other pain relief medications.  This was done even though Defendant either knew these representations to be false or had no reasonable grounds to believe them to be true.

15.     The advertising program purposefully downplayed the risks associated with Vioxx use, including serious illness and death.  Merck relayed only positive information and relied upon manipulated statistics to suggest widespread acceptability, while at the same time concealing adverse factual material, including relevant information of serious health risks from the State, physicians and the general public.  In particular, the advertising materials produced by Defendant falsely represented the severity, frequency and nature of adverse health effects caused by Vioxx.  Further, they falsely represented that adequate testing had been done on Vioxx.

16.     Merck's conduct was such that the FDA, which enforces federal statutes and regulations that require product safety disclosures to be truthful, fair and balanced, issued several informal warnings to Merck, requesting that accurate risk-related information be provided regarding Vioxx.  These warnings went largely unheeded, prompting the FDA to write an official "warning letter" in September of 2001, demanding that Merck correct certain false and misleading claims.

17.     As a result of Defendant's advertising and marketing efforts, Vioxx was pervasively prescribed throughout the United States and the State of Utah until September 30, 2004, when it was withdrawn from the market.

5

18.    While making Vioxx available to Medicaid patients, Defendant knowingly misrepresented to the State, as well as to physicians and the general public that Vioxx was safe and efficacious. The State of Utah allowed the purchase of Vioxx for Utah Medicaid recipients based upon such representations by Defendant.

19.    From May, 1999 until September 30, 2004, Vioxx was prescribed by Utah physicians to many recipients of the Medicaid Program of the State of Utah. As a result of ingesting Vioxx, Utah Medicaid patients suffered serious health effects now requiring further and more extensive medical treatment and provision of other health-related services. For these individuals, the State is the financially responsible party for this treatment. The State has thus suffered and will continue to suffer additional financial loss in the care of those Medicaid recipients who consumed prescriptions which were ineffective, unsafe and actively harmful.

20.    The Utah Attorney General has the right to bring this suit pursuant to Utah Code Annotated §§ 26-20-13(2)(a), 67-5-1(2) and 67-5-3. Utah Code Annotated § 26-20-9.5(1)(b) further provides that the State of Utah is entitled to recover the costs of enforcement in this case, including but not limited to the cost of its investigators and attorneys.

## FIRST CLAIM FOR RELIEF
### (Strict Products Liability – Failure to Warn)

21.    Plaintiff incorporates paragraphs 1 through 20 as if fully set forth herein, and further alleges as follows:

22.    Defendant is the manufacturer and/or supplier of Vioxx.

23.    The Vioxx manufactured and/or supplied by Defendant was unaccompanied by proper warnings or packaging regarding all possible side effects associated with the use of

6

Vioxx. The Defendant failed to warn of the comparative severity, incidence and duration of such adverse effects. The warnings given to the State, physicians and the general public did not accurately reflect the signs, symptoms, incidents or severity of the side effects of Vioxx.

24.     Defendant failed to adequately test Vioxx. Such testing would have further confirmed that Vioxx possessed serious potential side effects to which full and proper warnings should have been made.

25.     The Vioxx manufactured or supplied by Defendant was defective due to inadequate post-marketing warnings, packaging or instructions. After the manufacturer knew or should have known of the risks of injury from Vioxx, it failed to provide adequate warnings to physicians, the general public or the State as the prescribers, users and financially responsible party, respectively. Further, Defendant continued to aggressively market Vioxx.

26.     As a proximate cause and legal result of Defendant's failure to warn of known and reasonably knowable dangers associated with the use of Vioxx, the State of Utah has suffered and will continue to suffer damages as outlined in paragraph 19 above. The State is therefore entitled to recover for those damages, as well as those outlined in paragraph 20.

27.     Based on information and belief, Defendant actually knew of the defective nature of Vioxx, but continued to market and sell Vioxx without proper warning, so as to maximize sales and profits, in conscious disregard for the foreseeable harm caused by Vioxx.

28.     Defendant's conduct in the advertising, marketing, promotion, packaging and distribution of Vioxx without proper and timely warnings was fraudulent and knowing or reckless misconduct, with conscious disregard for the safety of consumers and the State as the

7

financially responsible party. The same constitutes oppression, fraud and malice sufficient to entitle the State to an award of punitive damages in an amount sufficient to punish Defendant and set an example to all drug manufacturers who represent the safety of their product to the State for use in the Medicaid Program.

### SECOND CLAIM FOR RELIEF
#### (Strict Products Liability: Design Defect)

29.     Plaintiff incorporates paragraphs 1 through 28 as if fully set forth herein, and further alleges as follows:

30.     At all times material and relevant to this action, Vioxx was defective in design and manufacture, and was so at the time it was prescribed by doctors participating in the State's Medicaid Program. Vioxx was defective and dangerous in that it caused serious injuries when used for its intended and foreseeable purpose, i.e., when ingested as prescribed and in the manner recommended by Defendant.

31.     The defects in Vioxx were known to Defendant at the time of approval by the FDA. Such defects were concealed and withheld from the FDA. Disclosure by Defendant was inaccurate, incomplete, misleading and fraudulent.

32.     Defendant knew Vioxx would be used by the consumer without inspection for defect and that the State, physicians and medicinal users of Vioxx were relying upon Defendant's representations that the product was safe.

33.     Adequate post-approval testing would have revealed the further extent of the dangers of ingesting Vioxx, and would have shown that Vioxx was unsafe for human

8

consumption and could cause extensive medical complications and costs for injuries relating to its use.

34.    As a proximate and legal result of the design defect, as well as Defendant's failure to adequately test the product so as to discover the defect, the State of Utah has suffered and will continue to suffer the damages alleged in paragraph 19, and is therefore entitled to recover for those damages as well as those outlined in paragraph 20.

35.    Defendant's conduct in the design and testing of this drug was fraudulent, reckless, and undertaken with conscious disregard for the rights and safety of others, including the State of Utah.  The State is therefore entitled to an award of punitive damages, to punish and make an example of Defendant as set forth in paragraph 28 above.

### THIRD CLAIM FOR RELIEF
### (Fraud and Negligent Misrepresentation)

36.    Plaintiff incorporates paragraphs 1 through 35 as if fully set forth herein, and further alleges as follows:

37.    Defendant's warning of side effects associated with Vioxx contained false representations and/or failed to accurately represent the material facts of the full range and severity of side effects and adverse reactions associated with the product.

38.    Defendant's claims and assertions to the FDA, the State of Utah, physicians and the general public regarding Vioxx contained false representations as to the safety of Vioxx and its defective design.

39.    Defendant was negligent in not making accurate representations regarding the side effects and adverse medical conditions caused by the use of Vioxx.

9

40.    Defendant knew or reasonably should have known through adequate testing that the claims made to the State with respect to the safety of Vioxx were false or incomplete, and misrepresented the material facts regarding the unsafe and defective condition of Vioxx.

41.    Defendant's misrepresentations in this regard were done with the intention of inducing the State to approve of the distribution of Vioxx to participants in the Utah Medicaid Program.

42.    As a proximate and legal result of Defendant's fraudulent misrepresentations, the State of Utah has suffered and will continue to suffer the damages alleged in paragraph 19, and is therefore entitled to recover for those damages, as well as those outlined in paragraph 20.

43.    Defendant's conduct in making these fraudulent representations was deliberate and undertaken with conscious disregard for the rights and safety of others, including the State of Utah. The State is therefore entitled to an award of punitive damages, to punish and make an example of Defendant as set forth in paragraph 28 above.

### FOURTH CLAIM FOR RELIEF
#### (Negligence)

44.    Plaintiff incorporates paragraphs 1 through 43 as if fully set forth herein, and further alleges as follows:

45.    Defendant had a duty to exercise reasonable care in the manufacture, sale, and/or distribution of Vioxx, including a duty to ensure that users would not suffer from unreasonable, dangerous, undisclosed or misrepresented side effects. This duty extends to the State of Utah as the party ultimately bearing financial responsibility for Utah Medicaid patients.

10

46.    Defendant breached this duty, as it was negligent in the testing, marketing, manufacture, sale and packaging of Vioxx.

47.    As a direct and proximate result of Defendant's negligence, the State of Utah has suffered and will suffer the damages alleged in paragraph 19 above, and is entitled to recover for those damages as well as the damages outlined in paragraph 20.

48.    Defendant's negligence in testing, manufacturing, packaging, and marketing Vioxx was fraudulent, reckless, and undertaken with conscious disregard for the rights of others, including the State of Utah.  Plaintiff is therefore entitled to an award of punitive damages to punish and make and example of Defendant as set forth in paragraph 28.

### FIFTH CLAIM FOR RELIEF
### (Breach of Express Warranty)

49.    Plaintiff incorporates paragraphs 1 through 48 as if fully set forth herein, and further alleges as follows:

50.    In marketing Vioxx and making it available through the Utah Medicaid Program, Defendant expressly warranted to the State, its physicians and Medicaid recipients that Vioxx was safe, effective, fit and proper for its intended use.  Pursuant to Utah Code Annotated § 70A-2-313, these express warranties were created by and through statements made by Defendant or Defendant's authorized agents or sales representatives, orally and in publications, package inserts, and in other written materials intended for the State, physicians, medical patients and the general public.

11

51.     The State, its physicians and Medicaid patients relied on the skill, judgment, representations and foregoing express warranties.  Such representations were false in that Vioxx was not safe or fit for its intended use.

52.     As a direct and legal result of this breach of warranty, the State of Utah has suffered and will continue to suffer damages as set forth in paragraph 19 above.  Pursuant to Utah Code Annotated §§ 70A-2-714 and 70A-2-715, the State is therefore entitled to recover those damages, including incidental and consequential damages, from Defendant.

### SIXTH CLAIM FOR RELIEF

### (Breach of Implied Warranty)

53.     Plaintiff incorporates paragraphs 1 through 52 as if fully set forth herein, and further alleges as follows:

54.     Pursuant to Utah Code Annotated § 70A-2-314, through the manufacture, marketing, and sale of Vioxx, Defendant impliedly warranted to the State of Utah, its physicians and its Medicaid recipients that Vioxx was of merchantable quality – safe and fit for the use for which it was intended.

55.     At all times relevant to this action, Defendant had reason to know of the particular purpose for which the State, its physicians and Medicaid recipients were purchasing and using Vioxx, i.e., for the safe and effective treatment of pain.  Therefore, pursuant to Utah Code Annotated § 70A-2-315, Defendant impliedly warranted to the State of Utah, its physicians and its Medicaid recipients that Vioxx was fit for that particular purpose.

12

56.     Defendant had reason to know through actual or constructive knowledge that the State of Utah, its physicians and Medicaid recipients were reasonably relying upon the skill, judgment and implied warranties of Defendant in allowing the use of Vioxx.

57.     Defendant breached the implied warranties of merchantability and of fitness for a particular purpose in that Vioxx was neither safe for its intended use nor of merchantable quality, nor was it safe for the particular purpose intended by the State and Medicaid recipients, in that Vioxx had dangerous propensities when put to its intended use, resulting in severe illness and injury to many of its users.

58.     As a direct and legal result of this breach of warranty, the State of Utah has suffered and will continue to suffer damages as set forth in paragraph 19 above.  Pursuant to Utah Code Annotated §§ 70A-2-714 and 70A-2-715, the State is therefore entitled to recover those damages, including incidental and consequential damages, from Defendant.

### SEVENTH CLAIM FOR RELIEF
#### (Negligence *Per Se*)

59.     Plaintiff incorporates paragraphs 1 through 58 as if fully set forth herein, and further alleges as follows:

60.     Defendant has an obligation not to violate the law.

61.     Defendant has violated the Federal Food, Drug, and Cosmetic Act as set forth in 21 U.S.C. 301, *et seq.*, its related amendments, codes, and federal regulations promulgated thereunder, and other applicable state and federal law.

62.     Medicaid patients, as purchasers and consumers of the product, and the State of Utah, as the financially responsible party, are within the class of persons that the statutes

13

described above are designed to protect. Injury due to design defect, misbranding, false

advertising and misleading products is the type of harm these statutes are intended to prevent.

63.　　Defendants failed to meet the standard of care set by the following regulations,

which were intended for the benefit of patients and the State of Utah as the responsible paying

party, making Defendant negligent *per se*:

   a.　The labeling lacked adequate information on the intended use of Vioxx, even though Defendant was aware of the widespread use of Vioxx, in violation of 21 C.F.R. 201.56(a) and (b);

   b.　The labeling did not state there was a lack of evidence to support the common belief in the safety and efficacy of Vioxx in violation of 21 C.F.R. 201.57(c)(3)(i);

   c.　The labeling failed to add warnings of the serious side effects including, but not limited to, cardiovascular events, strokes, heart attacks and death as soon as there was reasonable evidence of their association with Vioxx in violation of 21 C.F.R. 201.57(e);

   d.　The labeling contained inadequate information for patients and physicians to determine the safe and effective use of Vioxx in violation of 21 C.F.R. 201.57(f)(2);

   e.　The labeling contained inadequate information regarding the level of care and monitoring to be exercised by the doctor for safe and effective use of Vioxx in violation of 21 C.F.R. 201.57(f)(1);

   f.　Vioxx' labeling and promotion was misleading in violation of 21 C.F.R. 201.56(b);

   g.　Defendant's advertisements contained untrue and misleading information and/or failed to contain true and accurate statements relating to the side effects, contraindications and effectiveness of Vioxx in violation of 21 C.F.R. 202.1(e), and;

   h.　Defendant's advertisements for Vioxx were false, lacking in fair balance or otherwise misleading in violation of 21 C.F.R. 202.1(e)(7).

14

64.    Defendant is responsible to the State for economic loss incurred for violations of the statutes and regulations described above under the doctrine of negligence *per se*.

65.    As a direct and proximate result of the violations of these statutes, the State of Utah has suffered and will continue to suffer damages as alleged in paragraph 19 above, and is therefore entitled to recover for those damages, as well as the damages outlined in paragraph 20.

### EIGHTH CLAIM FOR RELIEF
### (Civil Penalties Under the Utah Health Code)

66.    Plaintiff incorporates paragraphs 1 through 65 as if fully set forth herein, and further alleges as follows:

67.    Defendant violated the False Claims Act of the Utah Health Code as codified in Title 26, Chapter 20 of the Utah Code Annotated.  These violations were committed in the following particulars:

    a. Defendant made "false statements" or false representations to the State and its agencies in seeking inclusion and payment under the Utah Medicaid Program, in violation of Utah Code Annotated § 26-20-3;

    b. Defendant caused false and fraudulent claims for benefit to be made to employees and officers of the State in order to secure inclusion and payment under the Medicaid Program, in violation of Utah Code Annotated § 26-20-7(1);

    c. the documentation given by Defendant to the State regarding the safety and efficacy of Vioxx for inclusion and payment under the Medicaid Program was falsified or altered with intent to deceive, in violation of Utah Code Annotated § 26-20-7(2)(j);

    d. Defendant's claims to the State for inclusion and payment under the Medicaid Program misrepresented the type and quality of the services rendered by the ingestion of Vioxx, in violation of Utah Code Annotated § 26-20-7(2)(b); and

15

e.  Defendant filed claims for inclusion and payment under the Medicaid program for services and/or goods which it knew were not medically necessary, in violation of Utah Code Annotated § 26-20-7(2)(d).

68.    Under the provisions of Utah Code Annotated § 26-20-9.5, Defendant is liable for the following damages:

a.  full and complete restitution to the state of all medical benefits improperly obtained;

b.  the costs of enforcement, including but not limited to the cost of investigators and attorneys;

c.  a civil penalty not to exceed three times the value improperly claimed; and

d.  a civil penalty of up to $2,000.00 for each violation.

69.    These costs and penalties are in addition to and not a substitute for the damages alleged in paragraph 19 and 20 above.

### JURY DEMAND

The State respectfully requests a trial by jury pursuant to Rule 38, Utah R. Civ. Proc.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the State of Utah, prays for judgment against Defendant as follows:

1.    an award to Plaintiff in the form of judgment against Defendant Merck for the Vioxx-related damages of past, present and future medical expenses for recipients of the Utah Medicaid Program;

2.    the cost of all Vioxx prescriptions paid by the Utah Medicaid Program;

3.    for all civil penalties pursuant to the statutes cited herein;

16

4.      for the costs of enforcement pursuant to § 26-20-9.5(b), Utah Code Ann.;

5.      for punitive damages for the wanton and reckless conduct of Defendant as outlined herein;

6.      for exemplary damages for the benefit of all other drug manufacturers who wrongly misrepresent the safety of their product to the detriment of the State's Medicaid Program;

7.      For such other and further relief as may be justified and which Plaintiff may be entitled to by law including, but not limited to, all court costs, witness fees and deposition fees.

Respectfully SUBMITTED and DATED this **27th** day of April, 2006

Mark L. Shurtleff
Attorney General of Utah

*David R. Stallard*

David R. Stallard
Assistant Attorney General

GARRETSON & STEELE, LLC
Matthew L. Garretson
Joseph W. Steele

ATTORNEYS FOR THE STATE OF UTAH

17

# Exhibit H

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

HOLMES et al.,                          )
                                        )
              Plaintiffs,               )
                                        )
    vs.                                 )        Case No. 4:05CV00439 ERW
                                        )
MERCK & CO. et al.,                     )
                                        )
              Defendants.               )

**MEMORANDUM AND ORDER**

This matter comes before the Court upon Defendant Merck's Motion to Stay [doc. #7]. A

hearing was held on April 27, 2005, and the Court heard arguments from the parties on the Motion.[1]

**I.      BACKGROUND FACTS**

This action concerns the prescription drug VIOXX, manufactured by Defendant Merck. On

September 30, 2004, Defendant Merck announced that, in a clinical study known as APPROVe,[2]

there was an increased relative risk for confirmed cardiovascular events beginning after 18 months

of treatment in patients taking VIOXX compared with those taking a placebo. Defendant Merck

subsequently voluntarily withdrew VIOXX from the market. Thereafter, numerous suits were filed

across the nation seeking some form of recovery for plaintiffs who had purchased and ingested

VIOXX. On October 21, 2004, Defendant Merck filed a motion for coordinated pre-trial

proceedings with the Judicial Panel on Multidistrict Litigation (the "MDL"), requesting that all of the

_____

[1]During this hearing, the Court also heard arguments from the parties on Plaintiff
Holmes's Motion to Remand [doc. #29].

[2]The APPROVe study was a prospective, randomized, placebo-controlled clinical trial
designed to evaluate the efficacy of VIOXX 25 mg. in preventing recurrence of colorectal polyps
in patients with a history of collerectal adenomas.

1

M00B670095

VIOXX cases be coordinated in a single district court.

## II.    STANDARD OF REVIEW

A district court has the inherent power to stay its proceedings. This power is "incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. North American Co.*, 299 U.S. 248, 254 (1936). This power requires a court to exercise its "judgment, which must weigh competing interests and maintain an even balance." *Id.* A court need not automatically stay a case merely because a party has moved the MDL for transfer and consolidation. *See Rivers v. Walt Disney*, 980 F.Supp. 1358, 1360 (C.D. Cal. 1997). In considering a motion for stay, a court should consider both the interest of judicial economy and the potential prejudice or hardship to the parties. *Id.*

## III.    DISCUSSION

In its Motion, Defendant Merck requests that the Court stay all proceedings in this action pending resolution of its motion currently before the MDL Panel for transfer of this case, and numerous other cases with certain overlapping factual issues and similar legal theories, to a single court for coordinated pretrial management. In support of its Motion, Defendant Merck argues that judicial economy mandates a stay because, without a stay, (1) much of the Court's work will be needlessly duplicated; and (2) Defendant Merck will be substantially prejudiced by duplicative discovery and motion practice. According to Defendant Merck, the issues raised by Plaintiffs' remand motion are similar to those raised in other cases that have been and likely will be transferred to a central court pursuant to certain MDL orders, and that court should be allowed to decide the remand issue to ensure all defendants are treated in a uniform manner.[3] In opposing the Motion,

---

[3]According to Defendant, stay orders have been issued in more than 175 VIOXX-related cases across the nation, and several of these 175 cases include pending remand motions.

2

M0086/70096

Plaintiffs state that the MDL rules specifically authorize the Court to rule on their pending Motion to Remand. Plaintiffs argue that the Court should rule on Plaintiffs' Motion to Remand before considering the Motion to Stay because (1) judicial economy weighs in favor of ruling the Motion to Remand because, if the Motion is granted, no further federal resources would be expended on this case; and (2) issuing a stay would be prejudicial to the rights of Plaintiffs because a stay will substantially delay Plaintiffs' recovery.

After considering the arguments made by the parties, the Court concludes that the factors weigh in favor of staying this action. At the hearing on this matter, Defendant Merck pointed out that the MDL panel has now issued five conditional transfer orders affecting about 400 VIOXX cases. Defendant Merck further stated that there are currently 46 actions with pending motions to remand. Therefore, the transferee court hearing the coordinated cases will decide many of the same issues this Court would determine with regard to Plaintiffs' pending Motion to Remand. Although Plaintiffs are correct in pointing out that the Court does have the power to decide their pending Motion to Remand rather than staying this action, the Court finds Defendant Merck's judicial economy argument persuasive and concludes that judicial economy weighs heavily in favor of granting the requested stay.

The Court also considers the resulting prejudice to the parties. Plaintiffs argue that a stay will prejudice them because it will delay their opportunity for recovery. The Court concludes that, although Plaintiffs might well be subjected to some delay as a result of the issuance of a stay, that prejudice does not outweigh the judicial economy interests described above. Therefore, Defendant Merck's Motion will be granted.

Accordingly,

3

M00B670097

**IT IS HEREBY ORDERED** that Defendant Merck's Motion to Stay [doc. #7] is

**GRANTED**. All motions currently pending before this Court are **DENIED**, **as moot**, with leave

to refile at a later date, if necessary.

Dated this <u>3rd</u> day of May, 2005.

_E. Richard Webber_

_____
E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE

4

M00B67O098

# Exhibit I

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

IN RE: VIOXX
    PRODUCTS LIABILITY LITIGATION

\*    MDL NO. 1657
\*
\*    SECTION: L(3)
\*
\*    JUDGE FALLON
\*    MAG. JUDGE KNOWLES

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

THIS DOCUMENT RELATES TO:
    *Tallas, et al. v. Merck & Co., Inc., et al.*, 06-3152

### ORDER

    The Court heard oral argument on August 30, 2006 on the Plaintiff's Motion to Remand (Rec. Doc. 6228). For reasons stated on the record, the Plaintiff's motion is GRANTED and this matter is REMANDED to the Philadelphia Court of Common Pleas.

    As an MDL Court, this Court has been charged with the task of presiding over thousands of cases involving hundreds of thousands of litigants. To promote the just and efficient conduct of these actions, the Court has previously indicated that it would deal with remand motions as a group in accordance with procedures to be determined at a future date. The Court is still committed to this plan. The facts of the present case, however, were so exceptional that they justified the Court's taking earlier action.

    New Orleans, Louisiana, this __5th__ day of __September__, 2006.

                        *[signature]*

                    UNITED STATES DISTRICT JUDGE

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2005 NOV 23  PM 3:03

LORETTA G. WHYTE
CLERK

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE: VIOXX                                          *    **MDL NO. 1657**
     **PRODUCTS LIABILITY LITIGATION**    *
                                *    **SECTION: L(3)**
                                *
                                *    **JUDGE FALLON**
                                *    **MAG. JUDGE KNOWLES**

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**THIS DOCUMENT RELATES TO**
    *Felicia Garza, et al. v. Michael D. Evans, M.D., et al.*

## ORDER AND REASONS

Pending before the Court is Plaintiffs' Motion to Remand. For the following reasons, the motion is GRANTED.

## I.    FACTS

This a medical malpractice/products liability case arising out of the death of Leonel Garza, Sr. During the spring of 2001, cardiologists Dr. Michael D. Evans and Dr. Juan D. Posada ("Defendant Doctors"), who are citizens of Texas, treated Mr. Garza for a heart condition. In the course of this treatment, Defendant Doctors prescribed Mr. Garza Vioxx. Vioxx was designed, manufactured, and marketed by Merck & Co. Inc. ("Merck"), which is a citizen of New Jersey. On April 21, 2001, while still being treated with Vioxx, Mr. Garza died of a heart attack.

On March 10, 2003, the Plaintiffs, the survivors of Mr. Garza and citizens of Texas, initiated this action in the 229th Judicial District Court of Starr County, Texas. Plaintiffs

1

asserted various products liability theories against Merck.  In addition, Plaintiffs also asserted

negligence and products liability claims against Defendant Doctors.

On March 17, 2003, Merck was served with a copy of the Plaintiffs' Original Petition.

On April 16, 2003, Merck removed this case to the Southern District of Texas contending that

the Defendant Doctors were improperly joined to defeat diversity jurisdiction.  On May 16, 2003,

Plaintiffs moved to remand.

To support their remand motion, Plaintiffs claimed that they asserted three viable legal

theories against the Defendant Doctors and, as such, the Defendant Doctors were not improperly

joined.  First, the Plaintiffs asserted that they had stated a negligence claim against the Defendant

Doctors because the Defendant Doctors negligently prescribed Vioxx to Mr. Garza when they

knew or should have known of an adverse risk of heart attack from the drug.  Second, Plaintiffs

asserted that they had stated a claim against the Doctor Defendants based on a theory of negligent

misdiagnosis of Mr. Garza's symptoms.  Third, Plaintiffs asserted that they had stated various

products liability theories against the Defendant Doctors.

In support of the two negligence theories, Plaintiffs attached affidavits from two medical

experts—Dr. Simonini and Dr. Bush.  Dr. Simonini claimed that the Defendant Doctors breached

the applicable standard of care by negligently dispensing Vioxx to Mr. Garza in the face of

known cardiac risks and by negligently misdiagnosing Mr. Garza's symptoms.  Dr. Bush claimed

that the Defendant Doctors negligently misdiagnosed Mr. Garza's symptoms, but did not render

any opinion concerning the negligent dispensation theory.  On July 31, 2003, the Southern

District of Texas remanded the case concluding that the Plaintiffs had stated a potentially viable

negligence claim against the Defendant Doctors.

2

On April 23, 2004, after the Southern District of Texas remanded the case, the parties entered into an Agreed Order Setting Jury Trial, which provided for a Monday, November 8, 2004 trial setting and an alternative trial date of Monday, February 14, 2005.

On August 21, 2004, Merck filed a Motion to Adopt the February 14, 2005 trial setting. This motion was granted by the 229th Judicial District Court of Starr County on September 15, 2004. The Plaintiff asserts that this Motion To Adopt was Merck's first continuance.

On September 30, 2004, Merck recalled Vioxx based on the findings in the APPROVe study, which sought to determine whether Vioxx was a viable treatment for colon polyps. Based on the findings of the APPROVe study, Merck filed a second motion to continue on October 22, 2004.

On December 9, 2004, Merck took the deposition of Dr. Simonini, the expert cardiologist whose affidavit the Plaintiffs submitted to the Southern District of Texas with its motion to remand. In his affidavit, Dr. Simonini testified that the Defendant Doctors had acted negligently because a reasonable and prudent physician would have known of the risks associated with Vioxx and would not have dispensed Vioxx to Mr. Garza. In addition, Dr. Simonini also testified that the Defendant Doctors had negligently misdiagnosed Mr. Garza's condition. At his deposition, however, Dr. Simonini changed his position and refused to attribute any blame to the Defendant Doctors.

On January 12, 2005, Merck filed its third motion to continue. Under Texas law, attorneys elected to the state legislature are afforded the benefit of a "legislative continuance," which allows state legislators to push back their civil trials until thirty days after the legislature adjourns. The "legislative continuance" only applies if the attorney legislator is hired at least

3

thirty days prior to the commencement of trial.

The Texas Legislature convened on Tuesday, January 11, 2005. On Wednesday, January 12, 2005, just two days prior to the thirty day deadline regarding legislative continuances, Merck filed a Notice of Appearance adding State Senator Juan Hinojosa as counsel. On January 13, 2005, after some local media exposure, Senator Hinojosa withdrew the motion to continue alleging that it was signed by mistake.

On January 14, 2005, Merck filed its fourth motion to continue. This time Merck added State Representative Rene Oliveira as counsel. In addition, on the same date, Merck filed a supplemental motion to continue, which the Plaintiff's classify as Merck's fifth motion to continue.

On January 18, 2005, Merck filed its second notice of removal. On January 24, 2005, the Plaintiffs filed a motion to remand. A hearing on this motion was set for February 24, 2005. On February 16, 2005, however, the Judicial Panel on Multidistrict Litigation ("Panel") issued a conditional transfer order in this case. On June 20, 2005, the Panel issued a final transfer order transferring this case to the Eastern District of Louisiana as part of MDL 1657.

## II.    **MOTION TO REMAND**

In its second notice of removal, Merck asserted that the Plaintiffs no longer had any viable causes of action against the Defendant Doctors. On December 17, 2004, the Plaintiffs filed a Second Amended Original Petition in which they dropped their previous allegations that the Defendant Doctors were liable for negligent misdiagnosis. Additionally, the Plaintiffs had previously dropped their products liability claims against the Defendant Doctors. Thus, at present and at the time of the second notice of removal, the only remaining claim against the

Defendant Doctors was the negligent dispensation claim. Merck claims that the Plaintiffs have no possibility of recovery based on the negligent dispensation claim because Dr. Simonini, the Plaintiffs' expert regarding negligent dispensation, changed his testimony at his deposition and asserted that the Defendant Doctors were not negligent.

In addition, Merck claims that the one year time limit for diversity removals under section 1446(b) of title 28 of the United States Code should be equitably tolled in this case. Based upon *Tedford v. Warner-Lambert Co.*, 327 F.3d 423 (5th Cir. 2003), Merck asserts that the one year time limit should be equitably tolled because the Plaintiffs improperly joined the Defendant Doctors to manipulate the forum. This claim is based on the change of Dr. Simonini's testimony and the Plaintiffs' voluntary dismissal of their other two theories of liability—all of which occurred more than one year after the commencement of the action.

The Plaintiffs assert that the one year time limit to section 1446(b) prevents Merck from removing this case and that the facts of this case do not warrant the equitable tolling of section 1446(b)'s one year time limit. Second, even if the one year time limit of 1446(b) is equitably tolled, the Plaintiffs argue that they still have a possibility of recovery against the Defendant Doctors and, as such, the Defendant Doctors are not improperly joined and their citizenship should be taken into account for diversity jurisdiction purposes.

III.    **LAW AND ANALYSIS**

If a case is not initially removable at the time of filing, a defendant may remove the case within thirty days of receipt of an amended pleading, motion, order, or other paper that indicates that the case is removable. 28 U.S.C. § 1446(b). A case, however, may not be removed on the basis of diversity jurisdiction more than one year after the commencement of the action. *Id.*

5

Section 1446(b)'s one year time limit was enacted to prevent the removal of an action wherein substantial progress had been made in state court. *New York Life Ins. Co. v. Deshotel*, 142 F.3d 873, 886-87 (5th Cir. 1998).

The Plaintiffs filed this case on March 10, 2003. Merck removed this case on January 18, 2005, well beyond the one year time limit. Merck concedes that the plain language of section 1446(b) precludes the removal of this action, but asserts that the principle of equitable tolling permits it to remove this case after the one year time limit.

In *Tedford v. Warner-Lambert Co.*, the Fifth Circuit held that section 1446(b) is subject to an exception of equitable estoppel. 327 F.3d 423, 426 (5th Cir. 2003). In *Tedford*, the plaintiff filed suit against several defendants, including one non-diverse defendant, in Texas state court. *Id*. at 424. Through discovery, Warner-Lambert, a defendant in the case, learned that the non-diverse defendant was not a proper party to the suit. *Id*. at 425. As such, Warner-Lambert informed the plaintiff of its intent to remove the case based on diversity jurisdiction. *Id*. A mere three hours later and before the notice of removal was filed, the plaintiff added another non-diverse defendant to prevent diversity jurisdiction and defeat removal. *Id*. Soon thereafter, without taking any discovery from the newly added non-diverse defendant and without providing the newly added defendant with proper notice under the Texas Medical Liability and Insurance Improvement Act, the plaintiff signed and postdated a notice of non-suit as to the newly added non-diverse defendant before the expiration of the one year time limit, but did not file the notice until after the one year time limit passed. *Id*. Ten days after the expiration of the one year time limit, Warner-Lambert removed the case to federal court. *Id*. The Fifth Circuit found that the plaintiff's blatant forum manipulation and the defendant's vigilance in seeking removal justified

6

the application of an equitable exception of estoppel. *Id.* at 428.

In addition to the Fifth Circuit in *Tedford*, other courts have equitably tolled section 1446(b)'s one year time limit based upon showings of both the plaintiff's forum manipulation and the defendant's rapid response in protecting his removal rights.[1] For example, in *Morrison v. National Benefit Life Ins. Co.*, where removal was permitted, the plaintiffs made a straight-forward admission of forum manipulation, and the defendants removed the case eight days after learning that the case fell within federal diversity jurisdiction. 889 F.Supp. 945, 947 (S.D. Miss. 1995). In *Kinabrew v. Emco-Wheaton, Inc.*, where removal was permitted, the plaintiffs deliberately withheld service of process on the defendant until after the one year period had expired, and the defendants removed the case within one month of service of process. 936 F.Supp. 351, 352-53 (M.D. La. 1996). In *Ardoin v. Stine Lumber Co.*, where removal was permitted, the plaintiffs filed suit against both diverse and non-diverse defendants. 298 F.Supp.2d 422, 427 (W.D. La. 2003). After one year had elapsed from the commencement of the action, the plaintiffs strategically dismissed the non-diverse defendants. *Id.* On the same day that the last non-diverse defendant was dismissed, the remaining defendants filed a notice of removal. *Id.* At oral argument on the plaintiff's motion to remand, the plaintiffs failed to articulate any justifiable reason for dismissing the non-diverse defendants more than one year after the initial filing of suit. *Id.* Accordingly, the court found that the plaintiffs had participated in forum manipulation and that the defendants had sought to vigilantly protect their removal rights. *Id.* at 429.

---

[1] For a list of cases regarding the equitable tolling of section 1446(b)'s one year time limit, see 14C CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE § 3732 n.82 (3d ed. 1998 & Supp. 2005).

In *Tedford*, *Morrison*, *Kinabrew*, and *Ardoin*, the courts equitably tolled section 1446(b)'s one year time limit because all the plaintiffs engaged in clear instances of forum manipulation and all the defendants rapidly removed the cases. Likewise, Merck argues that the Plaintiffs have engaged in forum manipulation. Merck contends that Dr. Simonini's change in testimony and the Plaintiffs' dismissal of two of their three theories of liability against the Defendant Doctors amounts to forum manipulation and justifies the application of the *Tedford* equitable exception.

Despite the Fifth Circuit's holding in *Tedford*, the party invoking removal jurisdiction bears the burden of establishing jurisdiction. *Frank v. Bear Stearns & Co.*, 128 F.3d 919, 922 (5th Cir. 1997). Merck fails to meet this burden.

Even though one of the Plaintiffs' expert changed his opinion and the Plaintiffs have voluntarily dismissed two of their three causes of action against the Defendant Doctors, the facts of this case do not rise to the level of *Tedford* or the cases leading to and flowing from it. Unlike *Tedford*, the Plaintiffs have complied with the Texas Medical Liability and Insurance Improvement Act by providing the Defendant Doctors with notice letters. The Plaintiffs have not abandoned their claims against the Defendant Doctors; but, instead, they have propounded formal, written discovery to the Defendant Doctors and have taken the deposition of Dr. Evans. In addition, the Plaintiffs have defended and defeated the Defendant Doctors's Motion for Summary Judgement. Moreover, the Plaintiffs have even cross-examined two of Merck's medical experts regarding Dr. Evans' opinion that he would continue to prescribe Vioxx to patients with known cardiovascular risks even after the FDA instructed Merck to include warnings in Vioxx packages in 2002. Lastly, Dr. Bush, the Plaintiffs' other medical expert, has

8

submitted a second affidavit in which he testifies that the Defendant Doctors did negligently dispense Vioxx to Mr. Garza. All of these facts lead to the conclusion that the Plaintiffs have actively pursued their claims against the Defendant Doctors in the hopes of recovery, not in the hopes of evading federal jurisdiction. Accordingly, the facts of this case simply do not rise to the level of *Tedford, Morrison, Kinabrew,* or *Ardoin.*

Furthermore, Merck has not been vigilant in asserting its rights. Dr. Simonini's deposition took place on December 9, 2004. Merck filed its second notice of removal on January 18, 2005. In stark contrast to the defendants in the previously mentioned cases, Merck waited over a month to remove its case to federal court. This unexplained delay does not amount to the vigilant protection of removal rights.

Moreover, even if section 1446(b)'s one year time limit was not applicable to this case, Merck would have still been required to file its notice of removal within thirty days of Dr. Simonini's deposition. If a case is not initially removable, as this one was not, a defendant has thirty days to remove the case from the receipt of an amended pleading, motion, order, or other paper that indicates that the case is removable. 28 U.S.C. § 1446(b). A deposition is considered an "other paper." *Poole v. Western Gas Res.*, No. CIV.A.97-2929, 1997 WL 722958, at *2 (E.D. La. Nov. 18, 1997) (finding that there was no functional difference between a deposition and a deposition transcript and, as such, a deposition was considered an "other paper" under the holding of *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 494 (5th Cir. 1996). *Contra Rivers v. Int'l Matex Tank Terminal*, 864 F.Supp. 556, 559 (E.D. La. 1994). Therefore, Merck would have been required to remove this case before January 18, 2005, even if section 1446(b)'s one year time limit did not apply.

Accordingly, since the Plaintiffs did not engage in blatant forum manipulation, Merck did not vigilantly assert its removal rights, and this action has already made substantial progress in state court, this case is not subject to the *Tedford* equitable exception of estoppel. Since the Court has found that this case is not subject to the equitable exception of estoppel, it is unnecessary to reach the issue of whether the Plaintiffs have a possibility of recovery.

As an MDL Court, this Court has been charged with the task of presiding over thousands of cases involving hundreds of thousands of litigants. To promote the just and efficient conduct of these actions, the Court has previously indicated that it would deal with remand motions as a group in accordance with procedures to be determined at a future date. The Court is still committed to this plan.

The facts of the present case, however, were so exceptional that they justified the Court's taking earlier action. Merck's conduct in postponing the trial of this action can be classified as peculiar, at best. Regardless of the classification, the facts of the present case, unlike those of other cases pending before the Court, necessitate that the Court take action.

## III.    CONCLUSION

For the reasons set forth above, IT IS ORDERED that the Plaintiffs' Motion to Remand is GRANTED and this matter is REMANDED to the 229th Judicial District Court of Starr County, Texas.

New Orleans, Louisiana, this __22nd__ day of __November__, 2005.

UNITED STATES DISTRICT JUDGE

10

# Exhibit J

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  VIOXX                                        *     MDL NO. 1657
       PRODUCTS LIABILITY LITIGATION     *
                                            *     SECTION: L(3)
                                            *
                                            *     JUDGE FALLON
                                            *     MAG. JUDGE KNOWLES

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

THIS DOCUMENT RELATES TO:
    *Flippin, et al. v. Merck & Co., Inc., et al.*, No. 05-1797

<u>ORDER</u>

At the last monthly status conference, the State Liaison Committee brought the above-captioned case to the Court's attention.  Accordingly, IT IS ORDERED that the Plaintiffs' Motion to Remand, which was filed on March 25, 2005 in the United States District Court for the Western District of Tennessee (C.A. 1-05-1068) before this case was transferred into the MDL, shall be heard on September 6, 2007, with oral argument, following the next monthly status conference.  IT IS FURTHER ORDERED that the Defendants shall file any opposition no later than August 28, 2007, and that the Plaintiffs shall file any reply no later than September 4, 2007.

New Orleans, Louisiana, this  8th  day of  August , 2007.

_____
UNITED STATES DISTRICT JUDGE

# Exhibit K

1

```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
 2                     NEW ORLEANS, LOUISIANA

 3

 4

 5
    IN RE:  VIOXX PRODUCTS        *   Docket MDL 1657-L
 6     LIABILITY LITIGATION       *
                                  *   August 25, 2005, 9:30 a.m.
 7   * * * * * * * * * * * * * * * *

 8

 9                  STATUS CONFERENCE BEFORE THE
                      HONORABLE ELDON E. FALLON
10                  UNITED STATES DISTRICT JUDGE

11
    APPEARANCES:
12

13   For the Plaintiffs:        Beasley, Allen, Crow, Methvin,
                                    PORTIS & MILES
14                              BY:  ANDY D. BIRCHFIELD, JR., ESQ.
                                218 Commerce Street
15                              Montgomery, Alabama 36104

16
     For the Defendants:        Stone Pigman Walther Wittmann
17                              BY:  PHILLIP A. WITTMANN, ESQ.
                                546 Carondelet Street
18                              New Orleans, Louisiana 70130

19
     Official Court Reporter:   Toni Doyle Tusa, CCR
20                              500 Poydras Street, Room B-406
                                New Orleans, Louisiana 70130
21                              (504) 589-7778

22

23

24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer.
```

M003126223

2

<u>PROCEEDINGS</u>

(August 25, 2005)

1   THE DEPUTY CLERK:  Everyone rise.

2   THE COURT:  Be seated, please.  Good morning, Ladies

3   and Gentlemen.  Call the case, please.

4   THE DEPUTY CLERK:  MDL 1657, In Re: Vioxx.

5   THE COURT:  Counsel, make your appearances for the

6   record.

7   MR. BIRCHFIELD:  Good morning, Your Honor.

8   Andy Birchfield on behalf of the plaintiffs' steering

9   committee.

10   MR. WITTMANN:  Good morning, Your Honor.

11   Phil Wittmann, defendants' liaison counsel.

12   THE COURT:  We are here today for our monthly status

13   report.  I met with liaison counsel before and discussed with

14   them the upcoming meeting.  The first item on the agenda is

15   Lexis/Nexis File & Serve.  Any report on that?

16   MR. WITTMANN:  Just briefly, Your Honor.  The system

17   seems to be working well.  We have got a new feature that's

18   been added this month by Lexis/Nexis.  It's known as

19   Case & Party Management.  It allows counsel to add a party if a

20   party is added to the case or remove a party if someone is

21   dismissed from the case, add additional attorneys in the case.

22   That all is done electronically.  There still has to be an

23   order attached confirming that's permitted by the Court.  It

M00312622

3

1  can be done electronically and should help expedite adding to

2  the service list.

3  Also, in early August 2005 Lexis/Nexis began a

4  nightly pull from the clerk's office to get cases into the

5  system quickly.  The cases are uploaded every Monday,

6  Wednesday, and Friday so that the parties will have quick

7  access via File & Serve to new cases as they come on line.

8  Other than that, Judge, that's about all to report.  I don't

9  have any problems working with the system.  I haven't heard any

10  reported from plaintiffs' counsel either.

11  MR. BIRCHFIELD:  Your Honor, we do not have any

12  problems to report.  Everything seems to be working fine.  I

13  would like to encourage the lawyers to take advantage of the

14  new features that have been added to Lexis/Nexis.  It will

15  greatly increase the efficiency of that program.

16  THE COURT:  I met, as you know, with their

17  representatives, as well as liaison counsel, and I'm glad

18  things have worked out.  If we get any hitches again, you've

19  got to get me involved early on so we can deal with it before

20  it becomes a crisis.  I'm happy that it's up and running now.

21  State court trial settings is the next item on the agenda.

22  MR. WITTMANN:  Yes, Your Honor.  I can give you a

23  report of the case statistics generally as of August 15.  There

24  are currently 1,811 cases in the MDL.  Some haven't been served

25  yet, but they have all been transferred and are here and are

M003126225

4

1    being docketed by the clerk.  There are approximately 290

2    additional cases served and pending in federal courts not yet

3    in the MDL, but they will be on the way shortly.  So we will be

4    over the 2,000 mark in cases in the MDL by the end of this

5    month.

6              There are 200 cases served and pending in state

7    courts other than New Jersey and California.  There are 2,400

8    cases served and pending in the New Jersey coordinated

9    proceeding.  Finally, there are 250 cases served and pending in

10   California in state court.  Those cases involve about 1,650

11   plaintiffs.  Included in those numbers, Your Honor, are 148

12   class actions.  That's an increase in the number of class

13   actions from last month.  I have agreed to give Arnold Levin a

14   copy of the new cases that we received since our last status

15   conference report.  As to the trial settings, as Your Honor --

16             THE COURT:  Before we get into that, let me discuss

17   numbers with you.  Numbers are important because of our clerk's

18   office, particularly.  We need to be thinking about increasing

19   the personnel to handle the matter, and I know the clerk's

20   office has been doing it.  As I understand it, you all

21   anticipate either double or triple what we have now in the MDL

22   in the next six months or thereabouts.  I know, in addition, we

23   have what I suspect to be several thousand cases on tolling

24   agreements, so that will not necessitate filing at this time.

25             MR. WITTMANN:  The estimate I heard from the

M003126226

5

1  plaintiffs' counsel this month is they anticipate a doubling of

2  the number in the MDL.  I would not disagree with that.

3       THE COURT:  It may be a little early to tell.  I know

4  at one time we were anticipating something like approximately

5  100,000 individual cases.  I don't know whether that will show

6  up in tolling agreements or whether it will show up in

7  individual filings, but we will have to take that a step at a

8  time.  The state court settings.

9       MR. WITTMANN:  As to the settings, Your Honor, there

10  was a verdict returned last week in Texas in the Ernst case.

11  Merck has indicated it intends to file an appeal.  The Humeston

12  case is set for trial in the New Jersey superior court on

13  September 12, 2005.  The Guerra case is set for trial in the

14  Texas district court in Hidalgo County on October 24, 2005.

15  Our case, the Irvin case, is set in the MDL on November 28,

16  2005.  The Zajicek case is set for trial in Texas in Jackson

17  County on March 20, 2006.  Those are the only settings I'm

18  aware of at this time.

19       THE COURT:  Let's segue into the federal court

20  litigation.  As you mentioned, the Irvin case is set for trial

21  to commence on November 28.  I met with counsel to discuss a

22  program for setting additional trials.  I would like counsel to

23  meet and talk about categories of cases.  One category, of

24  course, is the MIs and then we are dealing with both long-term

25  use and short-term use.  In addition, there's a category of

M003126227

6

1   strokes and a couple of other categories.  You know best.

2   Select the categories, and then I'm interested in trying a case

3   in each of those categories.  I have given counsel dates in

4   February, March, April, and May on which those cases will be

5   tried.  What are the dates, again?

6          MR. BIRCHFIELD:  Your Honor, February 13, March 13,

7   and April 10.  I'm not sure of the date in May.

8          THE COURT:  We'll discuss which cases are to be set.

9   My thinking is to have a case per category if we can possibly

10  do it.  It would be best if both sides could coordinate that

11  and pick a particular case.  You know the best cases from the

12  standpoint of which cases are ready for trial and would be

13  helpful to you in getting a feel for this type of category in

14  this type of litigation.  I hope you can join together and pick

15  a case that will be instructive in each of those categories.

16  If that cannot be done, then the Court will pick the case.  I

17  will allow you to first attempt to agree upon a case that will

18  be most instructive to each side in those particular

19  categories.  The next item on the agenda is class actions.

20  Anything on the class actions?

21         MR. BIRCHFIELD:  Your Honor, Arnold Levin would like

22  to address that on behalf of the plaintiffs.

23         MR. LEVIN:  Your Honor, as we explained to you in the

24  liaison committee meeting this morning, first we would like to

25  have the complaints -- which we are getting additional

M003126228

7

1   complaints -- because they may present class representatives
2   for subclasses that are headless at the present time.  We are
3   going to meet with defense counsel next week via telephone to
4   see if we can streamline the proceedings by maybe staging and
5   determining whether Rule 12 motions are being filed.  I'm happy
6   to report that we have an agreement on one thing.  Both sides
7   need more pages.
8        THE COURT:  I do think it's important to see if there
9   can be some meeting of the minds on how to handle the class
10  actions.  There are various issues in the class actions, issues
11  that are complicated by the law of where the class actions are
12  to be tried and, if they are to be tried here, which court of
13  appeals handles the appellate review for that particular class
14  action.  It can be done in several ways.  It's best if counsel
15  present me with something that is agreeable to both sides.
16  It's a question of whether I go to a particular place and try
17  the case or have the trials here, with the understanding that
18  the law applicable to that case will be the law of another
19  area.  I may have to be designated judge for that particular
20  district or that particular circuit, so that a different
21  circuit will handle different class actions depending on where
22  they emanate from.  Discovery directed to Merck is the next
23  item.
24        MR. BIRCHFIELD:  Your Honor, yesterday we held the
25  weekly conference to address the discovery issues, and out of

M003126229

8

1   that conference it was agreed that Merck would provide us with

2   specific answers to requests for production of documents and

3   interrogatories on September 15.  There were a couple of items

4   that will be taken up tomorrow, in a conference with the Court,

5   on the privilege log and on the depositions that will be

6   scheduled that are in dispute at this time.

7         THE COURT:  I have had some telephone conversations

8   and conferences with the parties since our last conference

9   here, over the past month, and there were a number of discovery

10  disputes.  It seemed to me that the most efficient way of

11  handling this aspect of the case is to set a discovery meeting

12  every Thursday with the Court.  At that time I will handle any

13  discovery disputes that have come up for that week or the week

14  hence.  I'll give each side an opportunity to discuss it with

15  me, I'll listen, but then I will rule on it so we can move on.

16         I think it's essential that we move quickly on

17  discovery in this case.  We can't be bogged down in discovery.

18  So rather than do it by way of filing interrogatories and

19  objections and noticing the objections for hearing, we should

20  be able to cut through that.  You just say what you need.  If a

21  party doesn't want to give it, that Thursday we will talk about

22  it and I will tell you whether or not they need to give it or

23  not give it and we will move to the next issue.

24         We are going to have a meeting every Thursday

25  with counsel.  I can do it over the phone or in person,

M003126230

9

1   whichever is convenient with counsel.  It's not necessary for
2   us to have this big of a meeting.  I'm just interested in the
3   discovery issue and the people who will handle those issues,
4   either the liaison committee, a liaison person, or somebody
5   that they select who knows that particular issue.  We'll get
6   them on the line and I'll handle it.  Hopefully, when we get
7   further along, we may not need the every-Thursday meeting, but
8   until further notice we will have a meeting every Thursday.
9          MR. WITTMANN:  If I could just clarify one thing on
10  the discovery, Your Honor, what we agreed to yesterday was we
11  would answer or object to specific interrogatories or requests
12  for production.  I would also just like to add, Your Honor,
13  that production of documents from Merck has been ongoing.  We
14  have produced a million documents just last week.  Another two
15  million is scheduled to go in addition to the nine million we
16  have already produced.  I want to make it clear that we are
17  continuing to produce and discuss with plaintiffs' steering
18  committee members what we are doing, even though we are
19  discussing the specific answers that we are going to respond to
20  by September 15.
21         THE COURT:  No, I have a feeling that matters are
22  moving.  It's just that we have to move the pace up a little
23  bit because we are setting some trials.  We just have to cut
24  through some of this.  I do think that Merck is doing yeoman
25  work in producing the material.  I recognize that.  Also, in

M003126231

10

```
 1   these matters, occasionally you hit a bump in the road and you
 2   need to be moved over that.  I'm prepared to do that.
 3            MR. BIRCHFIELD:  Your Honor, also on that issue,
 4   there were two matters that will need to be brought to the
 5   Court by a motion to compel, the Arcoxia and the foreign label
 6   issue.  We are prepared to file that motion and request an
 7   expedited hearing on those matters.
 8            THE COURT:  Set it for Thursday.  PSC request for
 9   production of FACTS database.
10            MR. BIRCHFIELD:  Yes, Your Honor.  You had scheduled
11   a feasibility hearing.  However, we were able to get together
12   and we have now negotiated an agreed-upon order that is ready
13   to be submitted to the Court.
14            MR. WITTMANN:  Actually, it should be submitted to
15   you today.  I figured out where in Florida that city was,
16   Your Honor.
17            THE COURT:  The next item is Vioxx professional
18   representatives.
19            MR. BIRCHFIELD:  Your Honor, as the Court instructed,
20   Merck produced a list of Vioxx professional representatives to
21   the Court in camera.  Plaintiffs' liaison counsel has reviewed
22   those.
23            THE COURT:  That was an issue.  The way we resolved
24   it is to have Merck produce a list of all of their
25   representatives, with their addresses, in camera.  I've
```

M003126232

1    reviewed them.  The PSC has had an opportunity to review them,
2    also.
3           The next item is discovery directed to the FDA.
4    Any report on that?  I had a conference with the FDA and
5    liaison counsel to discuss some issues that they were having
6    some difficulty on.  Hopefully we have overcome those issues.
7    I understand that you are beginning now to get boxes of
8    material.  I understand that there has been three boxes that
9    have been received and several hundred thousand documents that
10   are being reviewed.  I would like to continue to interface with
11   the FDA, so counsel should keep me plugged into that situation.
12   I'll have periodic meetings with the FDA and counsel and we'll
13   see if we can expedite the receipt of some of that material.
14           MR. BIRCHFIELD:  The meeting with the FDA and the
15   Court was very helpful, Your Honor, and the FDA is producing
16   documents.  They are continuing to produce those on a rolling
17   basis.  We are reviewing and coding those documents.
18           THE COURT:  I should also express my appreciation to
19   the FDA.  I know they have a lot on their plate these days.
20   They have given us access to documents that have been submitted
21   in congressional inquiries, and some of the security that they
22   have to go through has been expedited.  I appreciate their
23   efforts in that regard.  The discovery directed to third
24   parties, anything to report on that?  How is that coming along?
25           MR. BIRCHFIELD:  That's moving along quite well,

M003126233

12

1   Your Honor.  We are receiving some documents in response to the

2   third-party subpoenas.  We have an agreement with the

3   defendants that we will scan and provide them with all the

4   documents that we receive and they will do the same thing.  Any

5   documents that are received in response to third-party

6   subpoenas are going to be shared by the parties by agreement.

7   We are working out an arrangement, but that's the most

8   efficient way of doing it, by scanning and providing an

9   electronic copy.

10              THE COURT:  Anything further on that?

11              MR. WITTMANN:  No.  That's correct, Your Honor.

12              THE COURT:  The next item is deposition scheduling.

13              MR. WITTMANN:  Yes, Your Honor.  The plaintiffs have

14   noticed three depositions which are scheduled, Dr. Barr,

15   Dr. Block, and Thomas Cannell.  We are trying to get dates for

16   two former employees that the plaintiffs want to depose,

17   Dr. Geba and Marty Carroll.  We have objected to the

18   redeposition of James Dunn and Susan Baumgartner.  Your Honor

19   set argument tomorrow to discuss that issue.  We will be in

20   court with Your Honor tomorrow to talk about that.  The

21   deposition of Dr. Avorn, scheduled on September 8 in the

22   New Jersey proceeding, has been cross-noticed in the MDL.  I

23   think that pretty well covers what our deposition schedules are

24   at this point from our standpoint.

25              THE COURT:  With regard to the case that we have set

M00312623A

13

1    for trial, the Irvin case, I met with trial counsel and I'll be

2    meeting with them shortly again to discuss some of the

3    logistics.  Any discovery that you need, I want to meet and

4    talk with you about it.  The same way from the defendants'

5    standpoint.  Any discovery that they need, we have to put that

6    on an extra-fast track.

7                 I talked to the parties about the number of

8    jurors we will need for that particular case and talked to the

9    parties about whether or not we would get some help from a jury

10   questionnaire.  We talked about some advance summary of jury

11   charges being given to the jury before they begin to hear the

12   case so they will understand what some of the legal principles

13   are before they process the facts and other issues such as use

14   of technology in the courtroom, what they will need.  I will be

15   talking to the trial counsel in that particular case both on

16   discovery and some other aspects of the trial.

17              MR. BIRCHFIELD:  Your Honor, in the Irvin case, we

18   actually have some depositions that have been scheduled and

19   have actually taken place this week.  There's an additional

20   deposition tomorrow and then depositions next week, as well.

21   We are moving forward on the discovery in that case.  As far as

22   the depositions that are scheduled, Mr. Wittmann is correct.

23   We do have depositions we do need dates for, Dr. Geba and

24   Dr. Marty Carroll.  I understand we will get those today.

25              MR. WITTMANN:  Hopefully.  They are no longer

14

1   employed by Merck.  That's why it's difficult to arrange.

2           MR. BIRCHFIELD:  Also, Your Honor, there had been a

3   motion for protective order with regards to the unilateral

4   cross-noticing of the MDL depositions.  We have worked out an

5   agreement on that.  We will communicate and the PSC will be

6   involved in the scheduling as much as we can be on those

7   depositions.  I don't think that there's any reason for the

8   Court to rule on that.  I think we have worked that out among

9   the parties.

10          THE COURT:  That's important because the depositions

11  that are been taken in state court ought to be able to be used

12  in the MDL.  The depositions in the MDL ought to be able to be

13  used in state court.  To give everybody comfort on that

14  situation, they ought to have notice of it.  They ought to know

15  what's coming up so they can deal with it and protect their

16  interests.  I'm glad you have been able to get together on

17  that.  Plaintiff profile form and Merck profile form, anything

18  on that?

19          MR. BIRCHFIELD:  Your Honor, the profile forms, that

20  process seems to be working smoothly.  If I could just go back,

21  Your Honor, to the scheduling of the depositions and to avoid

22  issues with cross-noticing, it's just important from our

23  perspective that we be involved in the scheduling of those.

24          THE COURT:  I do want both sides to be involved in

25  the scheduling of those depositions, both state and federal.  I

M00312C236

15

1   want everybody to know what depositions are coming up before

2   they come up and have some input on it.  We talked about the

3   profile forms.  That's on our web site.  If anybody has any

4   interest in them, they can pull them down and look at them.

5   Medical records from healthcare providers is the next item on

6   the agenda.

7          MR. WITTMANN:  That's working as it's supposed to,

8   Your Honor, in accordance with Pretrial Order 17.  We have had

9   no problems with that.

10          THE COURT:  Contact with claimants' healthcare

11   providers.  I issued another order on that.  It's on the web

12   site.  It shouldn't present a problem any longer.  Remand

13   issues.  Ms. Barrios, do you have anything on that?

14          MS. BARRIOS:  Yes, Your Honor.  Good morning,

15   Your Honor.  Dawn Barrios for the state liaison committee.  On

16   behalf of the entire committee, we would like to extend our

17   appreciation to the Court for reaching out to us to assist with

18   substantive issues.  We stand ready, willing, and able to help

19   in anything else, with regards to remands or any other issues.

20          After you handed down your order, we were in

21   touch with Merck and we learned that Merck did not keep a list

22   of cases with motions to remand, so we felt we had a yeoman's

23   task ahead of us.  We reached out to all plaintiffs' counsel

24   across the country in a special newsletter which was

25   electronically sent to about 800 people and hard copies to

M003126237

16

1   about 200.  We got a tremendous response from that.  We then
2   turned to the PACER system and reviewed the PACER records for
3   each district court in the United States.  With that
4   information, we were able to amass a list of approximately 250
5   cases with pending motions to remand.

6              Last evening, after the close of business, we
7   received Merck's list.  They were simultaneously putting a list
8   together.  A quick comparison that we were able to do under the
9   time restraints yielded an additional 130 cases that Merck had.
10  We are working now from an inventory that should be
11  substantially complete of approximately 380 cases that are
12  pending before Your Honor with remand motions.

13             I beg the Court's indulgence for some extra time
14  until tomorrow.  I've spoken with Ms. Wimberly.  Both of our
15  offices are going to compare each other's lists.  I'm going to
16  present to you a comprehensive list of all those cases.  I'm
17  prepared to give you one that we have today.  We have an
18  electronic copy as well as a hard copy.  You will see,
19  Your Honor, on this disk we have two lists of cases.  We have
20  the cases that are pending remand, the 250 that the plaintiffs
21  were able to find.  We have grouped them by state.  The second
22  list are those cases which have orders on the remand motion.  I
23  know it's not authoritative for Your Honor, but I thought it
24  would be beneficial for you to see those additional cases.
25             With Your Honor's permission, I indicated to

M003126238

17

1   Mr. Wynne when I spoke with him that within approximately a

2   week or 10 days we will present Your Honor with a CD-ROM that

3   will have all the cases that defense and plaintiffs have been

4   able to put together.  We will hyperlink all the motions, the

5   memos in support and the opposing memos, for ease of

6   Your Honor's work when you go to look at this issue.

7           In reviewing this material over the past month,

8   it's come to light that Your Honor is absolutely correct there

9   are different nuggets and threads throughout all of these

10  motions.  If the Court would like, we are willing to undertake

11  a second project to begin to group those under the state's law

12  to provide you with a chart of what we would recommend would be

13  the issues that Your Honor would address in looking at the

14  remand motions.

15          THE COURT:  Let's do that within 10 days.  I do

16  appreciate the offer to do the second.  I would be interested

17  in your input.  You are closer to the states.  I would like to

18  have your views about some grouping, and in that grouping there

19  are going to be some common issues.  I can take up a particular

20  case and focus on those common issues, then apply that ruling

21  to the other cases.  I won't have to deal with the same issues

22  200 times.  Hopefully I can get it down to less numbers than

23  that.

24          MS. BARRIOS:  Exactly.  Your Honor, the response from

25  the state attorneys around the country has been incredibly

M0031 26239

18

1   positive and complimentary to Your Honor looking at this issue
2   so early on in the MDL litigation, and so many of them have
3   asked me to express that appreciation to you.
4           THE COURT:  I'm aware that this case has been going
5   on for some period of time in the states.  It's different than
6   in some of the other MDLs where the states get their cases
7   about the same time that the MDL transferee gets its case and
8   so it doesn't present a problem.  This is a little more
9   complicated by the fact that some of the states have been
10  working on these cases for some three or four years now.  That
11  needs to be plugged in and taken into consideration.  I
12  appreciate your work, Ms. Barrios.
13          MS. BARRIOS:  Thank you, Your Honor.  Your Honor,
14  Ms. Kathryn Snapka of Texas is here.  She is prepared to
15  address the Court, either formally now or informally after, on
16  her Garza remand.
17          THE COURT:  On the what?
18          MS. BARRIOS:  The Garza remand.
19          THE COURT:  Okay.
20          MS. BARRIOS:  Your Honor, if I may, I would like to
21  approach the bench with your copy.  I have provided copies
22  already to plaintiff and defense.
23          THE COURT:  Fine.
24          MS. SNAPKA:  Your Honor, Kathryn Snapka, plaintiff's
25  attorney for the Garza case.  The Court graciously heard this

M00312624D

1    matter in chambers after the last status hearing.  We had an

2    emergency motion for remand.  To remind the Court, this is the

3    case that was filed in early 2003, removed, remanded back to

4    the state court, and then removed again immediately before the

5    February 14, 2005 trial setting.  We had filed an emergency

6    motion to remand with this Court.

7              The one thing I wanted to bring up to the Court

8    that is slightly different than the last status conference is

9    the Texas legislature, after trying valiantly in special

10   session to accomplish some goals, failed to do so.  It is no

11   longer in special session.  Therefore, any legislative

12   impediments would be out of the way.  We would respectfully

13   again request the Court to return this case -- the doctors, as

14   well, which has already been remanded to the state court by

15   federal court -- back.  It was trial ready when it was removed

16   and remains trial ready to this day.  If the Court wishes to

17   hear additional argument, we stand ready at any time to present

18   that to the Court.

19             THE COURT:  I'm reviewing that now.  If I do need

20   argument, I will let both of you all know and will give each

21   side an opportunity to address it.

22             MR. WITTMANN:  We would like to have an opportunity

23   to do that, Judge.

24             THE COURT:  Yes.  Anything on tolling agreements?

25             MR. BIRCHFIELD:  I'm not aware of any issues with the

M00312G241

1   tolling agreement.  We would just like to remind all the

2   attorneys that the forms for the tolling agreement are

3   available on the Court's web site.

4           THE COURT:  We talked about this several times.  The

5   question that's raised in the tolling agreements is whether

6   there is an effective way of tolling the cases so that expense

7   does not have to be incurred in filing particular cases.  There

8   are certain agreements that can be entered into.  Our state

9   does not because it's a civil law jurisdiction perhaps.  In any

10  event, the state law doesn't really clearly approve tolling

11  agreements, so you may have to do that by a different method.

12  The concept is that the cases are suspended and do not have to

13  be filed at the current time.  This helps, hopefully, both

14  sides and also helps the clerk's office wherever these cases

15  go.

16          MR. WITTMANN:  I would just like to ask, Judge, that

17  the lawyers who have clients who are using the tolling

18  agreements pay particular attention to get the authorizations

19  attached to the plaintiff profile forms, get those completed

20  properly, take a few minutes to do it and try and get the forms

21  completed as much as they can.  We are getting some in that are

22  really not very well done.  Most of them are okay, but some are

23  coming in kind of sloppily done.

24          THE COURT:  Yes.  That's essential because the

25  tolling agreement, while it's good for some aspects of the

M00312624

1  case, the problem is it sometimes interferes with the accurate

2  census of the case because you don't know who's out there, so

3  to speak.  So we have tried to bridge that gap by having a form

4  filled out by anyone who is interested in partaking of the

5  tolling agreement.  This at least alerts everyone as to your

6  whereabouts.  That will help you, also, because as the case

7  goes on everyone will know of your interest and your presence.

8  I urge it be done.  If you have any problems with it, then

9  bring it to the Court's attention and I will require it to be

10  done within a certain period of time or the case will be

11  dismissed.

12        MR. WITTMANN:  I will, Your Honor.

13        THE COURT:  Louisiana master complaint.

14        MR. WITTMANN:  I've drafted the Pretrial Order

15  governing the Louisiana master complaint.  Mr. Meunier has

16  given me his comments.  I have given him my comments on his

17  comments.  I think we are pretty close to a final version.

18        THE COURT:  Would you tell us why we need a master

19  complaint and what's involved.

20        MR. MEUNIER:  Jerry Meunier for the PSC.  As you

21  alluded to, there is at least an argument that can be made that

22  Louisiana claimants would not be protected by a tolling

23  agreement.  For that reason, we have been negotiating with

24  Merck for the filing of a Louisiana joint complaint, which will

25  set forth by name each plaintiff who is eligible to be in that

M003126243

22

1    complaint.  We intend to put these plaintiffs on the same

2    footing as those non-Louisiana plaintiffs will be protected by

3    the tolling agreement.

4              I do want to emphasize and as Mr. Wittmann

5    indicated, we should have a Pretrial Order submitted to the

6    Court within the next couple days to govern this, but we will

7    be sending to Louisiana counsel a letter that alerts them to

8    the availability of this vehicle.  We are aware of the late

9    September anniversary date for the withdrawal of Vioxx, which

10   has potential implications on the statute of limitations in

11   Louisiana.  I do want to emphasize, though, for those who are

12   here that like the tolling agreement -- and, again, pursuant to

13   the equivalent footing idea -- the plaintiffs who are eligible

14   to be in the Louisiana joint complaint must have a

15   cardiovascular event, that is, a heart attack or ischemic

16   stroke.

17             There is going to be the same process that's in

18   place with the tolling agreement.  After their name, they will

19   be required to fill out a profile form.  Merck will have an

20   opportunity to review the records.  If Merck feels that they

21   are not cardiovascular event cases, there will be some motion

22   practice.  During that period of time, Your Honor, the time

23   limit on the statute of limitations will not be running, but

24   there may be some opportunity then for Merck to delete certain

25   people from the joint complaint, which just like the tolling

M0031262A4

23

1    agreement they will have to be filing separately.

2            THE COURT:  We ought to have some kind of notice that

3    goes out.  I'll put it on the web site so that everybody has

4    knowledge of that so that they know the advantages and

5    potential problems they might have.

6            MR. WITTMANN:  We will do a proposed Pretrial Order,

7    Your Honor.

8            MR. MEUNIER:  In addition, Judge, we can submit a

9    proposed notice for you to put on your web site.

10           THE COURT:  I think that's a good idea.  The next

11   item is state/federal coordination, state liaison committee.

12           MR. BIRCHFIELD:  Your Honor, when do you want that on

13   the Louisiana --

14           THE COURT:  Can you get the notice to me within 10

15   days?  We have a short fuse on that prescriptive period, and I

16   would like everybody to know it.

17           MS. BARRIOS:  Yes, Your Honor.  Dawn Barrios again.

18   We will be more than happy to put that information, also, out

19   in the state liaison committee newsletter that we send.  Since

20   the last status conference, we have sent out two newsletters

21   and, as I indicated earlier, had a tremendous response.  We

22   have been invited to speak at the Mealey's conference to

23   present the MDL status, and we are actively seeking out all

24   different professional conferences so that we can make a

25   presentation on the status here.

M00312245

24

1        We have had regular communications with the

2   plaintiffs' steering committee through Mr. Davis and

3   Mr. Arsenault and with Mr. Wittmann's office.  Your Honor, if I

4   might ask Mr. Wittmann when he provides the plaintiffs'

5   steering committee with a list of all these class actions that

6   he provide our committee with it, as well, particularly the

7   state class actions.  We have been getting inquiries from

8   different states to see if there's a pending class action for

9   statute of limitation purposes.  If we could get that

10  information, we would appreciate it.

11        THE COURT:  Let's do that, Mr. Wittmann.

12        MR. WITTMANN:  We will.

13        MS. BARRIOS:  Thank you.

14        THE COURT:  The state liaison committee is very

15  significant in a litigation like this.  One of the challenges

16  in MDL is that it's a dual-tracked situation.  In a federal

17  court, there's the MDL.  All of the cases in federal court are

18  assigned to a transferee judge and the transferee judge handles

19  them in a coordinated matter.  In addition to that, there are

20  numbers of cases that are filed in state court.  It seems to me

21  that there's an opportunity for coordination so that the states

22  can have the benefit of the MDL and the MDL can have the

23  benefit of the states.  It only works if the people who are on

24  the state committee and the MDL committee are willing and

25  interested in working together to help each other process the

M003126246

1  cases.

2            I'm particularly appreciative and congratulatory

3  of the state committee.  We have appointed some excellent folks

4  on it.  They have risen to the challenge and done a great job.

5  I have increased the membership on it by Mr. Leonard Fodera.

6. Mr. Fodera, would you stand up.  I'm going to be issuing an

7  order appointing Mr. Fodera to the committee.  He is from

8  Philadelphia.  He is very well-qualified and highly

9  recommended.  I look forward to working with you on it, sir.

10            MR. FODERA:  Thank you, Your Honor.

11            THE COURT:  Again, thanks to the committee, and I

12  urge you to continue to work together.

13            MR. BIRCHFIELD:  Your Honor, on behalf of the

14  plaintiffs' steering committee, I would also like to extend our

15  appreciation to Ms. Barrios and the entire state liaison

16  committee for the tremendous work they have done on the remand

17  issues and on coordination and communication.  It's been a

18  tremendous help and we appreciate that.

19            THE COURT:  I think it works if the committees

20  coordinate with each other.  If the committees get out of sync

21  or one resists some of the movement of the other, I think it

22  then breaks down and presents problems.  It only works if you

23  coordinate and work together.  If you have any difficulties,

24  bring it to me.  I will resolve it.  Any pro se claimants?

25            MR. BIRCHFIELD:  Your Honor, we are not aware of any

M0031262247

26

1   new requests, but the PLC continues to handle those claims as

2   they come in, directing them to attorneys in their appropriate

3   state.

4            THE COURT:  The next come is the MDL assessment.  How

5   is that being received?

6            MR. BIRCHFIELD:  It has been received very well,

7   Your Honor, from all the feedback that we are aware of.  I

8   would also like to remind everyone that the full participation

9   option agreements are on the Court's web site and can be

10  accessed that way.  We have gotten a tremendous response and

11  it's been well-received nationwide.

12           THE COURT:  These cases are very expensive to handle.

13  I think it is to the benefit of everybody if they participate

14  in the expense and also have an opportunity to participate in

15  the work.  The case has to be run by committee, but the

16  committee ought to have an opportunity to tap people who are

17  outside of the committee so that they can work through the

18  committee on the MDL.  Anybody out there who is interested in

19  working, you need to contact the committee.  They are willing

20  to give you an assignment to work.  It has to be funneled

21  through the committee, but I'm interested in your work.  Your

22  work will be compensated for.  It will be to the advantage of

23  everyone and also to your own advantage.  I urge anybody who is

24  not on the committee who is interested in working to let the

25  committee know and you will be put to work.  There's enough

M00312624B

1   work out there for a lot of folks.

2          MR. HERMAN:  Thank you, Your Honor.

3          MR. BIRCHFIELD:  Your Honor, before you set the next

4   status conference, I would like to offer my apologies.  I see

5   there is a large audience.  For those who came expecting a

6   Shakespeare quote from the plaintiffs' spokesperson, I humbly

7   apologize for disappointing them.

8          THE COURT:  The next meeting is Thursday,

9   September 29, 9:30.  I will be meeting with liaison counsel at

10  8:00 that day.  Anything from anybody?  Any other comments?

11  Thank you very much.  The Court will stand in recess.

12         THE DEPUTY CLERK:  Everyone rise.

13         (WHEREUPON, the Court was in recess.)

14                        * * *

15                     CERTIFICATE

16         I, Toni Doyle Tusa, CCR, Official Court Reporter,
    United States District Court, Eastern District of Louisiana, do
17  hereby certify that the foregoing is a true and correct
    transcript, to the best of my ability and understanding, from
18  the record of the proceedings in the above-entitled and
    numbered matter.

19

20

21              _Toni Doyle Tusa_
                Toni Doyle Tusa, CCR
22              Official Court Reporter

23

24

25



# Exhibit L

102705.TXT

```
00001
 1              UNITED STATES DISTRICT Court
                EASTERN DISTRICT OF LOUISIANA
 2
 3
 4   IN RE:  VIOXX PRODUCTS       * MDL NO. 1657
     LIABILITY LITIGATION         *
 5                                * JUDGE FALLON
     *   *   *   *   *   *   *   *   *   *   *
 6
     THIS DOCUMENT RELATES TO ALL CASES
 7
 8          PRETRIAL CONFERENCE HELD IN THE
     ABOVE-CAPTIONED MATTER ON THURSDAY, THE 27TH
 9   DAY OF OCTOBER, 2005, BEFORE THE HONORABLE
     JUDGE ELDON FALLON IN THE JUDGE LEE H.
10   ROSENTHAL COURTROOM, 515 RUSK, HOUSTON, TEXAS.
11
12
13   APPEARANCES:
14
15   FOR PLAINTIFFS:
16
     RUSS HERMAN
17              RICHARD ARSENAULT
18
19   FOR DEFENDANTS:
20
     PHILIP WITTMANN
21   DOUG MARVIN
22
23   REPORTED BY:
24          NANCY LAPORTE
            CERTIFIED COURT REPORTER
25          STATE OF LOUISIANA
            (504)495-1692 (for transcript orders)
000002
 1          JUDGE FALLON:
 2   Call the case, please.
 3          CLERK WYNNE:
 4   MDL 16567.  In Re: Vioxx Products
 5   Liability Action.
 6          JUDGE FALLON:
 7   Counsel will make your appearance
 8   for the record, please.
 9          MR. HERMAN:
10   May it please the Court, good
11   morning, Judge Fallon.  Russ Herman for the
12   plaintiffs.
13   I have Mr. Wittmann's agreement
14   to surrender.
15          MR. WITTMANN:
16   I would like to put this on the
17   record, Your Honor.
18   It's an agreement with Mr. Herman
19   to voluntarily surrender.  It's an
20   understanding in the near future the Court
21   will sign an order that requires him to
22   surrender to an institution to be selected by
23   the Bureau of Prisons for the Department of
24   Justice.  The agreement is he will report
25   voluntarily surrender under the order, and his
000003
```

102705.TXT
```
 1   failure to appear will be punished by a fine,
 2   imprisonment, or both.
 3               MR. HERMAN:
 4   By stipulation, Your Honor.
 5               JUDGE FALLON:
 6   I will have both of you-all
 7   there.
 8   We are here for the monthly
 9   status report back in Houston.  I had hoped we
10   could move back to New Orleans, but we are not
11   there yet.  Hopefully we will be there soon.
12               The first item on the agenda is
13   LexisNexis File & Serve.
14   Anything there?
15               MR. HERMAN:
16   May it please the Court, we've
17   had several hundred calls from attorneys who
18   have served the Plaintiff Profile forms, hard
19   copies, on Mr. Coronado.  Mr. Wittmann however
20   can't upload to LexisNexis because of the
21   backlog of a large number of cases being filed
22   in MDL.  Mr. Wittmann and I have reached
23   agreement that service on Mr. Wittmann and
24   Mr. Coronado of hard copy will suffice for
25   now, and when the clerk's office can handle
□00004
 1   the large influx of MDL cases, at that time we
 2   will notify Plaintiffs' counsel to upload on
 3   LexisNexis.
 4               JUDGE FALLON:
 5   This is not a Lexis-Nexis
 6   problem.  This is a logistical problem created
 7   by the hurricane?
 8               MR. WITTMANN:
 9   Yes.  With the Clerk's office,
10   Your Honor.
11               JUDGE FALLON:
12   I will talk to the Clerk's office
13   and see whether or not I can expedite the
14   matter.
15   The Clerk's office is moving back
16   to New Orleans.  Hopefully they will be
17   established there very shortly.  I will talk
18   to them, if I have to, this week.
19               MR. WITTMANN:
20   One other thing in connection
21   with those documents.  If from now on people
22   who are filing Exhibit As or Bs or Cs, in
23   connection with the tolling agreements, should
24   send them to our office in New Orleans.  We
25   were operating out of our Baton Rouge office
□00005
 1   for the past two months, but have transitioned
 2   that back to New Orleans effective today.  We
 3   put a notice to that effect on File & Serve,
 4   as well.  We wanted everybody here to know we
 5   are operating out of the New Orleans office in
 6   terms of this case.
 7               JUDGE FALLON:
 8   Next item is the orders issued as
 9   a result of the hurricane.
10   Any comment on that?
11               MR. HERMAN:
```

102705.TXT
```
12    Various orders have been issued
13    by the presiding judge of the Eastern
14    District, by the governor of Louisiana, and
15    now by the Louisiana Supreme Court as regards
16    statute of limitations or prescription in
17    Louisiana and statutes of repose.  The Law
18    Institute has now suggested some amendments to
19    the Louisiana Civil Code, which I think will
20    only be binding on Louisiana cases;
21    nevertheless, counsels have concerns that any
22    of these orders may -- have concerns none of
23    these orders will affect the statute of
24    limitations issues in the MDL.
25          MR. WITTMANN:
```
00006
```
 1    I think we agree with that.  I
 2    think the Louisiana legislature is going to
 3    have a session starting November 6th to
 4    consider some of these problems.  I think the
 5    legislature can deal with it effectively.
 6          JUDGE FALLON:
 7    The third item is State Court
 8    trial settings.
 9          MR. WITTMANN:
10    Yes, Your Honor.
11    The Humeston case is underway, as
12    you know.  The evidence is closed.  The case
13    will be argued to the jury tomorrow, and the
14    verdict will be read when it comes.  We've got
15    the Zajicek case, if I am pronouncing that
16    right, set for trial March 20th in Jackson
17    County, Texas.  The Guerra case is set for
18    trial on April 17th, 2006, in Texas District
19    Court of Hidalgo County, and the Kozic case
20    set for trial in Hillsborough County, Florida.
21          JUDGE FALLON:
22    Let me comment about the cases.
23    I said this several times before, but I will
24    reinforce it this time.
25    This MDL Multi District
```
00007
```
 1    Litigation concept is a concept that was
 2    created to deal with multi-district cases.
 3    This particular case is a multi-district case.
 4    Suits filed throughout the country.  We have
 5    now about 148 class actions filed in every
 6    state in the union, and it looks like that the
 7    census will bear the prediction of the
 8    attorneys that there will be about another
 9    hundred thousand claims.
10    The MDL is particularly suited to
11    deal with a case of that type.  It's an
12    opportunity for the lawyers to have one
13    proceeding and develop all of the discovery in
14    that particular proceeding.  It's good for the
15    litigants.  It's good for the plaintiffs and
16    the defendants -- litigants in general.
17    A problem that has developed over
18    the years, which continually poses a challenge
19    to the MDL is to begin trying cases as quickly
20    as possible.  In this particular case, I have
21    been able to do that because the case has been
22    filed for several years before the MDL was
```
Page 3

102705.TXT

```
23   created.
24   There are many cases that are
25   ready for trial, and they are being migrated
```
000008
```
1    here so that I can begin trying them.  We try
2    a case in three or four weeks.  The first MDL
3    case will go for trial.  I set dates in
4    February, March, April, and May for other
5    cases to go to trial.  It's helpful, I think,
6    if the cases go to trial in this forum.  If
7    they go to trial in this forum at the end of
8    April; hopefully, we will have an opportunity
9    to sit down on both sides.  I will sit with
10   both sides and make some sense out of what the
11   juries have been doing with these cases.
12   Hopefully, out of that discussion will come
13   some programs to resolve the entire litigation
14   without the necessity of trial in every
15   particular case.  That's the aim of the MDL,
16   or at least one aim of the MDL.  The primary
17   aim, of course, is to create a forum for
18   discovery.
19   In this particular case, we might
20   also have another opportunity, because the
21   cases are not only ready to be discovered;
22   they are ready to be tried.  I want to give
23   the parties a forum to do that.
24   We've selected categories of
25   cases that are representative of all of the
```
000009
```
1    entire census of the case.  If we now select
2    cases that are representative of each of those
3    categories, we will have some intelligent way
4    of looking at the entire scope of the case.  I
5    think that opportunity is not there if you try
6    hundreds of thousands of cases one at a time
7    throughout this country and throughout the
8    State Court system.  The parties, the
9    litigants are different.  The lawyers are
10   different, and you don't have the opportunity
11   to look at a body of cases which we have in
12   the MDL.
13   So, I know there's an interest
14   always in looking at State Court as an
15   opportunity to try cases, but I suggest to the
16   parties that I am interested in trying to move
17   this case forward in the MDL format.
18   I am concerned that I am getting
19   information from the press and others that
20   indicate that there's a move afoot to work
21   outside of the MDL.  I think that is
22   counterproductive to the litigants.  I think
23   that is counterproductive to the lawyers, and
24   I am going to be particularly conscious of
25   that happening, and I am going to look at
```
000010
```
1    ways, both informal as well as formal for
2    moving this case through the MDL process so
3    that we can get a prompt resolution of the
4    entire litigation and not have this linger for
5    years.  I think the best way of doing that is
6    to try some cases in the MDL, so that's what
7    I'm doing.
```
                                Page 4

102705.TXT

```
 8          MR. HERMAN:
 9   Your Honor, Mr. Kline and
10   Mr. Balefsky for the Plaintiffs, and
11   Mr. Marvin for the defendants have had some
12   discussions.  Any argument on these issues,
13   Your Honor, is reserved following the status
14   conference.
15          JUDGE FALLON:
16   I will take that up following the
17   status conference.  Again, as I mentioned just
18   a moment ago, parties met at my direction.
19   They met and selected categories.  The
20   categories, the entire census of this
21   litigation, fall into several categories.  It
22   makes sense to me now to go forward and pick
23   cases that are representative.  First that are
24   ready for trial.  I don't want any cases that
25   are not ready for trial.  They are not going
000011
 1   to be helpful to us.  The purpose of trying
 2   the cases is to get information for the
 3   parties to deal with.  They must be ready, and
 4   they must be representative of that category.
 5   If they are ready and representative of that
 6   category, we should try them and see what
 7   juries -- how juries deal with that issue.
 8   The first thing is to pick the categories.
 9   That's been done.
10   Now we are at the stage of
11   picking the cases.  I will talk with the
12   parties at the appropriate time on that issue.
13          The next item is class actions.
14          MR. WITTMANN:
15   On class actions, we've got
16   several motions pending on class actions.  The
17   defendants filed a Rule 12 motion to dismiss
18   on the personal injury complaint and the
19   purchase claims complaint.  Those have all
20   been fully briefed.  Plaintiffs filed a motion
21   to stay of class briefing on the personal
22   injury complaint, and they filed a motion to
23   amend the master class action complaint for
24   medical monitoring and personal injury by
25   adding some class representative.
000012
 1   All of those motions have been
 2   fully briefed and are ready to be argued, and
 3   Merck requests they be set for argument at the
 4   earliest practical date.
 5          JUDGE FALLON:
 6   Let me hear from the Plaintiffs.
 7          MR. KLINE:
 8   Mr. Wittmann's only half right.
 9   The Rule 12 motion on the personal injury
10   complaint and the purchase claims complaint,
11   the Plaintiffs' response is due November 8th.
12   The other three motions:  The motion to strike
13   with regard to headless classes, the motion to
14   stay to mature the tort, and the motion to
15   amend to add plaintiffs for the headless
16   classes are ready for determination, those
17   three.
18          JUDGE FALLON:
```

Page 5

102705.TXT

19  I will set those by minute entry.
20  I will give you a date.
21  Discovery directed to Merck?
22       MR. HERMAN:
23  Yes, Your Honor.
24  I want to thank Arnold Levin and
25  Liz Cabraser who have done an excellent job in
00013
 1  charge of our Class Action Committee.
 2  There are several discovery
 3  issues, Your Honor, that are pending.  One has
 4  to do with prioritization, and we have a
 5  letter for counsel opposite we will deliver
 6  today setting forth priorities.
 7  The privilege log issue is still
 8  an issue of contest, even though there are
 9  certain issues that have been resolved by meet
10  & confer, and we can take those issues up
11  after the status conference.  A proposed order
12  on the Arcoxia and foreign discovery should be
13  in a form to present to Your Honor.  The date
14  of production of that discovery is still being
15  discussed, and hopefully that can be resolved
16  today.  The other discovery issues are further
17  on the agenda.
18       MR. WITTMANN:
19  I don't have anything to add to
20  that, Judge.
21  That sort of segues into the
22  next, which is the request for the production
23  of FACTS database, which is on target.  We
24  said we would produce in accordance with the
25  Court's order, and it's ongoing.
00014
 1       JUDGE FALLON:
 2  The next item is Vioxx
 3  professional representatives.  I made a ruling
 4  on that.  How's that working?
 5       MR. HERMAN:
 6  It's working fine.  Today I have
 7  with me the Bates stamped list.  I have
 8  assignments for each PSC member.  I returned
 9  the original list to the Court, along with an
10  assignment list that shows each PSC member's
11  assignment.  It's clear to the PSC, and Your
12  Honor made it clear that only PSC members and
13  their staffs will have access to the list
14  which I am distributing, and they may not be
15  disseminated to non-PSC representatives.
16       JUDGE FALLON:
17  That's clearly the intention of
18  the Court.
19       MR. WITTMANN:
20  I am going to submit a clarifying
21  order to Your Honor to make that perfectly
22  clear.
23       JUDGE FALLON:
24  Do that.
25  The discovery directed to the
00015
 1  FDA.
 2  Any problems with the FDA?
 3       MR. HERMAN:
                              Page 6

102705.TXT

```
 4   No problem, sir.
 5        JUDGE FALLON:
 6   I appreciate their cooperation.
 7   It's very helpful.
 8        MR. HERMAN:
 9   Thanks to Mr. Tici and
10   Mr. Rafferty for doing an excellent job.
11        JUDGE FALLON:
12   Discovery directed to third
13   parties.
14   Any issues there?
15        MR. HERMAN:
16   I received a letter.
17        JUDGE FALLON:
18   Discovery directed to third
19   parties?
20        MR. HERMAN:
21   Yes.
22   Mr. Tici received a letter from
23   Victoria L. Vance of the Cleveland Clinic
24   Foundation, in which the Cleveland Clinic
25   Foundation attempts to delay October
```
00016
```
 1   depositions to December, well past the
 2   beginning of the Irvin case.  We have been
 3   unable to resolve that, Your Honor, and we
 4   would like to issue subpoenas from the MDL,
 5   and if the Cleveland Clinic Foundation
 6   persists, its general counsel persists in not
 7   making the deponents available for deposition,
 8   we would like the subpoenas enforced by the
 9   MDL Court.
10        JUDGE FALLON:
11   Let me comment on that.
12   I want the parties who notice
13   depositions, particularly noticing doctors'
14   depositions, to first contact the doctors or
15   their representatives, and see whether or not
16   it can be done at a time convenient with their
17   schedule, as well as with your schedule.  I am
18   aware they are busy.  I am aware they have
19   matters on their agenda, but having done that,
20   if that is not workable, then you should
21   subpoena the doctors at a date and time that
22   is convenient with you.  Subpoena them and
23   bring the subpoenas to my attention.
24   I expect the doctors, or anyone,
25   for that matter, but in this case, the
```
00017
```
 1   doctors, to be present at the time that is
 2   required by the subpoena.  If they are not
 3   there, I will convene a meeting to show why
 4   they should not be held in contempt of Court.
 5   I will do it either here in Houston.  I will
 6   do it in New Orleans, or I will do it at their
 7   particular place of residence, wherever that
 8   might be.
 9   The MDL Court sits throughout the
10   country, and I will do that.  If they violate
11   a subpoena, they will have to explain it to me
12   and not to counsel.
13   When a subpoena is issued, it is
14   issued with the full power of the United
```

Page 7

102705.TXT
```
15   States Court and the United States Government,
16   and I expect them to be present at the
17   deposition.  I'll also send a copy of this
18   comment to the attorney, Ms. Victoria Vance,
19   at the Cleveland Clinic Foundation, 1950
20   Richmond Road, Cleveland, Ohio, 44124.
21        MR. HERMAN:
22   There is one other scheduling
23   matter, which Mr. Wittmann and I will argue
24   after the status conference, regarding the
25   detail of depositions.  Mr. Robinson chairs
```
000018
```
 1   our committee.  Mr. Lanier, Mr. Arsenault are
 2   also involved in the detail at issue, and we
 3   reserve that argument until after the
 4   conference.
 5        JUDGE FALLON:
 6   Plaintiff Profile forms and
 7   Merck's --
 8        MR. WITTMANN:
 9   As Russ mentioned, there is a
10   delay between the final entry on the written
11   transfer orders and the actual docketing of
12   cases in the MDL.  The delayed cases won't
13   have access to File & Serve until docketed
14   into the Court.  There have been questions
15   raised when the Plaintiff Profile forms should
16   be filed.  I have routinely been saying,
17   "Don't worry about the November 15th date.
18   Just do it on December 15th, and we will be
19   happy."  That seems to work, and we will
20   continue to do that.
21   I want to point out to counsel
22   present, and whoever may be on the telephone,
23   if anyone is on the phone this morning, that
24   we are getting some problems with the
25   completeness of both the Plaintiff Profile
```
000019
```
 1   forms and the Tolling Agreement forms.
 2   For example, in the Plaintiff
 3   Profile forms, we have 127 forms we received
 4   are just incomplete, based on the standards
 5   outlined in Pre-Trial Order 18B.  Actually,
 6   only about 19 of the Plaintiff Profile forms
 7   have the requisite information that Merck
 8   needs to do the most basic queries of its
 9   databases and systems.
10   Mr. Herman asked to be furnished
11   with a copy of our deficiency letter, and we
12   have been doing that.  We sent a deficiency
13   letter to each counsel who got a form that is
14   incomplete or inaccurate for some reason.  We
15   will in the future send copies of all of our
16   deficiency letters to Mr. Herman.  I want to
17   urge the lawyers filling in these forms to
18   give them attention and fill them in
19   accurately in the first place.  We can't do
20   our job of getting the Merck profile forms
21   prepared if we don't have accurate information
22   from the Plaintiffs going in.
23        JUDGE FALLON:
24   I want to give everybody an
25   opportunity to ask any questions, fill out any
```
Page 8

102705.TXT

000020
```
 1   forms.  If they are not certain, call liaison
 2   counsel.  Ask them about it.  It's important
 3   that you get the forms filled out correctly,
 4   because that's the first step to this
 5   discovery process, at least on that phase of
 6   the case.  Then Merck has to respond in a
 7   certain period of time thereafter, and they
 8   are not going to respond until they get the
 9   form filled out properly.
10   If after sufficient time,
11   sufficient cajoling and sufficient
12   encouragement, the forms are not filled out, I
13   will entertain a motion to dismiss the
14   particular case for failure to comply with
15   discovery.  I won't do that immediately.  I'll
16   give an opportunity to the parties to try to
17   work it out to urge them to fill it out and
18   give them an opportunity to fill it out.  If
19   it's not filled out properly after a certain
20   period of time, we will instruct the
21   Defendants to file a motion to dismiss that
22   particular case.
23          MR. HERMAN:
24   We appreciate Defendants'
25   willingness to send copies of the deficiency
```
000021
```
 1   letters.  More importantly than that is if the
 2   defense would outline for us the major
 3   technical objections and the major substantive
 4   so we can concentrate on that and at least
 5   provoke some responses as to those major
 6   issues.
 7          MR. WITTMANN:
 8   We can do that.
 9          MR. HERMAN:
10   Thank you.
11          JUDGE FALLON:
12   Remand issues.
13          MR. HERMAN:
14   None at this time, Your Honor.
15          JUDGE FALLON:
16   Tolling agreements.
17          MR. HERMAN:
18   As Mr. Wittmann indicated, the
19   extension of time that Mr. Wittmann has agreed
20   to is December 15th, 2005, and if there are
21   any further problems, they can contact
22   Mr. Wittmann in this regards, the Plaintiff
23   Profile forms used in connection with Tolling
24   Agreements.
25          MR. WITTMANN:
```
000022
```
 1   That's correct.
 2          JUDGE FALLON:
 3   The next item is State and
 4   Federal coordination with the State Liaison
 5   Committee.
 6          MS. BARRIOS:
 7   Good morning, Your Honor.
 8   The State Liaison Committee
 9   continues to be in contact with the
10   Plaintiffs' Steering Committee, particularly
```

102705.TXT
```
11    through Mr. Arsenault, Mr. Levin and Mr.
12    Davis.  We have worked diligently on the
13    remand project you ordered us to complete, and
14    I would like to thank all involved with that
15    project, to members of the State Liaison
16    Committee -- actually to members of your
17    staff -- Mr. Wynne has been particularly
18    helpful, your docket clerk, assisting us in
19    getting materials from PACER, and several
20    attorneys who aren't members of the State
21    Liaison Committee gave us a hand sending us
22    their remand pleadings.
23    I have prepared Your Honor today
24    for the Court, I have given the Plaintiff
25    liaison counsel and Defense liaison counsel a
```
□00023
```
 1    copy of a binder.  That binder is divided into
 2    states.  It lists all of the remand cases; the
 3    ones which have already been decided, the ones
 4    which are pending before Your Honor, and we
 5    broke down the various issues that you might
 6    address those issues when you see fit.
 7    There are various patterns that
 8    emerge from California with the parties naming
 9    McKesson as the defendant, to the usual naming
10    of doctors, healthcare providers, pharmacists,
11    sales representatives.
12    We are also, Your Honor, in the
13    process of preparing a CD-ROM which will have
14    it all hyperlinked for you, because of our
15    temporary offices, we were unable to burn that
16    for you today, but with your permission, I
17    will deliver it to your chambers in New
18    Orleans on Tuesday when you are back, and I
19    will provide copies to both liaison counsel,
20    as well.
21          JUDGE FALLON:
22    That will be fine.  We will
23    receive that.
24          MR. HERMAN:
25    Your Honor, I have one comment.
```
□00024
```
 1    I want to thank Dawn for doing her usual, very
 2    competent job, and Richard Arsenault for
 3    helping her coordinate.
 4    There have been some resignations
 5    from the State Liaison Committee.  We would
 6    like the opportunity, Your Honor, for the PSC
 7    to meet after our business today in the jury
 8    room so we can offer Your Honor some potential
 9    names for service on this committee.
10          JUDGE FALLON:
11    When you do that, let me also
12    say, Ms. Barrios, I appreciate your work on
13    this matter.  I create a State Liaison
14    Committee, and I am in favor of the concept --
15    I think that a State Liaison Committee can
16    play an important part in coordinating the
17    litigation, the federal litigation with the
18    states, and when we reach the point where the
19    matters clarify a bit when we get experience
20    and are able to look at it, the state cases
21    can hopefully be resolved short of trying
```
                         Page 10

102705.TXT

22    every case.  That is my hope.  That is what I
23    am working toward.
24    My concern, however, is that
25    people who may not be on the State Liaison
□00025
1    Committee can utilize the work that the State
2    Liaison Committee is doing, and the access
3    that the State Liaison Committee has in the
4    process to either derail or to make
5    problematic the process, the MDL process, and
6    I am concerned about it in this particular
7    case.
8    I don't know at this point
9    whether there is any particular action, but I
10    am hearing a lot of words, that, to me,
11    indicate that there is some potential move
12    afoot to inhibit the MDL process from
13    proceeding in an expeditious manner, and I may
14    have to rethink the position and the role of
15    the State Liaison Committee.  I am not there
16    yet.
17    I urge that the Plaintiffs submit
18    to me names of individuals who want to
19    participate in the MDL process; not
20    individuals who want to participate outside of
21    the MDL process.  If they are willing to
22    participate inside of the MDL process, I
23    welcome them.  I will make every effort to
24    make their lives easier in their vineyard.
25    But those who are not, I will
□00026
1    deal with in a different manner.
2            MS. BARRIOS:
3    Those members remaining on the
4    State Liaison Committee are committed to make
5    this the most successful MDL we possibly can.
6    We reach out constantly to other members of
7    the bar.  We had obviously been aware of the
8    press report that you reference, and I have
9    met in person and talked on the telephone to
10    the people I think who are the most prominent
11    members of the Texas bar.  Each and every one
12    of them is committed to do everything they
13    possibly can to coordinate with the MDL.  I
14    have today, Your Honor, a copy of Judge
15    Wilson, who is the Texas MDL judge, his most
16    recent case management order, and that case
17    management order is very telling, because it
18    directs the parties to coordinate with your
19    MDL.  He no longer is quashing any depositions
20    that are cross noticed.  If there is a Federal
21    MDL deposition that's taken of any deponent, a
22    Texas litigant may not retake that deposition
23    absent Court order.  He is falling into place
24    behind Your Honor.  He has adopted your MDL
25    Plaintiff Fact sheet requiring that to be used
□00027
1    and all of the authorizations.  I commend
2    Judge Wilson as well as the PSC and Mr. Fibich
3    who appeared before Your Honor in the past who
4    noticed counsel for the Texas MDL, and report
5    to you there is a cohesive group of the most
6    prominent Texas attorneys who are still in the
Page 11

102705.TXT

```
 7   same position they were a month ago, and that
 8   is to coordinate and assist the Federal MDL in
 9   any way possible.  They've asked to assist
10   with depositions.  They've asked us to
11   coordinate dates of depositions.
12   Mr. Arsenault was present at that meeting, and
13   he pledged to do so between the PSC and the
14   Texas MDL.
15   There are numerous instances in
16   this order, and I would like to hand it to
17   Mr. Wynne to provide it to Your Honor so that
18   you can be assured that the Texas MDL is right
19   behind Your Honor in prosecuting the case.
20            JUDGE FALLON:
21   I appreciate Judge Wilson's
22   willingness to work with the MDL.  That's very
23   meaningful to me.  I will do everything
24   possible to make his journey in this type case
25   easier for him.  We've plowed some ground.  We
```
000028
```
 1   will make any work product that I have
 2   generated or that has been generated in the
 3   MDL available to him for his use, and I do
 4   appreciate his help in this regard.
 5            MS. BARRIOS:
 6   Your Honor, the last matter is
 7   one of a message that Kathy Snapka, who has
 8   the Garza case in the remand pending before
 9   you, she is in trial today.  She called me
10   last evening to extend her apologies for not
11   being present today and to ask the report to
12   remember the Garza motion before Your Honor.
13            JUDGE FALLON:
14   I have it, and I am working on
15   it.
16            MS. BARRIOS:
17   Thank you, Your Honor.
18            JUDGE FALLON:
19   The next item is proces
20   claimants.
21            MR. HERMAN:
22   There is one more issue on
23   coordination.  Ms. Cabraser of the PSC has
24   been contacted by the Canadian counsel,
25   Canadian Court, and will provide Your Honor
```
000029
```
 1   with the name of the presiding judge and
 2   contact information and also whatever
 3   information she has on the attorneys that are
 4   proceeding with that.
 5            JUDGE FALLON:
 6   I would like to get the judge's
 7   name and his telephone number, and I will
 8   contact him, and I will be happy to work with
 9   the Canadian judiciary on this matter.
10   There also have been some cases
11   filed, I understand, in Great Britain and
12   maybe Italy or France.  I am not sure we heard
13   from any of those folks yet.
14   Anything on that, Mr. Herman?
15            MR. HERMAN:
16   Liz, why don't you step up.
17            MS. CABRASER:
```

Page 12

102705.TXT

18  Your Honor, there has been some
19  activity with respect to foreign claimants,
20  both overseas and in the U.S. courts. We are
21  trying to sort that out. I think there were
22  some complaints filed in connection with the
23  New Jersey proceedings. We don't know what
24  the outcome of those will be, and there has
25  been discussion of filing cases in overseas
000030
 1  fora, most notably Great Britain, and perhaps
 2  elsewhere. We will make every effort to
 3  apprise and report to Your Honor on the status
 4  of those proceedings so that any appropriate
 5  coordination initiatives can be implemented.
 6          JUDGE FALLON:
 7  Thank you.
 8          MR. HERMAN:
 9  With regard to proces claimants,
10  Your Honor, we continue to communicate with
11  and notify the proces claimants of their
12  rights. As is our usual practice, we advise
13  them they should seek counsel, and we have
14  given them the names of the attorneys who have
15  cases pending in the MDL in their particular
16  venue and jurisdiction for contact should they
17  desire to do so. They have also been informed
18  of the Court's website, and that these
19  conferences and status conferences are posted
20  for their information. If we receive a
21  specific request for specific information, we
22  have responded. We have not, however, had --
23  there's been a dearth of request for specific
24  information.
25          JUDGE FALLON:
000031
 1  Anything else we haven't taken
 2  up?
 3          MR. WITTMANN:
 4  No, Your Honor.
 5  You might want to announce the
 6  date for the next status conference.
 7          JUDGE FALLON:
 8  What's the --
 9          MR. HERMAN:
10  December 1st at 1:00.
11          JUDGE FALLON:
12  December 1st at 1:00 here in
13  Houston.
14  I will be trying the first Vioxx
15  case that week, the first week of the trial,
16  and I will take some time out and hold this
17  meeting. I will begin the general meeting at
18  1:00. I will meet with liaison counsel at
19  12:00.
20          MR. HERMAN:
21  Your Honor, may we have access to
22  the jury room after you conclude your business
23  today?
24          JUDGE FALLON:
25  Certainly.
000032
 1          MR. HERMAN:
 2  Your Honor, that ends the status

Page 13

102705.TXT
3    conference.  There are several matters for
4    argument.
5            JUDGE FALLON:
6    All right.  We will take a
7    five-minute recess.
8            (Brief recess.)
9            JUDGE FALLON:
10   We have three motions to take up.
11   Let's talk about the motion to compel on the
12   privilege log.
13           MR. HERMAN:
14   Your Honor, I asked Richard
15   Arsenault to argue for the PSC.  He and Drew
16   Ranier have been involved.
17           MR. ARSENAULT:
18   Your Honor, Richard Arsenault for
19   the PSC.
20   Your Honor, in preparing for this
21   argument, I tried to go through the documents
22   that Your Honor was provided with.  We had a
23   meet & confer regarding this in New York
24   several weeks ago.  We provided Your Honor
25   with a transcript of that.  Following that
□00033
1    there was a Plaintiff report to provide Your
2    Honor with some additional details regarding
3    the dispute.  There was a Defendant report.
4    That was followed with our motion to compel,
5    which was followed by the Defendant's
6    opposition, our reply to that opposition, and
7    last night we received the Defendant's
8    surreply.
9    We anticipated this problem three
10   months ago.  We sent a letter, and that's
11   attached to the transcript that was part of
12   the meet & confer we had in New York.  We
13   anticipated this very problem three months
14   ago.  We sent -- when I say "we," Mr. Herman
15   sent a detailed letter, some 20 pages
16   anticipating this very problem.  I would like
17   to go through three or four of the key issues
18   there.
19   We first brought to their
20   attention we reviewed the logs that had been
21   produced in New Jersey and wanted to bring to
22   their attention those which were problematic.
23   We specifically advised them that if these
24   were going to be produced in the MDL, they
25   would be insufficient.  We specifically
□00034
1    indicated that those logs would not satisfy
2    the requirements of Federal Rule of Civil
3    Procedure 26b5, and attached to the letter, we
4    gave some very specific examples of why those
5    would not be in compliance with Rule 26.
6            JUDGE FALLON:
7    They say now they are in the
8    process of doing that.
9    How do you answer that?
10           MR. ARSENAULT:
11   The problem with that, Judge, is
12   we are just weeks away from a trial.  We asked
13   for this three months ago.  Their offer last
                              Page 14

102705.TXT
14  evening to -- I think the term is "re-review"
15  or "dedesignate," is much too little and much
16  too late.  This is going to be of no
17  assistance to the people trying the case in a
18  few weeks from now.  These documents need to
19  be looked at.  If they are discoverable, these
20  are items that should have been given,
21  perhaps, to our experts.  They could have been
22  used in depositions.  They could have been
23  used in connection with Daubert practice.
24  They could have been used in connection with
25  expert reports.  It's too little too late.
□00035
 1      We pointed out all of the case
 2  law with regard to what is required in the
 3  initial letter we sent to them three months
 4  ago.  We sent them examples from Professor
 5  Rice's text on the kind of descriptions that
 6  you need in these things.  I think we've done
 7  all we can, and we've briefed this early.  If
 8  Your Honor has any questions, I will be happy
 9  to answer them.
10          JUDGE FALLON:
11  Let me hear from the other side
12  and talk with both of you-all.
13          MR. MARVIN:
14  Let me provide a few points of
15  clarification on the history here.  The timing
16  of the letter that Mr. Arsenault was
17  mentioning was the very end of July, and in
18  response to that correspondence, which
19  concerned a number of different discovery
20  issues, not just the privilege log, on August
21  19th, we advised Plaintiffs' counsel we were
22  in the process of re-reviewing the documents
23  that had been listed on the privilege log in
24  the New Jersey litigation, and that as soon as
25  we possibly could, we would be providing a
□00036
 1  revised list.
 2      In the meantime, we did rely
 3  upon, fundamentally, the list used in New
 4  Jersey.  But bear in mind, this is just
 5  discovery gearing up in the MDL proceeding at
 6  that point.  We relied on the New Jersey list
 7  but advising Plaintiffs' counsel that we would
 8  be making revisions to that list.
 9          JUDGE FALLON:
10  How do you deal with this problem
11  about the case just coming up in a couple of
12  weeks?
13          MR. MARVIN:
14  Well, Your Honor, that is a
15  product of trying to move, I think, toward
16  trial very quickly.  I think the way we can
17  deal with it is in the proposal we made last
18  night.  We are all going to be running 50
19  miles per hour to get done everything we need
20  to get done for that first trial, but that is
21  part of an accelerated trial process.
22  What we are proposing is that the
23  revised privilege log will be provided to the
24  Court and to opposing counsel on Monday,
                        Page 15

```
                               102705.TXT
25    November 7th.  We will begin a rolling
□00037
 1    production of the documents that are being
 2    released as a result of that re-review next
 3    week, and we will complete that production by
 4    November 11th.
 5    And, Your Honor, I think with
 6    respect to, I believe at the last status
 7    conference, you mentioned the Court would have
 8    an interest in doing a random review of the
 9    documents.  What we said in our briefing last
10    night is that as soon as the log is in the
11    Court's hands, we will get to the Court within
12    24 hours whatever random selection of
13    documents It wishes to review.  We will make
14    the commitment to get that to you very
15    promptly.
16    But this is not a process, Your
17    Honor, of trying to withhold documents or
18    anything.  This is a process that we told
19    Plaintiffs we would be going through.  We have
20    been trying to deal with this as well as the
21    other priority document productions that
22    Plaintiffs have sought, and admittedly this is
23    a compressed process, but that is our proposal
24    to deal with that.
25              JUDGE FALLON:
□00038
 1    So there are two issues before
 2    me:  One is the general MDL discovery.  That
 3    is an easier one to deal with than the Irvin
 4    case that is coming up in three weeks.  That
 5    concerns me, because some of those documents
 6    may be germane, may be relevant, may be of
 7    interest to the Irvin litigants, and I am
 8    trying to deal with that aspect.  What is the
 9    solution to that problem.
10              MR. MARVIN:
11    Your Honor, I think that, as I
12    said, we will begin the production of any
13    additional documents that flow out of that.  I
14    think that a couple of things I should note is
15    that I am not -- I don't think it is fair to
16    state at this point that there is a large
17    number that are going to be of any great news
18    to Plaintiffs' counsel.  A lot of the
19    production is going to be duplicative of
20    materials that have been.  We have done cross
21    checks of documents that have been produced.
22    In a large document production, people may
23    have changed position over time, maybe several
24    years of this production going on, and so some
25    of these are documents we are releasing now
□00039
 1    Plaintiffs already have.  I can't give you the
 2    precise percentages on this.
 3    I think, Your Honor, the approach
 4    is we get them the documents as soon as we
 5    can, and we will need to respond, Your Honor,
 6    if there is follow-up and so on, which we are
 7    committed to do on these issues to make sure
 8    that gets done before the Irvin trial gets
 9    started.
                                    Page 16
```

102705.TXT

```
10          JUDGE FALLON:
11   Let me talk to the Plaintiffs.
12                  How do I deal with this with the
13   Irvin trial?
14          MR. ARSENAULT:
15   Quite frankly I am not sure, Your
16   Honor.
17          JUDGE FALLON:
18   We have several thousand
19   documents.  We are talking about 50,000
20   documents, or thereabouts?
21          MR. ARSENAULT:
22   Yes, Your Honor.
23   Certainly one of the options
24   available to Your Honor is that they waive the
25   privilege.  Three months ago, very clearly, we
000040
1    indicated to them, and cited the Paps case out
2    of the Eastern District and advised if we got
3    the same log here we got in New Jersey, it
4    would not comply with the federal rules, and
5    we cited to them a number of cases that stood
6    for the proposition that if we got the same
7    kind of New Jersey log here, they would be
8    risking waiving the privilege.  That is
9    certainly an option.
10   Another option we brought to Your
11   Honor's attention is we've identified eight
12   specific categories that we think are
13   problematic and a corresponding list of Bates
14   numbers of documents that fall into those
15   categories which Your Honor or a designee or a
16   Special Master or one of your magistrates
17   might look at in camera to determine the
18   efficacy of the privileges asserted for those
19   categories, and perhaps Your Honor could make
20   rulings category wide with regard to those.
21                  Those are some of the
22   suggestions, but quite frankly, we worked very
23   hard for three months now to get to a point to
24   where we would be able to intelligently
25   determine whether these privileges have been
000041
1    appropriately asserted, and we've gotten
2    nowhere.
3          MR. MARVIN:
4    Your Honor, if I may, there seems
5    to be an assumption operating here that there
6    is a substantial problem with the list that
7    was provided in New Jersey.  As in any major
8    document production, we volunteered to go
9    through and tried to respond to the issues the
10   Plaintiffs made to add to the log and also to
11   go through to identify documents where we can
12   that we believe can be released.
13   To suggest there has been some
14   default here with the overall privilege log I
15   think is absolutely wrong.  This issue was
16   raised with us at the end of July.  In
17   addition to doing everything else we have been
18   having to do on the production front, we have
19   worked on this issue.  The solution of you
20   release all of the privileged documents
                        Page 17
```

102705.TXT

21  doesn't help with respect to the Irvin trial.
22  That makes it more of a problem.
23         JUDGE FALLON:
24  With the overall case, what I
25  would do with the overall issue is that I
□00042
 1  would order the Defendants to produce, in
 2  camera, the documents that are privileged and
 3  designate them by the eight categories that
 4  you-all apparently feel they fit into.  I
 5  would then have a Magistrate randomly select a
 6  representative sample from each of those
 7  categories and give it to me.  I review that
 8  random sample, and if the Defendant, who has
 9  the burden, sustains the percentage of the 51
10  percent of the documents, then I would declare
11  that area privileged.  If the Defendant fails
12  to do that, then I would deny the privilege.
13  That would be a way of handling
14  the general approach.  It's not like looking
15  at each document.  I don't mind looking at
16  each document if there is a reasonable amount,
17  but I am not going to be able to look at
18  80,000 documents.  It doesn't make sense to
19  me.
20  My concern is the Irvin case.  I
21  don't know how to deal with Irvin and get them
22  to have some feeling that they have done their
23  due diligence looking at the documents.  How
24  do I deal with that?  That's what I am
25  struggling to find the solution to.
□00043
 1  Are there any documents that are
 2  more germane to Irvin?
 3         MR. MARVIN:
 4  Not that I am aware of, Your
 5  Honor.
 6         JUDGE FALLON:
 7  How about Plaintiff?
 8         MR. ARSENAULT:
 9  Obviously, Your Honor, there is
10  no way for us to know that.  We don't know
11  what documents are in there.  That is exactly
12  why, Judge, three months ago, even before the
13  privilege log was due, we anticipated this
14  problem.  We knew from the beginning of the
15  MDL that Your Honor was going to tee up a
16  trial early on.  We wanted to get a look at
17  those privilege logs early on and get some
18  resolution.
19  Weeks before the privilege log
20  was due we went into tremendous detail.  We
21  outlined the law.  We gave them specific
22  examples of the problems with the New Jersey
23  log and said, "Please, don't send us that New
24  Jersey log.  It's inappropriate, inadequate
25  and doesn't comply with Federal Rule 26."
□00044
 1  Despite that, here we are three months later,
 2  and all that has fallen on deaf ears to the
 3  detriment of what's happening in the Irvin
 4  trial.
 5         MR. MARVIN:
                                    Page 18

102705.TXT

```
 6    Your Honor, I am a little
 7    puzzled.  It seems to me there are several
 8    issues.  The documents for which there is no
 9    claim for privilege going forward, they will
10    have those documents next week.
11             JUDGE FALLON:
12    Let's do that by the 3rd, and I
13    will hear from the parties by way of telephone
14    on the 4th.  Give me a conference, a telephone
15    conference on the 4th, and I will decide what
16    to do from their standpoint.
17    I want you-all to think about the
18    Irvin case as well as the overall matter.  The
19    overall aspect I can deal with at least by
20    procedure that I am comfortable with.  I don't
21    know how I will deal with that with the Irvin
22    case.
23             MR. HERMAN:
24    Your Honor, may I be heard for a
25    minute?
```
□00045
```
 1             JUDGE FALLON:
 2    Sure.
 3             MR. HERMAN:
 4    I don't know what can be done
 5    about the Irvin case.  It may be water under
 6    the bridge.  I know we are entitled to a
 7    Federal Fifth Circuit privilege log.
 8    Now, maybe they can't get us a
 9    Fifth Circuit privilege log by November 3rd or
10    December 15th or whatever, but the one thing
11    that we would like the Court to rule on is
12    that we are entitled to a true privilege log.
13             When matters are set in camera,
14    Plaintiffs play blind man's bluff.  We don't
15    know if we are dealing with a trunk or a leg
16    of an elephant.  All we have to go by is a
17    privilege log that the rules require.
18             JUDGE FALLON:
19    I got the point.
20    What is your situation with that?
21             MR. MARVIN:
22    Your Honor, that's what I was --
23             JUDGE FALLON:
24    I thought you agreed with him.
25             MR. MARVIN:
```
□00046
```
 1    We agree with that.  We believe
 2    that the log that was produced earlier
 3    complied, but we are trying to make changes to
 4    it, to address issues Plaintiffs have raised
 5    and provide that by Monday, November 7th.
 6             JUDGE FALLON:
 7    That's what I need by that
 8    Thursday.
 9             MR. MARVIN:
10    By the 3rd?
11             JUDGE FALLON:
12    The 3rd.  That, and which
13    documents are not being asserted privileged.
14             We all know because we've been
15    there.  We've done that.  When you are looking
16    at logs, when you are looking at documents of
```

102705.TXT
17  this nature, this number, you've got a staff
18  of thousands to look it at, and when in doubt,
19  they make it privileged.  They are generally
20  not lawyers.  It doesn't mean they are not
21  good, but it just means they are looking at it
22  from a different vantage point.  So when in
23  doubt, they put a privilege on it.  But some
24  lawyers have to look at it and deal with it.
25            The privilege really is -- the
00047
1  focus has to be on the document, whether it
2  seeks legal advice, whether it receives legal
3  advice, whether it's acting on legal advice,
4  whether it's passing on legal advice from one
5  employee to another employee.  That is what's
6  necessary.
7  It can be waived.  It has to be
8  done by attorneys who are meting the legal
9  advice.  While the attorney is the attorney
10  for the party, that information has to be
11  confidential.  It's hard to generalize and say
12  that it's not necessary clearly for the
13  attorney to sign the document.  If it's
14  information that is being passed on from one
15  employee to another passing on legal advice
16  that that person got from the attorney, that
17  may well be covered.  The fact that an
18  attorney signs something does not mean that it
19  is within the privilege.  It has to be legal
20  advice.  It can't be commenting on the weather
21  or something that is not significant.
22  We all know the scope of the
23  privilege.  We are not dealing with, at this
24  point, whether it's admissible into evidence.
25  We are dealing at this point whether it is
00048
1  discoverable, whether it has anything to do
2  with an issue for defense in the lawsuit.
3  It's broader and a hard row to hoe for the
4  person who's urging the privilege, but it is a
5  privilege, and it is a legitimate privilege,
6  and I recognize that.  But you have to be
7  descriptive, and if you are not descriptive,
8  then I am going to say it is not descriptive
9  enough.  It's just discoverable.  You've got
10  to be descriptive.
11  I will talk to the parties, as I
12  said, by phone on that Friday.  Give me a copy
13  of what you give to the Plaintiffs.  That will
14  be resolved one way or the other at that time.
15        MR. HERMAN:
16  If counsel will permit, Your
17  Honor, if you would serve me and Mr. Arsenault
18  who have carried the ball on this with those
19  responses, I would appreciate it.
20        JUDGE FALLON:
21  We talked a little bit about the
22  cases being set for trial.  You wanted to say
23  something for the record in this regard.
24        MR. HERMAN:
25  Your Honor, the Plaintiffs' and
00049
1  Defendants' committees have had some
                    Page 20

102705.TXT
```
 2   productive discussion this morning with
 3   alternatives.  We would like to have further
 4   discussion with   Mr. Marvin and Mr. Wittmann
 5   about case selection.  Mr. Kline and
 6   Mr. Balefsky are going to look into a
 7   suggestion that Mr. Marvin made and see if we
 8   can come to an agreement, and in addition to
 9   that, Mr. Marvin and I have discussed some
10   Louisiana stroke and MI cases that I am going
11   to endeavor to cull through with Louisiana
12   attorneys and see which plaintiffs and which
13   plaintiff physicians may be available for
14   trial.
15          JUDGE FALLON:
16   As I said earlier on, we are at
17   the stage where we have to try cases, and I am
18   going to be trying cases.  There is no
19   question we are going to be trying cases
20   shortly.  One of the first steps, as I
21   mentioned earlier, was to pick the categories.
22   We are not interested in trying cases so that
23   we can just keep trying cases, thousands and
24   thousands and thousands of cases.  We are not
25   going to be here long enough for that.  We
```
000050
```
 1   have to begin this journey with the view that
 2   the purpose of it is to resolve those several
 3   cases.  That's one purpose.  But the other
 4   purpose has to be to see whether or not that
 5   can be productive to resolving the whole group
 6   of cases.  That's what I am interested in in
 7   trying to give you information so that both
 8   sides can look at it in three or four months
 9   and say:  What have we learned from this, and
10   get something from it and see whether or not
11   we can take a look at this whole group of
12   cases with that intelligence behind us.
13   To do that, we need cases that
14   are ready for trial.  Even if they are
15   wonderful cases and very descriptive and would
16   be informative, if they are not ready for
17   trial, we can't deal with that.  The purpose
18   is not to just hurry up and try cases.  We
19   have over a hundred thousand of them to do.
20   You can't resolve it that way.  I need cases
21   that are ready for trial.
22   Who is best at that?  The
23   litigants.  You folks who have been doing it.
24   You have to know which cases are ready for
25   trial.
```
000051
```
 1   Also, I would hope you would know
 2   which cases are instructive.  We don't want to
 3   try the case if it's the only case of its
 4   kind.  What do you get out of that other than
 5   just a couple of weeks of trial?  That doesn't
 6   make sense to me.  I am looking to you-all to
 7   deal with that, but you've got to have a
 8   meeting of the minds on it.  You can't say:  I
 9   want to try the "X" case, and they say:  If
10   they want to try the "X" case, we don't want
11   to try the "X" case, because they picked the
12   "X" case because it's the best case for them.
```
                                        Page 21

102705.TXT
13   We want to try the "Y" case.  And the other
14   side says the same thing about them.  You have
15   to listen to each other and talk it out.  If
16   you can't do it, then I will do it.  My
17   solution is not going to be as sound as your
18   solution.
19   I felt this morning in talking
20   with both sides that there was some renewed
21   interest in trying to do that, and I would
22   urge that be done.
23   When can I hear from the parties?
24         MR. HERMAN:
25   Next week, Your Honor.
000052
 1         JUDGE FALLON:
 2   Let's do that by Friday, too.
 3                The motion to defer depositions.
 4   The Merck employees.  I think that is your
 5   motion.
 6         MR. MARVIN:
 7   Yes, Your Honor, it is.  I
 8   believe there is correspondence before the
 9   Court that was issued, but let me very briefly
10   note that Plaintiffs noticed depositions for
11   seven Florida sales representatives, former
12   sales representatives, in early November.  The
13   notices, I would note, Your Honor, are rather
14   curious.  If you look at the document demand
15   that went with the subpoena or with the notice
16   of the deposition, it refers to a request for
17   information, in many cases about a plaintiff's
18   prescribing physician, as though it were part
19   of some particular case where this information
20   was being sought.  But the notice itself says
21   that it's for purposes of all cases, and
22   nowhere in the notice is there reference to
23   any particular individual case for which the
24   notice is being issued.
25   We are left with some confusion
000053
 1   about what is the purpose of these
 2   depositions.  Mr. Herman's response to Your
 3   Honor on this doesn't clear it up much.  It
 4   says in there that the plaintiff in the
 5   scheduled trial was residing in Florida at the
 6   time of ingestion of Vioxx, referring to the
 7   Irvin case.  "There is no reason to consider
 8   to continue those depositions whether they are
 9   taken in connection with the upcoming trial or
10   otherwise."  That doesn't exactly clarify it,
11   either.
12   I think the point here is as
13   follows:  To the extent these depositions are
14   intended to be used in the Irvin case,
15   discovery in that case is closed.  In any
16   event, none of the sales representatives had
17   anything to do with the Irvin case.  They
18   didn't call on any of the physicians that were
19   prescribing to Mr. Irvin.
20   If they are not attached to that
21   case, then the purpose is completely unclear
22   at this point.  What we are asking, Your
23   Honor, is that, given the fact we are to be
                                          Page 22

102705.TXT
```
24  focusing on getting ready specific trials, we
25  believe that when it comes to sales reps, we
000054
 1  ought to be doing the depositions of the sales
 2  reps who are involved in the cases that are
 3  scheduled for trial coming up to get those
 4  done.  Those are related to a particular
 5  matter.
 6  To be willy-nilly and just going
 7  out taking sales reps depositions, seven in
 8  Florida in this instance, really doesn't
 9  connect to anything that is of urgency in this
10  case, and we think that is a rule that should
11  be adopted as we are doing these in connection
12  with the cases that are being scheduled for
13  trial.
14          JUDGE FALLON:
15  I read the parties' comments.
16  The way I understand they are approaching this
17  is they feel that you have urged learned
18  intermediary and various other defenses that
19  knowing what the representatives knew and who
20  they told and whether or not they should have
21  told or whether or not they should have said
22  something differently is germane to those
23  particular issues and those particular
24  defenses.
25  You make the point -- it's a
000055
 1  valid one -- that it's more instructive to
 2  find out what the sales reps of that
 3  particular case said or knew or could have
 4  known or should have said.  On their side of
 5  it they say:  Well, then the other aspect of
 6  the depositions are for credibility purposes
 7  to test that person.  He says he knew
 8  something.  If he didn't know something,
 9  everybody else knew it.  He must have known,
10  so that is a valid point, also.
11  It seems to me, and I am mindful
12  of the fact that one problem in this
13  particular issue is having to take the same
14  depositions generally and then having to take
15  the deposition specifically.  That's adverse
16  to the purpose of the MDL, but it's hard to
17  rule that they don't have a right in the
18  discovery process to take the depositions of
19  somebody who may shed some light or that deals
20  with an issue or a defense in a lawsuit,
21  particularly a defense.  It's a significant
22  defense in all drug cases.
23  I think that the depositions are
24  discoverable or appropriate and should go
25  forward, but it seems to me that in scheduling
000056
 1  the depositions, it makes more sense to me to
 2  begin taking depositions in those cases that
 3  are set for trial.   I am not saying that I am
 4  going to rule that you can't take other
 5  depositions in other cases.  That you are
 6  going to not be able to take the reps involved
 7  in other cases, but it seems to me that the
 8  way to start this is to take all of the reps
```
                                Page 23

102705.TXT
```
 9   who are involved in the cases where we have
10   the trial and then look at it.  If you need to
11   take other reps that are not in cases that are
12   set for trial, that may be doable.  It doesn't
13   seem to be as urgent as the first ones.
14        MR. HERMAN:
15   If it please the Court, with all
16   due respect, our perspective is very
17   different.  Very different.
18   We raised this issue in June.  We
19   indicated to the Defendants that we had not
20   had the opportunity in any pharmaceutical case
21   to destroy the learned intermediary defense,
22   which is the most vicious defense.  It's a
23   defense that the Fifth Circuit adopted and
24   written in concrete.
25   The only way to deal with that
```
□00057
```
 1   defense is to show that there was a nationwide
 2   directive by Merck to its detailers to subvert
 3   the truth to physicians, hospitals, and the
 4   medical community.
 5   We sought detailer information as
 6   early as June.  We finally got the detailer
 7   information.  The original order that the
 8   Defendants consented to said they were
 9   perfectly willing to double track depositions.
10   They have listed 300 law firms, 30 of them in
11   this litigation.  30 law firms have appeared
12   one way or the other with more than 8,700
13   attorneys.
14   I don't think there is any
15   relationship between the Irvin case.  Counsel
16   says that the Irvin case discovery is over
17   with.  Let's suppose we set, and I hope we
18   can, a trial every two months in the MDL.  Are
19   we ever going to get to this issue?  Will the
20   discovery of detailer information in a single
21   case destroy the learned intermediary defense
22   that's been alleged in every one of their
23   cases?  No, because we have to show a
24   nationwide pattern.
25   We listed well in advance seven
```
□00058
```
 1   depositions in Florida.  It's not incumbent
 2   upon us to tell them what our thinking is,
 3   what our strategy is, and by citing only a
 4   portion of the subpoena for documents doesn't
 5   really give the flavor of what we believe we
 6   have to do as plaintiffs.  I point out that
 7   the only way this can be done is in an MDL.
 8   It cannot be done in State Courts on a
 9   state-by-state basis.  This gives the MDL a
10   rightful plaintiff discovery which adds weight
11   to the efforts that we are doing here.  They
12   could dismiss cases, have cases thrown out on
13   learned intermediary issue, because we haven't
14   had sufficient time to take depositions, and I
15   don't think they ought to be linked to
16   specific cases.  If it has to do with a
17   specific case Mr. Kline is handling, they can
18   notice those depositions and take them with
19   the trial teams they have got.
```
                                    Page 24

102705.TXT
```
20   Your Honor has preached that MDLs
21   be open to lawyers across the country to
22   participate, submit their hours.  We have 60
23   lawyers in training sessions.  We have had to
24   hire two outside counsel for ethics opinions
25   as to whether we could statementize or take
```
00059
```
 1   depositions of former detailers.
 2   We have done all that work.  We
 3   are ready to roll now.  We are ready to give
 4   the 60 or 70 lawyers that want to work in the
 5   MDL work to do that is meaningful directed at
 6   a defense that, in all due respect, is
 7   vicious.  It says that an HMD physician with
 8   ten minutes with a patient has to read a label
 9   every time something comes out and warn every
10   patient that goes through his office, and they
11   don't do it.  They haven't done it for me.
12   They haven't done it for anybody in this room.
13   We never get warnings.  The physicians can't
14   read the warnings they are so long and
15   convoluted.
16   This was an archaic defense that
17   has grown into a poisonous tree, and we mean
18   to chop it down if we are allowed.  I don't
19   see any reason why seven depositions that have
20   been noticed in the State of Florida can't go
21   forward and then in Ohio and Pennsylvania and
22   Louisiana and every state.  At least we need
23   the opportunity in the MDL to take on this
24   defense fairly and squarely for the first time
25   in pharmaceutical litigation.  That's what we
```
00060
```
 1   are asking.  They got plenty of lawyers.  They
 2   have more lawyers than we do.  We've got 60
 3   lawyers to deal with this issue.
 4   I respectfully ask Your Honor
 5   that we be allowed to double track as the
 6   order originally said, to notice depositions
 7   fairly in advance, and send our folks out in
 8   the field to take depositions that are
 9   germane, that are relevant, that will lead to
10   discoverable and admissible evidence.  I
11   understand why the Defendants would like to
12   delay it.  They have been delaying it for 40
13   years now.  The time has come to deal with the
14   learned intermediary issue.  And, Your Honor,
15   we believe this is the case to deal with it.
16        JUDGE FALLON:
17   Let me hear from the Defendant.
18        MR. MARVIN:
19   Well, Your Honor, I think that
20   the rhetoric here about trying to change the
21   law of the Fifth Circuit or any other circuit
22   on this issue is interesting.  We have a hard
23   core discovery issue to deal with here.  What
24   I hear counsel saying is we will take seven
25   depositions in Florida.  If I understand
```
00061
```
 1   correctly, now we are talking about doing that
 2   in 50 states with 350 depositions.
 3   There needs to be some sort of
 4   program and priority here.  You can double
```
Page 25

102705.TXT

5  track these, but we are not going to get
6  anything else done that needs to be done in
7  these cases.  That's why it's not clear to me
8  the relevancy of depositions of what sales
9  reps told physicians in Florida when you have
10  a case coming out of Ohio or other
11  jurisdiction.  What is relevant to a
12  particular case, what may be relevant in the
13  case is the communication of the sales reps
14  for the prescribing physicians in that
15  particular case.  There may be some back drop
16  for this, but I think it's, among other
17  things, we have a real question of
18  proportionality here about how many of these
19  depositions are going to be taken and when
20  they are going to be fit into the priority.
21            We seem to be in a mode here
22  where everything is top priority.  We need all
23  privileged documents.  We need all other
24  documents.  We need 350 depositions.  There is
25  a limit to how many different things can get
□00062
1  done at the same time, and that is part of the
2  problem we are facing here.
3            JUDGE FALLON:
4  I understand the issue.  I am
5  going to allow him to go forward with the
6  seven in Florida.  I do urge, though, that
7  counsel take a look at prioritizing the reps,
8  just from the standpoint of making sense.  It
9  makes sense to me that some thought be given
10  to prioritizing.  But insofar as the ones in
11  Florida, I will grant the motion to take those
12  depositions.  If it becomes a problem from the
13  standpoint of burdensome, if it becomes a
14  difficulty with taking depositions that have
15  no rational basis, I will entertain a motion
16  to do something about it.  Insofar as these
17  depositions, they seem to me to be relevant on
18  the issues that Counsel have brought up and
19  made in the pleadings.  I am going to grant
20  that motion.  Anything further?
21  Thank you very much.
22
23        *    *    *
24
25
□00063
1
2            REPORTER'S CERTIFICATE
3
4
5       I, NANCY LAPORTE, Certified Court
6  Reporter, State of Louisiana, do hereby
7  certify that the above-mentioned witness,
8  after having been first duly sworn by me to
9  testify to the truth, did testify as
10  hereinabove set forth;
11       That the testimony was reported by me in
12  shorthand and transcribed under my personal
13  direction and supervision, and is a true and
14  correct transcript, to the best of my ability
15  and understanding;

Page 26

102705.TXT

16          That I am not of counsel, not related to
17     counsel or the parties hereto, and not in any
18     way interested in the outcome of this matter.
19
20
                    NANCY LAPORTE
21                  Certified Court Reporter
                    State of Louisiana
22
23
24
25